# APPENDIX A

### APPENDIX A - FACTUAL BACKGROUND

**A.   At-Will Employers Time Warner Cable and Charter Communications Merge in May 2016 and Create Brand Name of Spectrum Business.**

Charter Communications, Inc. ("Charter") is a broadband communications company providing video, Internet, and voice services to residential and business customers. Ex. 1, Kodama Dec. ¶ 2. It also is the second largest cable operator in the United States. *Id.* Since late 2016, Charter has sold its cable and telecommunications services under the national brand platforms known as Spectrum, Spectrum Business, and Spectrum Enterprise. *Id.* at ¶ 5. Spectrum Business in particular provides scalable, tailored, and cost-effective broadband communications solutions to commercial customers, such as business-to-business Internet access, data networking, business telephone, video, and music entertainment services, and wireless backhaul. *Id.* at ¶ 3.

On May 18, 2016, Charter officially merged with Time Warner Cable ("TWC"). *Id.* at ¶ 4. As a result of this transaction, Charter became the new public parent company and holds now the operations of both combined companies. *Id.* At all times relevant to this lawsuit, both TWC and Charter have maintained employment-at-will policies and have employed most of their workforces on an at-will basis. Ex. 2, Hennings Dec. ¶ 4; Ex. 3, Standards of Business Conduct.

**B.   Plaintiff Jeffrey Fadness Was an At-Will Account Executive II Selling Under the Spectrum Business Brand Name.**

TWC hired Plaintiff Jeffrey Fadness in January 2014 as an Austin, Texas based Account Executive II, a non-management commercial sales position. Ex. 2, Hennings Dec. ¶ 3. Fadness remained in that position through the TWC-Charter merger and continued selling to commercial customers in the Austin area after the merger under the Spectrum Business brand name. Ex. 1, Kodama Dec. at ¶ 4-5; Ex. 2, Hennings Dec. at ¶ 3; Ex. 4, Fadness Dep. 53:6-21, 92:21-22. From the beginning of his employment in January 2014 with TWC through his resignation of employment in December 2016 with Charter, Fadness was at all times considered an at-will

1

employee.  Ex. 2, Hennings Dec. at ¶ 4; Ex. 5, Fadness Offer Ltr.; Ex. 4, Fadness Dep. at 28:20-24.

### C.  Fadness Struggles to Meet his Sales Quota and Complains about Various Aspects of His Job.

Throughout his employment, Fadness voiced his displeasure with various components of his job and appeared to have consistent problems meeting his sales quota.  In fact, in March 2015, Fadness received a written warning due his deficient sales performance.  Ex. 4, Fadness Dep. at 96:6-22, 97:10-99:10; Ex. 6, 2015 Written Warning.  As noted therein, Fadness had a three-month rolling sales average of only 28%, which included zero sales for the month of January.  Ex. 6, 2015 Written Warning.  His sales performance improved slightly during the remainder of 2015, but only reached at its peak a three-month average high of 62%.  Ex. 7, 2015 Sales Scorecard.  The first half of 2016 reflected sales similar to 2015, with Fadness's three-month rolling average sales ranging from a low of 22% to a high of 56%.  Ex. 8, 2016 Sales Scorecard.

On May 27, 2016, Fadness emailed his then-management team regarding objections he had to possibly being converted as a result of the merger to an Account Executive I.  Ex. 9, May 2016 Email.  Ultimately, Fadness as well as other proposed Account Executive IIs were not so converted.  Ex. 4, Fadness Dep. 92:19-93:14; 104:14-17.  In his email to management, however, Fadness also complained about other aspects of his employment.  In doing so, he indicated in particular that his "personal business interest lies in larger, more complex transactions—which is evident with the majority of my sales being Fiber—and the vast majority of my professional experience being in complex, multi-million dollar capital machinery sales in both territory management and 20+ years in executive management roles."  Ex. 9, May 2016 Email.[1]  He also

---

[1] The attachments to Exhibit 9 are not included due to their volume and the lack of material relevance to the Motion for Summary Judgment itself, but will be submitted to the Court upon request.

detailed concerns he had over his newly assigned territory and whether it contained a sufficient amount of viable business customers. *See id.*

**D.     Fadness is Assigned a New Sales Manager and Learns of Forthcoming Changes.**

In early June 2016, Fadness was transferred to a different sales team, and Ryan Voigt became his direct supervisor. Ex. 4, Fadness Dep. 92:2-4. According to Fadness, Voigt's team "was the kind of team that goes out and generates new business." *Id.* at 95:20-22. Voigt, for his part, was a relatively new Sales Manager, having just been promoted in January 2016. Ex. 10, Voigt Dep. 14:8-15:17.

While walking into a weekly meeting together not long thereafter, Voigt purportedly mentioned to Fadness that, due to the merger, things would be changing across the company—some for the better and some that were "not so great." Ex. 4, Fadness Dep. at 82:19-83:4. When Fadness asked what he meant, Voigt allegedly said, "Well, how do you feel about door knocking?" *Id.* at 83:5-6. To Fadness, "door knocking" was "what they call … door-to-door solicitation." *Id.* at 83:5-8. Fadness purportedly responded, "Well, the problem with door knocking is probably 95 percent of every business in this area or certainly every commercial building has a 'no soliciting' sign." *Id.* at 83:9-12. Fadness admits there was no requirement to go door-to-door at this point; rather, according to Fadness, Voigt merely mentioned such to give a "heads-up, this is kind of what's coming down the pike." *Id.* at 83:12-84:15, 87:3-12. During this conversation, Voigt also advised Fadness that, going forward, sales would likely be based, not on revenue generated, but rather on "units of sales," meaning it no longer would "make any difference the value of the contract." *Id.* at 84:9-15.

**E.     Fadness Sends Email to New Sales Manager Expressing Concern with Changes.**

Before transferring to Voigt's team, the only instruction provided to Fadness about "going door to door" was to "[a]scertain who the occupants of the building were so [he] could contact

3

them." *Id.* at 125:4-13.  However, on July 8, 2016, Voigt emailed his entire sales team referencing upcoming changes that would be occurring, including that all Account Executives would have a target of making thirty new business contacts each day.  *Id.* at 88:4-89:3; 128:3-129:13; Ex. 11, July 8, 2016 Emails, F53-54.  Of all of team members, Fadness alone became concerned about this strategy and sent an email to Voigt outlining his concerns later that same day.  *See* Ex. 11, July 8, 2016 Emails.  In his email, Fadness complained that, in his mind, business development would be difficult due to the limited types of customers to which he could sell and "because his territory is spread out across many miles throughout 18 zip codes [in the Central Texas region] and much of it is rural."  *Id; see also* Ex. 12, Territory Zip Codes (listing the 18 zip codes that comprised Fadness sales territory in 2016); Ex. 4, Fadness Dep. 110:2-9 (agreeing that zip code listing reflects his territory in 2016).  Although not mentioned at all in Voigt's original email, Fadness also demanded to see Charter's position in writing on how to approach businesses displaying "no soliciting" signs.  Ex. 11, July 8, 2016 Emails.

According to Fadness, his July 8, 2016 email was the first time he mentioned anything about any potential legal concern with "no soliciting" signs to Voigt.  Ex. 4, Fadness Dep. 136:5-7.  Importantly, Fadness also admitted in his deposition that, prior to July 8, 2016, he was not asked to do anything that he believed was illegal in any way.  *Id.* at 110:22-111:15.  Erroneously, however, Fadness believed as of July 8—as he still does today—that it was illegal to "go door-to-door soliciting at 30 locations a day."  *Id.*; Ex. 11, July 8, 2016 Emails.

Fadness claims he and Voigt next spoke by phone during the evening of July 8, 2016.  During this phone call, Fadness contends Voigt advised him that Charter company-wide wanted its Account Executives to contact potential new businesses in person in order to make sales.  Ex. 4, Fadness Dep. 137:20-138:12.  Fadness also contended in his deposition that he originally called

4

Voigt because he "just wanted to confirm that was really the company position because …to [him] that was just outrageous." *Id.* at 137:8-13-138:20. Fadness further claimed he told Voigt during their phone call that "under no circumstances was [he] going to violate a 'no soliciting' sign" and if such was a requirement, he "can't do that." *Id.* at 135:15-18. Fadness, however, admits Voigt never told him he should ignore a "no soliciting" sign. *Id.* at 145:7-9. On the contrary, according to Fadness, Voigt did not express "any opinion on what the company's physical position was on soliciting at buildings that had 'no soliciting' signs other than he said he was working on getting those answers for me." *Id.* at 145:7-21.

### F. Fadness Confronts West Division Vice President of Sales Gail Kodama about his Concern with, Among Other Issues, "No Soliciting" Signs.

After July 8, Fadness did not speak to anyone about "no soliciting" signs, other than raising it on August 23, 2016 to Gail Kodama, Charter's Vice President of Direct Sales for the West Division. Ex. 4, Fadness Dep. 147:14-19, 152:13-18; Ex. 13, Kodama Dep. 7:13-8:24. On that date, Kodama, who is based in California, attended a weekly meeting of Voigt's sales team. Ex. 4, Fadness Dep. 153:25-154:13. During this meeting, Kodama did not herself mention or discuss "no soliciting" signs; Fadness instead claimed to be the one to raise it as an issue. *Id.* at 154:14-155:1, 156:9-12. According to Fadness, he pressed Kodama about the issues, stating:

> [Y]ou're telling us that you want us to go uninvited door to door to 30 or 40 businesses a day and you understand that probably 90 percent of all businesses out there have 'no soliciting' signs. So I said: 'What are we supposed to do when there's a 'no soliciting' sign because I've been asking Ryan [Voigt] for weeks to give me something in writing and I haven't gotten a response to it yet? So what is it that you expect us to do when a customer had- has a 'no soliciting' sign? … I have asked Ryan for guidance and I have not gotten guidance.

*Id.* at 156:17-157:9. In response, Fadness claims Kodama told him, "Ignore the signs and proceed into the business." *Id.* at 157:10-19.[2] Fadness believes he retorted, "[I]sn't that trespassing or

---

[2] Kodama denies instructing anyone to ignore a "no soliciting" sign. Ex. 13, Kodama Dep. 42:15-20.

5

whatever," to which Kodama allegedly responded, "[J]ust don't worry about it, go in there and solicit the business." *Id.* at 157:10-158:1.

After the meeting, Fadness asked to speak with Kodama privately. *Id.* at 158:8-9. During their one-on-one meeting, Fadness raised other concerns, including that "in [his] territory [he] only had 39 accounts," and that his accounts were even further limited based on the nature of companies he could contact. *Id.* at 160:21-162:2. According to Fadness, Kodama "listened, but that was kind of it." *Id.* at 162:1-2. Fadness also claims to have shared his belief that ignoring a "no soliciting" sign was illegal, to which Kodama "really didn't have a response to that." *Id.* at 162:20-25. Importantly, Fadness does not contend Kodama ever told him that, if he did not ignore "no soliciting" signs, he would be fired; instead, Fadness claims she only stated, "[W]e expect you to enter that building and call on those people anyway." *Id.* at 163:11-25. Fadness also had no further contact with Kodama after August 23, 2016. *Id.* at 153:9-11, 163:23-164:3. Additionally, according to him, he continued to visit businesses in person without having to ignore any "no soliciting" signs. *Id.* at 164:7-21.

### G.     Kodama Seeks Advice on "No Soliciting" Signs and is Advised of No Issue.

Because any issue with "no soliciting" signs had ever come up in Kodama's twelve years in sales, she followed up in September 2016 with Ryan Hennings, Director of Human Resources for their business unit, to determine if there was any legal concern. Ex. 13, Kodama Dep. 25:23-24; 26:13-22, 27:21-28:13. Hennings in turn checked with Charter's Legal Department and shortly thereafter notified Kodama that "legal had no issue." *Id.* at 29:9-18; *see also* Ex. 14, Stevens Dep. 40:11-13 (reiterating that "the response came back from Legal saying it was okay to knock and call on doors with no soliciting signs."). Hennings further advised Kodama that if a sales representative was asked to leave a prospective business, they should promptly comply. Ex. 15, Hennings Dep. 27:17-22.

6

**H.     Although Not at Work, Fadness Sends Late Night Email Complaining About Having to Contact Businesses in Person and Not Being Able to Sell Fiber Products.**

Fadness began a vacation on September 8, 2016, and although he was due to return on Monday, September 19, he instead went out on FMLA leave due to a family illness.[3]  Ex. 16, Time Detail Report.  Despite not reporting back to work on September 19 as planned, Fadness sent an email at 3:58 a.m. outlining "limitations and constraints" he claimed resulted from various changes implemented after the TWC-Charter merger.  Ex. 4, Fadness Dep. 167:1-20; Ex. 17, Sept. 2016 Email,  As Fadness expressed in his late night email, he believed he did not have enough accounts in his assigned territory to physically contact thirty new businesses daily.  Ex. 17, Sept. Email; Ex. 4, Fadness Dep. 169:3-15 & 177:16-18.  He also complained about no longer being able to sell fiber products.  Ex. 17, Sept. Email; Ex. 4, Fadness Dep. 171:25-172:21.  Fadness concluded his email by stating:

> With all due respect I cannot in good conscience engage in prospecting tactics that disregard the publically posted policy and preference of any business. … Furthermore, with respect to the new structure that precludes sales personnel on the cable operations side from selling Fiber products, this is counter to one of the primary reasons I accepted employment with TWC nearly 3 years ago.

Ex. 17, Sept. Email.  Fadness also in closing asked to be assigned to another position "that is more suited to [his] expertise and experience."  *Id.*

**I.     Fadness Resigns Instead of Returning from Leave of Absence.**

Significantly, Voigt did not issue any written corrective action to Fadness before he went out on vacation and leave,[4] nor was Fadness ever demoted.  Ex. 4, Fadness Dep. 145:22-146:4.

---

[3] Fadness's September vacation leave from which he was due to return on Monday, September 19, turned into FMLA leave to care for his elderly parents who had health conditions and lived in Virginia. Ex. 16, Time Detail Report. Fadness testified that, although he originally travelled to Virginia to care for his parents in person, he returned in October, but continued to stay on FMLA leave until he resigned in December. Ex. 4, Fadness Dep. 183:11-184:7. Fadness has not asserted an FMLA claim in this lawsuit. *See generally* Dkt. 1-3, Pl.'s Orig. Pet.

[4] Voigt drafted a Written Warning for Fadness based solely on his last six-month sales performance, but it was never issued before Fadness went on leave and resigned. Ex. 10, Voigt Dep. 111:4-9; Ex. 18, 2016 Draft Written

7

Fadness also never had his salary or commissions cut in any way. *Id.* at 146:5-8, 147:9-12. Fadness's job responsibilities as an Account Executive II likewise remained the same as they were for other Account Executive IIs with Charter. *Id.* at 188:13-16. Moreover, while his territory did morph over his tenure, it was, as Fadness himself admitted, due to the merger and unrelated to any objection he made about "no soliciting" signs. *Id.* at 189:8-12.

Despite such, on Sunday, November 27, 2016, Fadness emailed Voigt and Jametra Shanks, a Human Resources Business Partner, advising of his potential return to work date of December 12, 2016 and raising various concerns he had with his role and duties. *Id.* at 201:8-202:4*; Ex.19, Nov. 2016 Email. As Fadness admitted, he drafted this email on his own, with no one telling him what to write. Ex. 4, Fadness Dep. 201:8-202:4. In the email, Fadness stated that "[i]f there is a requirement that my sales prospecting activity is to be conducted primarily on a door-to-door, cold call, door knocking basis, I would respectfully decline." Ex. 19, Nov. 2016 Email. He then went on to object to calling on businesses with "no soliciting" signs and to not being able to sell fiber products, which he specifically noted was "counter to one of the primary reasons [he] accepted employment with TWC nearly 3 years ago." *Id.* Fadness closed his email by stating, "So, if indeed door-to-door soliciting, in disregard of businesses' or property owners' requests, is a requirement, I would need to find an alternate position at Charter, [a]nd if this is the case, and there are no alternate positions … **I would have no alternative than to resign.**" *Id.* (emphasis added).

In response to Fadness's November 27 email, Voigt and Shanks scheduled a telephone conference to discuss his resignation on December 6, 2016. Ex. 4, Fadness Dep. 209:2-9; Ex. 10, Voigt Dep. 95:1-97:8. During their telephone call, Fadness claims Voigt and Shanks indicated that "[w]e're just calling you back to clarify the issues that you wanted to clarify." Ex. 4, Fadness

---

Warning. Fadness thus was not even aware of its existence when he decided to resign, although based on his sales numbers, he could have suspected a warning would be issued.

8

Dep. at 212:10-12.  Either Voigt or Shanks then allegedly told Fadness "it is [Charter's] position that there is no legal liability in calling on businesses and buildings posting 'no solicitation' signs." *Id.* at 212:15-17.[5]  Then, Fadness contends they told him developing new business by contacting thirty to forty prospective commercial customers per day was a new job requirement and that:

> "If you refuse to do the job, we will accept that as your resignation.  And I said: **'Well, I won't agree to solicit door to door.'  And he said: 'Well, then you're resigning.'**  And [Shanks] said: 'When do you want your last day to be? Do you want it to be today or a week from now or whatever?'  And I think she suggested December the 22nd, and I said okay. … I said: 'I'll send you a letter outlining our discussion.'"

Ex. 4, Fadness Dep. 212:25-213:11, 216:2-21 (emphasis added).[6]  Importantly, Fadness admitted that, before his December 6 call with Voigt and Shanks, he never once contacted anyone in Human Resources about his alleged concern with "no soliciting" signs, nor did he ever call the ethics hotline or send anything online through the Charter system.  *Id.* at 152:4-9, 239:25-240:13.

Fadness followed up their December 6, 2016 call with another email to Voigt and Shanks, intended, at least according to Fadness, "to memorialize the details of [the] discussion and the conclusions reached."  Ex. 21, Dec. 2016 Resignation Email; Ex. 4, Fadness Dep. 222:7-223:11.  As before, Fadness drafted his December 8, 2016 email by himself and with no assistance.  Ex. 4, Fadness Dep. 222:15-23.  Critically, Fadness's email confirms he had at least **two reasons**

---

[5] Voigt's recollection of the phone call differs only slightly from Fadness.  According to Voigt, Shanks and he "addressed [Fadness's] concern about no soliciting and I had mentioned to him …that … door knocking is –is part of the day-to-day activity within Charter and it's one of the components to doing your job.  And if you're not willing to do that, then …you're probably not going to be successful, especially if you don't have referral partners.  But that was what was said, and he decided to—to leave."  Ex. 10, Voigt Dep. 96:3-15.

[6] Shanks's recollection of the phone call differs more significantly from Fadness in that she explained over and over again that Fadness could not be placed in another job while out on FMLA leave, but instead would need to return to work first and then apply for any open position he wanted.  Ex. 20, Shanks Dep. 32:2-22, 33:13-21.  She also told him "more than once, that his role was waiting for him to return to work."  *Id.* at 33:22-34:23.  Based on the December 6 call with Fadness, Shanks recalls that he resigned because "[h]e was not happy with his current role.  He wanted to sell fiber.  Spectrum [B]usiness sells coax."  *Id.* at 37:16-20.

9

unrelated to any alleged criminally illegal conduct: (1) not wanting to cold-call at all, and (2) the Ink Wins compensation plan.  Specifically, Fadness cited the following reasons for his resignation:

> (1) "Business solicitation by way of cold call knocking … is now the primary prospecting function of …AE2 sales personnel … and I categorically refuse to participate in such business tactics that I believe are unprofessional, unethical, damaging to one's professional reputation, and potentially subject the offender to legal liabilities;" and

> (2) "The change from protected accounts by way of geographic, territory assignment—to …Ink Wins—is in my opinion ill-conceived and likely to damage business-client relationships, while promoting conflict and predatory conduct among sales personnel that will continue to degrade the existing state of employee morale and corporate culture."

Ex. 21, Dec. 2016 Resignation Email.

**J.     Despite his Emails to Charter, Fadness Had No Personal Knowledge as to Whether It Was Criminally Illegal to Approach Businesses with "No Soliciting" Signs in Texas.**

Fadness, for his part, admitted in his deposition that he had no idea at the time of his resignation whether it was in fact illegal within the State of Texas—much less his assigned territory—to attempt to develop new business from prospective customers that displayed "no soliciting" signs.  Ex. 4, Fadness Dep. 179:14-180:9, 232:16-233:10, 233:14-234:6.  He also declined being aware of any prosecutions in Texas for ignoring "no soliciting" signs or whether any Charter Account Executives had ever encountered complaints as a result of bypassing such signs.  *Id.* at 149:17-20, 150:20-21.  Fadness never researched or looked into the issue prior to his resignation; he instead merely assumed approaching businesses with "no soliciting" signs was illegal and "the extent of [his] research was by asking the company to tell [him] what was legal or not."  *Id.* at 179:14-180:9.  As Fadness stated in his deposition, he also "assume[d] when you violate the law that means criminal violation."  *Id.* at 185:15-25.

It was only after his resignation that Fadness mentioned anything about municipal ordinances.  *Id.* at 232:16-233:10.  According to Fadness, during a subsequent telephone call in

late December over the return of his Charter equipment, Fadness told Voigt, "By the way, you know, soliciting door to door at locations that have … 'no soliciting' signs, you should be aware that individual – you know, that these cities have laws against that…." Ex. 4, Fadness Dep. 231:20-232:1.  Afterwards, Fadness sent Voigt pasted excerpts of three municipal ordinances—two of which were for cities outside his assigned territory (Georgetown and Cedar Park) and the third of which (Bastrop) only involved the revocation of a permit, not a criminal penalty.  Ex. 22, December 29 Email; Ex. 12, Territory Zip Code List.  As Fadness admitted, he did not provide these or any other ordinances to Voigt prior to his resignation from employment.  Ex. 4, Fadness Dep. 232:16-233:10.  Likewise, other than through this December 29, 2016 email to Voigt, Fadness never provided any ordinances or citations to ordinances to anyone else within Charter. *Id.*  According to Fadness, he did not do so "[b]ecause [he] wasn't even aware of cities having their own specific laws regarding-You know, I assumed there was state law.  I wasn't even aware that individual cities had their own laws guide – you know, that dealt with these issues." *Id.* Fadness nevertheless filed suit against Charter not even two weeks later, claiming he was discharged because he refused to commit an illegal act.  *See* Dkt. No. 1-3, Pl.'s Orig. Pet.