# EXHIBIT 4

*In The Matter of:*

### *Jeffrey Fadness*
### *Vs.*
### *Charter Communications, Inc.*

*Oral Deposition of*
# *Jeffrey M. Fadness*
# *August 29, 2017*

*No. 1:17-cv-00206-LY*
*In the USDC for the Western District of Texas / Austin Division*

### *Davidson Reporting, Inc.*
*926 Chulie Drive, Suite 115*
*San Antonio, Texas 78216*
*(210) 340-3656*

**Word Index included with this Condensed Transcript**

## 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2              AUSTIN DIVISION
 3 JEFFREY FADNESS,        )
        Plaintiff,         )
 4                         )
    VS.                    )  CIVIL ACTION
 5                         )  NO. 1:17-cv-00206-LY
    CHARTER COMMUNICATIONS, INC.)
 6      Defendant.         )
 7 *********************************************
 8         ORAL DEPOSITION OF
 9         JEFFREY M. FADNESS
10         AUGUST 29, 2017
11 *********************************************
12    THE ORAL DEPOSITION of JEFFREY M. FADNESS, having
13 been duly sworn, was taken in the above-styled and
14 numbered cause on the 29th day of August, 2017, from
15 10:56 a.m. to 6:21 p.m., before ROSA E. DAVILA, CSR in
16 and for the State of Texas, reported by machine
17 shorthand, at the Law Office of Jeffrey A. Goldberg,
18 15303 Huebner Road, Building 13, San Antonio, Texas
19 78248 pursuant to the Federal Rules of Procedure and
20 the provisions stated on the record or attached hereto.
21
22
23
24
25
```

## 2

```
 1        A-P-P-E-A-R-A-N-C-E-S
 2 FOR THE PLAINTIFF:
 3      MR. JEFFREY A. GOLDBERG
        THE LAW OFFICE OF JEFFREY A. GOLDBERG
 4      15303 HUEBNER ROAD, BLDG 13
        SAN ANTONIO, TEXAS 78248
 5      PHONE: (210) 690-2200
        FAX: (210) 690-0438
 6
   FOR THE DEFENDANT:
 7
        MS. CHRISTINE E. REINHARD
 8      SCHMOYER REINHARD, LLP
        17806 IH-10 WEST, SUITE 400
 9      SAN ANTONIO, TEXAS 78257
        PHONE: (210) 447-8033
10      FAX: (210) 447-8036
11 ALSO PRESENT:
12      JEFFREY M. FADNESS,
        THE WITNESS; and
13
        ROSA E. DAVILA,
14      CERTIFIED COURT REPORTER.
15
16
17
18
19
20
21
22
23
24
25
```

## 3

```
 1              I-N-D-E-X
 2 JEFFREY M. FADNESS              PAGE
 3 Appearances........................  2
    Index.............................  3
 4 Examination by Ms. Reinhard.........   4
    Signature and Changes............. 258
 5 Reporter's Certificate............ 259
 6              EXHIBITS
 7 EXHIBIT                 PAGE
    NUMBER    DESCRIPTION      MARKED
 8
 1  E-mail communications by J. Fadness with.. 34
 9  potential employers
10 2  J. Fadness and Andrew Chase e-mail exchange  55
11 3  Work history and application details as... 66
    submitted to Cardiac Imaging, Inc.
12
 4  Plaintiff's Answers and Objections to.....  71
13 Defendant's First Set of Interrogatories
14 5  7/8/16 e-mail from R. Voigt to team and...  90
    7/8/16 e-mails between R. Voigt and J. Fadness
15
 6  Performance Improvement/Corrective Action.  97
16 Form signed 3/6/16 by J. Fadness
17 7  Listing of zip codes to account executives  110
18 8  8/24/16 R. Voigt and J. Fadness e-mail...  150
    communications referencing letter to HR
19
 9  Two 9/19/16 J. Fadness e-mails to R. Voigt  166
20
10  11/29/16 Sedgwick letter to J. Fadness....  185
21
11  11/27/16 J. Fadness e-mail to R. Voigt....  185
22 copying J. Shanks and 12/05/16 R. Voigt
    e-mail to J. Fadness
23
12  12/8/16 and 12/29/16 J. Fadness e-mails...  221
    to R. Voigt
25 13  Plaintiff's Second Supplemental Initial....  241
```

## 4

```
 1        (10:56 a.m.)
 2        JEFFREY M. FADNESS,
 3 having been first duly sworn, testified as follows:
 4        EXAMINATION
 5 BY MS. REINHARD:
 6    Q.  Could you please state your full name for the
 7 record.
 8    A.  Jeffrey Michael Fadness.
 9    Q.  And Mr. Fadness, have you ever given a
10 deposition before?
11    A.  I have.
12    Q.  How many times?
13    A.  Quite a few.  I'm going to -- I'm going to
14 guess probably five or six.
15    Q.  And when was the last time that you
16 participated in a deposition?
17    A.  Probably 2006.
18    Q.  And what did that last deposition -- What
19 type of case was it related to?
20    A.  That was a personal injury case.  I sued my
21 former wife.
22    Q.  And where was this case filed?
23    A.  Fairfax County, Virginia.
24    Q.  And since it has been at least a few years
25 since you've given a deposition, I'm just going to go
```

**25**

1   Q.   And during the time that you worked for
2 MV Transportation did you receive any type of benefits
3 from the company?
4   A.   No.
5   Q.   During the time that you worked for MV --
6 MV Transportation were you looking for employment
7 elsewhere?
8   A.   I was continuing to do the same thing that
9 I've been doing since I've been unemployed, which is
10 sending out -- I look every day for jobs and send out
11 applications.
12   Q.   And when you look every day, where do you
13 look?
14   A.   Typically from e-mails that are sent to me
15 from Monster, Glassdoor, Dice, CareerBuilder.  So these
16 are job board companies that you can sign up with and
17 tell them the type of work that you're interested in
18 and then they send you jobs.  You know, most of this
19 stuff is repeated -- you know, the same information
20 over and over, but you still have to look -- or I still
21 have to look, you know, I -- you know, probably through
22 30 or 40 e-mails every single day to see if there's
23 anything new out of, you know, maybe a hundred or 200
24 or 300 jobs, however many jobs are listed in all of
25 those e-mails.

**26**

1   Q.   And what type of jobs have you signed up to
2 receive notice in terms of openings through these
3 different online job posting sites?
4   A.   Mostly sales.  Sales, sales management.
5   Q.   Anything else besides sales or sales
6 management?
7   A.   I've even tried to sign up for manual labor.
8   Q.   When you say manual labor, is there a
9 particular category or type?
10   A.   Construction, road work.  You know, I thought
11 I could work, you know, maybe road work on the highway.
12   Q.   Anything else besides construction and road
13 work when you're talking about manual labor?
14   A.   Drive -- Yes.  Since I got my Class B
15 commercial driver's license I've started applying for a
16 lot of those jobs because a lot of -- lot of the other
17 commercial driving jobs offer a higher pay if you have
18 experience.  And that's kind of the problem that I have
19 is I don't have two years of driving experience.  So a
20 lot of those guys are willing to train you, but when
21 you start out you have to start out at ten bucks an
22 hour.  So -- and that's worse than what I was making.
23   Q.   So besides sales, sales management jobs,
24 manual labor in terms of construction and road work and
25 then now driving jobs, have you signed up to receive

**27**

1 notices of any other types of jobs besides those?
2   A.   No.
3   Q.   And have you received any phone interviews in
4 the last two weeks?
5   A.   Yes.
6   Q.   With whom?
7   A.   Toyota of Cedar Park.
8   Q.   Anyone else besides Toyota?
9   A.   And Energy Logix.
10   Q.   And have you been invited back for a
11 face-to-face interview with either of those two
12 entities?
13   A.   I've had a face-to-face with Energy Logix.
14   Q.   And when was that?
15   A.   Friday.
16   Q.   And have you heard back from them in terms of
17 a job offer?
18   A.   No.
19   Q.   Have you heard back from Toyota Cedar Park
20 since you had a phone interview?
21   A.   Yes.
22   Q.   And what have they told you?
23   A.   That they have other people more closely
24 aligned with whatever it is that they're looking for.
25   Q.   What type of position was it that you were

**28**

1 interviewed for with Toyota of Cedar Park?
2   A.   Sales.
3   Q.   Sales of what?
4   A.   Cars.
5   Q.   So you weren't selected for a position with
6 Toyota?
7   A.   Correct.
8   Q.   And you've not heard back from Energy Logix
9 from your face-to-face interview?
10   A.   Correct.
11   Q.   Have you had any other interviews since you
12 left MV Transportation?
13   A.   Let me think.  I've had a lot of interviews
14 over the months, but since --
15   Q.   I'm asking in the last two weeks.
16   A.   Right.  No, I can't think of any others.
17   Q.   And I take it no other job offers either?
18   A.   No.  The only job offer that I've had since
19 my termination from Charter is MV Transportation.
20   Q.   Now, you resigned from Charter, correct?
21   A.   Correct.
22   Q.   And what was -- You resigned in December of
23 2016; is that correct?
24   A.   That's correct.
25   Q.   And so since December of 2016 you said the

49

1   A.  Probably, yeah.

2   Q.  This -- If we look on Page 837 through 838,
3 this is an e-mail exchange that you had with a
4 representative from DermaQuip about a telephone
5 interview for a position with them.  Did you
6 participate in that telephone interview?

7   A.  Honestly I can't tell you whether I did or
8 not.  I mean, if I had an opportunity to, I would have.

9   Q.  But as you sit here today, you can't say
10 whether you did or you didn't?

11   A.  No, I don't recall.

12   Q.  Did you --

13   A.  Like I said, I've -- I've had many dozens of,
14 you know, brief phone conver -- initial phone calls or
15 whatever with people.

16   Q.  Did you keep a calendar?

17   A.  No.

18   Q.  Not on Outlook or paper?

19   A.  No.

20   Q.  Or in any other type of computer program or
21 app?

22   A.  No.

23   Q.  So there's no way for you to go back to see
24 if, for example, you actually attended an interview in
25 March of 2017 with DermaQuip?

50

1   A.  Well, I would know if I had attended the
2 interview.  You're talking about a phone call.  Whether
3 or not I had a phone call with them, I don't recall.  I
4 may well have.  I don't recall.

5   Q.  Did you ever have a face-to-face interview
6 with DermaQuip?

7   A.  No.

8   Q.  Did you ever have a face-to-face interview
9 with AMEX, American Express?

10   A.  No.  But I do recall speaking with them.

11   Q.  And did they ever give you any feedback as to
12 why you weren't selected or moved on in the hiring
13 process?

14   A.  I don't know.  I mean, they -- typically if
15 we have -- Well, sometimes if there's a phone interview
16 and, you know, for whatever reason they don't want to
17 follow up, they just -- I never hear back from them.

18   Q.  Did you have --

19   A.  Sometimes I'll get an e-mail that says, you
20 know, we've decided -- I have lots of e-mails in that
21 file that say we've chosen to go with somebody else
22 more closely aligned with the experience that we're
23 looking for.

24   Q.  Did you ever have a face-to-face interview
25 with Navistar?

51

1   A.  No.

2   Q.  What about with Champion Window?

3   A.  No.

4   Q.  What about with SolarCity?

5   A.  No.  I had a phone interview with them, but I
6 did not have a face-to-face.

7   Q.  What about a company called Parcel Pending?

8   A.  Don't know.  Well, I didn't have a
9 face-to-face interview.  I don't recall a company
10 called Parcel Pending.

11   Q.  Do you remember an individual by the name of
12 Mike Williams?

13   A.  No.

14   Q.  What about a company called Niagara Bottling?

15   A.  I did have a conversation with them, I think.

16   Q.  And did you have a -- when you say a
17 conversation, was that over the phone?

18   A.  Yeah.

19   Q.  And did it ever evolve into a face-to-face
20 interview?

21   A.  No.

22   Q.  Did you ever get any feedback in terms of
23 where your application for a position with Niagara
24 Bottling stood?

25   A.  No.

52

1   Q.  And Niagara Bottling was actually a position
2 that you applied while you were still working for
3 Charter, correct?

4   A.  I don't recall.

5   Q.  Well, if you look at the very back of
6 Exhibit 1, Page 1974 -- Let me know when you're there.

7   A.  I got it.

8   Q.  That starts off with an e-mail from you to
9 Andrew Still with Niagara Bottling dated November 23rd,
10 2016, correct?

11   A.  Yes.

12   Q.  And that was while you were still employed
13 with Charter Communications, correct?

14   A.  Correct.

15   Q.  And that was also while you were on a leave
16 of absence; is that correct?

17   A.  Yes.

18   Q.  Did you apply with any other companies
19 besides Niagara Bottling during the time that you
20 worked for Charter Communications?

21   A.  I sent my resume out probably to 50 different
22 companies, I would guess.  So when you say applied, I
23 didn't necessarily apply, but I did send my resume out.

24   Q.  And when you say you sent it out to 50
25 different companies, when did you first start doing --

## 53

1 start looking for other jobs outside of Charter
2 Communications or what was known as Time Warner Cable?
3    A. Well, this wasn't Time Warner Cable. This
4 was Charter. But I would guess that November time
5 frame.
6    Q. Well, you originally were hired by Time
7 Warner Cable, correct?
8    A. Yes.
9    Q. And when was that?
10    A. January of 2014.
11    Q. And you were hired into an account executive
12 position?
13    A. Yes.
14    Q. And you worked with Time Warner Cable up
15 through its merger with Charter Communications,
16 correct?
17    A. In May of 2016, correct.
18    Q. And you continued then working under Charter
19 Communications from May of 2016 to December of 2016,
20 correct?
21    A. Correct.
22    Q. So is the first time you started looking for
23 other jobs besides the one you held either with Time
24 Warner Cable or Charter -- was that in November of
25 2016?

## 54

1    A. Probably.
2    Q. You say probably. Did you look for
3 employment outside of Time Warner Cable or Charter at
4 any time prior to November of 2016?
5    A. I don't recall specifically.
6    Q. And you said that you sent your resume out to
7 50 different companies?
8    A. That's a guesstimate. Yeah.
9    Q. How did you identify which companies to --
10 whom to send your resume?
11    A. I don't recall. Specifically I think I was
12 just looking for large multi-national companies.
13    Q. And you sent your resume regardless of
14 whether or not they had any particular opening at the
15 time, correct?
16    A. Right.
17    Q. And that's the same thing you did in December
18 of 2016 when you sent your resume out to 300 or some
19 odd other companies? You just sent your resume out
20 regardless of whether or not they actually had an
21 opening or not, correct?
22    A. I don't remember how many it was, but yes,
23 same thing.
24    Q. Now, when you were -- had been looking for
25 other job positions, had you set a minimum salary

## 55

1 threshold?
2    A. Sure. I mean --
3    Q. And what has that salary threshold been?
4    A. It's kind of been all over the place.
5 Anything from $20 an hour to, you know, 65 or 75,000.
6 So it's been a lot of different numbers that I've asked
7 for.
8    Q. And how do you determine what number you're
9 going to ask for?
10    A. Well, if it's a territory management position
11 that takes into account several different states where
12 I would need more help taking care of my daughter, then
13 I would ask for more money.
14    Q. Any other factors you would take into
15 account?
16    A. That would be the primary factor is how much
17 time I would be gone.
18    Q. So is that why you would ask for up to
19 150,000 in some cases in compensation?
20    A. Sure. I don't recall when I did that, but
21 yes.
22    Q. I'm going to show you what's marked as
23 Exhibit 2 and ask if you recognize Exhibit 2.
24         (Deposition Exhibit No. 2 marked.)
25         THE WITNESS: Okay. I don't

## 56

1 specifically recall it.
2    Q. (BY MS. REINHARD) But Exhibit 2 is e-mails
3 exchanged between yourself and an Andrew Chase with
4 Zengo Talent, correct?
5    A. Yes.
6    Q. And it's in reference to a job application
7 you were submitting for enterprise sales executive,
8 correct?
9    A. Yes, that appears to be the case.
10    Q. And you completed or answered questions that
11 were posed by Mr. Chase that he wanted answers to,
12 correct?
13    A. I suppose. I don't know what exactly this
14 is.
15    Q. If you look at the e-mail that's on 560 to
16 561 --
17    A. Okay.
18    Q. -- at the top of the page you say: "Hi,
19 Andrew. Please see enclosed questioner" -- I assume
20 you meant "questionnaire."
21    A. Right.
22    Q. And then below there's some questions that
23 looks like there were answers provided in Mr. Chase's
24 e-mail. Did you provide those answers in Mr. Chase's
25 e-mail?

81

1   Q.   And so you do not know -- no one -- no
2 medical professional has advised you as to what may be
3 causing your nosebleeds?
4   A.   That's correct.
5   Q.   With regard to your prescription for Xanax
6 from Dr. Lee, had you ever been prescribed Xanax
7 before?
8   A.   No.
9   Q.   Had you -- What was the reason that Dr. Lee
10 was prescribing you Xanax in July of 2016?
11   A.   I was having a problem -- Well, I was under a
12 lot of pressure that was making me feel incredibly
13 uncomfortable at the company.  And I explained to him
14 that it was causing problems -- I have a condition -- I
15 have a hereditary condition called essential tremor and
16 if I'm -- feel threatened or stressed, the tremor
17 becomes much worse.  And it got to a point where I
18 couldn't shave without cutting myself.
19   Q.   And why was it that you were feel -- you were
20 under pressure that you felt was causing these tremors
21 to flare themselves?
22   A.   Well, because I was asked -- being told to do
23 something that was very deceitful, that was illegal,
24 that was a lie and my livelihood was being threatened
25 if I didn't comply.  And that --

82

1   Q.   And what was this --
2   A.   -- caused a great deal of difficulty.
3   Q.   And what was this that you were told to do?
4   A.   This was the issue of being told that we were
5 not allowed to contact customers by conventional means,
6 that we had to solicit door to door and that it didn't
7 make any difference that the buildings and companies
8 had "no soliciting" signs, we were to ignore them
9 and -- So that was the issue.
10   Q.   And when were you first told this?
11   A.   I think it was first kind of brought to my
12 attention maybe in June by Ryan, my boss.
13   Q.   When in June?
14   A.   I don't know, but I'm going to guess mid to
15 late.
16   Q.   And did he just tell you this or did -- How
17 did he first make you aware of these instructions
18 you're claiming he was giving you?
19   A.   I recall going into a sale -- We used to have
20 sales meetings every Monday morning.  And going into
21 one of our sales meetings one day -- And this was after
22 the merger had been completed.  And he had been going
23 to meetings, I guess, with, you know, Charter personnel
24 or -- or whatever, you know, being schooled in -- in
25 what the changes coming down the pipe were going to be.

83

1 And he had mentioned something to me going into one of
2 our Monday morning sales meetings that some things were
3 going to be changing, some that he thought were
4 positive, some that he didn't think were so great.
5          And I asked him what he meant, and he
6 said:  "Well, how do you feel about door knocking?"  So
7 door knocking is the -- is what they call, you know,
8 door-to-door solicitation.
9          And I said:  "Well, the problem with
10 door knocking is probably 95 percent of every business
11 in this area or certainly every commercial building has
12 a 'no soliciting' sign."  And so that was kind of the
13 first heads-up.  So he mentioned that just to say
14 there's -- you know, this is a heads-up, this is kind
15 of what's coming down the pike.
16   Q.   Okay.  So the first time this ever comes up
17 is in a conversation with Ryan Voigt --
18   A.   Uh-huh.
19   Q.   -- mid to late June in the context of a
20 Monday morning sales meeting.  Was this a conversation
21 that was just between you and Mr. Voigt, or were others
22 present?
23   A.   I'm going to guess other team members were
24 present because it was -- I think he may have discussed
25 it in the team meeting as well.

84

1   Q.   Well, were you in the team meeting?
2   A.   Yeah.
3   Q.   Do you recall him specifically discussing it
4 during a team meeting?
5   A.   I think so, but I'm -- I can't be completely
6 sure if it was in that meeting where -- I think he did
7 suggest it in that meeting although it wasn't really at
8 that point, you know, this hard-and-fast rule that it
9 was something that we had to do.  It was just kind of
10 something where he was talking about how a number of
11 things were changing like the -- you know, how the
12 sales were going to be determined going forward.  They
13 weren't going to be based on revenue.  It was going to
14 be based on units of sales and it didn't make any
15 difference the value of the contract.
16   Q.   Okay.  I just want to be clear.  So the first
17 time something comes up about door knocking is in -- is
18 it in the actual sales meeting with Ryan Voigt, or is
19 this a separate conversation you and Ryan had?
20          MR. GOLDBERG:  Object to the form of
21 the question to the extent it mischaracterizes
22 testimony.
23          Go ahead.
24          THE WITNESS:  It starts out as a
25 conversation -- just an impromptu thing that -- that he

85

1asked me on the way into the meeting. And then I think
2he brought it up in the sales meeting when he was
3talking about, you know, how -- how things were going
4to be changing.
5   Q.   (BY MS. REINHARD) Okay. Just want to break
6those down. So into the meeting, at least based on --
7if I'm understanding you correctly, Ryan Voigt made
8the -- or asked you how do you feel about door
9knocking?
10   A.   Right.
11   Q.   And to which you -- you say you responded,
12well, 95 percent of businesses have "no soliciting"
13signs?
14   A.   Right.
15   Q.   Was there anything further to that
16conversation besides those two comments, his question
17and your response?
18   A.   Yeah. That's why I was -- You know, he
19started it out by -- And I don't know if I started the
20conversation or if he started the conversation, but it
21had to do with -- You know, he had been in all of these
22different meetings. He was gone quite a bit. And it
23was in meetings with Charter personnel, I'm assuming,
24and he was learning about all of the things that they
25wanted to change or the things that were going to be

86

1changing for us as an organization and more
2specifically us as a sales team. So he was mentioning
3this to me.
4        And I may have asked him, you know,
5how's it going, you know, what do you think. And --
6And he said, you know, there's some good stuff in here
7and there's some not so good stuff. And I think the
8good stuff he was talking about is how the compensation
9plan he was thinking, you know, could be very
10beneficial because now it doesn't make any difference
11what the monetary value of the -- of the contract is,
12it's going to be based on units. And he's thinking
13that that's a much easier sale. And I was thinking
14maybe that's true. You know, I didn't know for sure.
15        And then in that same conversation he
16also mentioned: "Well, and one of the other things is,
17you know, how do you feel about door knocking?"
18        And I said: "Well, you know -- you
19know, can be a problem because almost everywhere you go
20they've got a 'no soliciting' sign."
21   Q.   Was there any further conversation about door
22knocking than what you've just described at that
23particular point in time?
24   A.   At that moment I don't -- I don't think there
25was anything besides that other than, yeah, you know, I

87

1know and -- So no, nothing else specifically that I
2recall at that moment.
3   Q.   And did door knocking come up at all in the
4meeting itself that then happened after this sidebar
5conversation you and Mr. Voigt had?
6   A.   I think he did bring it up in the meeting
7along with what I was telling you that there were --
8but it didn't come up as like this is what we have to
9do. It was kind of like this is something that -- you
10know, that they do or they suggest. So it wasn't
11like -- wasn't described as a hard-and-fast rule at
12that particular point in time.
13   Q.   Okay. When was the next conversation you had
14with anyone at Charter about door knocking?
15   A.   I think the next time would have been in
16July. And there was -- they -- they had this phone
17meet -- or conference call, phone meeting that we were
18supposed to attend. But he didn't send notice out
19about this. And it was like an 8:30 phone conference
20that we were supposed to attend. And I never got the
21message because I was actually driving on my way to the
22office. So I didn't get his message about a phone
23conference call that morning. I live a little bit
24further away, I think, than most of the people did that
25were on my team. So I missed that phone conference.

88

1But as -- as part of the phone conference call that I
2saw later, you know, there was an attachment of
3information.
4        And so I reviewed the information
5that was attached that was part of this -- supposed to
6be part of this phone conference call, and it described
7what now the not suggestion but the requirement was
8going to be of our position of the job and among the
9requirements was this requirement to go door to door to
10a minimum of 30 businesses every day. And these are
11non-customers. And they were supposed -- You know, so
12you're supposed to pick a building and go to the
13building and go door knocking and -- you know, and hit
1430 businesses that were not customers.
15        And in addition to that, there were
16other metrics. So based on these 30 door knocks every
17day, 30 minimum, you -- you should have a certain
18number of proposals that you make based on these
19contacts of 30 businesses and out of that you're
20supposed to make one unit sale, you know, some -- some
21metric like that.
22        And then that -- there was a
23requirement that every -- at the end of every day at 4
24o'clock, I believe it was 4 o'clock in the afternoon,
25we were supposed to provide a daily report of what

89

1 businesses we door knocked at, what -- what proposals
2 we had made, what sales we had made. So this was
3 the -- the crux of what was in that meeting. So --
4 Q. What you describe your attending -- was
5 within a written attachment to what?
6 A. To -- To an e-mail that he had sent out
7 regarding this meeting.
8 Q. Is this an e-mail that's dated on or about
9 July 8th, 2016?
10 A. Could very possibly be. I'd have to see it.
11 Q. Do you still have the attachment to that
12 e-mail?
13 A. If I do, my attorney would have it.
14 Q. Well, do you recall specifically that you do?
15 A. I don't recall specifically that I do or not.
16 Q. Okay. So you're saying you've got some
17 e-mail from Ryan Voigt and attached to it was some
18 description regarding the requirements of your job and
19 specifically that you were to go to 30 new businesses
20 every day?
21 A. Correct.
22 Q. And then it further described information
23 related to -- Did it describe how you were to go to 30
24 businesses every day, or did it just say 30 new
25 businesses?

90

1 A. I don't know specifically what you mean by --
2 by that question, but it -- Did it tell me where to go
3 every day? No. It just pretty much said you have to
4 go door knock 30 new businesses every day.
5 Q. Did it say anything else with regard to door
6 knocking at 30 businesses? Did it tell you how, what
7 to say or what to do?
8 A. No. It told you as a result of that what
9 metrics they expected you to achieve, which would have
10 been, say, for instance, three proposals and one sale.
11 Q. Okay. So you indicated that this was an
12 attachment you received. You didn't participate in the
13 phone call. But did you have some sort of
14 communication with Ryan Voigt afterwards?
15 A. I think I had a phone conversation with him
16 and I sent him -- or I sent him an e-mail and then had
17 a phone conversation or I had a phone conversation and
18 followed up with an e-mail. I don't recall which. But
19 I think I had both phone contact and e-mail contact
20 with him.
21 (Deposition Exhibit No. 5 marked.)
22 Q. (BY MS. REINHARD) Okay. I'm going to show
23 you what's marked as Exhibit 5 and ask you if you
24 recognize Exhibit 5.
25 A. Yes.

91

1 Q. Exhibit 5 is an e-mail exchange between
2 yourself and Ryan Voigt on July 8, 2016, correct?
3 A. It starts out as an e-mail to the team
4 talking about the call that they had that I missed.
5 Q. And then afterwards is an exchange between
6 yourself and Mr. Voigt; is that correct?
7 A. Correct.
8 Q. Is this the phone call that you've been
9 referencing that occurred that you did not attend? Is
10 this what we're talking about that would have occurred
11 on July 8, 2016?
12 A. Well, this -- the team meeting right --
13 that -- So it reflects he's saying, you know, the --
14 the target of 30 and number of proposals. So that --
15 yes, that's the meeting that they were -- that he was
16 referencing --
17 Q. Okay.
18 A. -- that I -- that I was referencing as well.
19 Q. So what you're looking at within Exhibit 5 is
20 on the page marked Fadness 54; is that correct? That's
21 the beginning of -- of this e-mail exchange?
22 A. Right.
23 Q. Okay. And the first e-mail in this exchange
24 is from Ryan Voigt to you and other members of your
25 account executive team --

92

1 A. Correct.
2 Q. -- correct? Okay. Now, when did Ryan Voigt
3 become your supervisor?
4 A. Early June, I think, of 2016.
5 Q. Who was your supervisor immediately prior to
6 Ryan Voigt?
7 A. Bruce Boggs.
8 Q. And how long had Mr. Boggs been your
9 supervisor?
10 A. I'm going to guess since maybe October or
11 November of the year prior.
12 Q. Which would have been October, November 2015?
13 A. I believe so.
14 Q. So Mr. Boggs was your direct supervisor
15 between October, November 2015 and early June 2016?
16 A. That's correct.
17 Q. And do you know why he stopped being your
18 supervisor in early June 2016?
19 A. Yes. It was sometime in May, I believe, that
20 I was called into a sales meeting with several other
21 people that were in my position. My position was an
22 AE-II. And there were five or six of us called into a
23 meeting that included Carol Westmoreland, Bruce Boggs
24 and Jim Parker and they said that they had a
25 meeting with Charter Communications and Charter issued

93

1this directive that five of us -- that five people were
2going to go from AE-Is -- or from the position of AE-II
3to the position of AE-I and we were going to be moved
4from the teams that we were on to different teams.  And
5I was assigned from Bruce Boggs's team to Ryan Voigt's
6team.
7    Q.  And so were you one of the five that went
8from an AE-II to an AE-I?
9    A.  Well, that's what they told us was going to
10happen, but then it wound up not changing to an AE-I.
11So --
12    Q.  So you kept the AE-II child -- title but you
13changed teams?
14    A.  But still changed teams, correct.
15    Q.  Was Mr. Boggs located in the Austin facility?
16    A.  Yes, ma'am.
17    Q.  Was he still working in the Austin facility
18when you left Charter Communications in December of
192016?
20    A.  I believe so.
21    Q.  And Bruce Boggs, did he report directly to
22Carol Westmoreland?
23    A.  I believe so, yes.
24    Q.  Who then, in turn, reported to Jim Parker?
25    A.  Not that I know of.  I think Jim Parker

94

1reported to Carol.
2    Q.  Okay.  Were Bruce and Jim peers?
3    A.  Yes.
4    Q.  With both of them then reporting to
5Ms. Westmoreland?
6    A.  Correct.
7    Q.  Did you receive any sort of discipline from
8Mr. Boggs?
9    A.  No.
10    Q.  Did he give you any -- Did he ever give you a
11performance evaluation?
12    A.  I don't believe so.
13    Q.  Did he ever advise you that your performance
14was less than acceptable?
15    A.  Not that I recall, no.
16    Q.  Who was your supervisor before Ms. --
17Mr. Boggs?
18    A.  Tom Ancira.
19    Q.  And was he your supervisor from January of
202014 up until October, November 2015?
21    A.  That's correct.
22    Q.  And did he report to Carol Westmoreland
23during that time frame?
24    A.  Yes, he did.
25    Q.  And do you know why he stopped being your

95

1supervisor in October or November 2015?
2    A.  Yes.
3    Q.  Why?
4    A.  They demoted him.
5    Q.  To what?
6    A.  Salesperson.
7    Q.  And did he stay with the company afterwards?
8    A.  He did.
9    Q.  Was he still with the company in 2016?
10    A.  Yes.
11    Q.  Was he still with the company at the time
12that you resigned in December of 2016?
13    A.  I believe so.  So you're asking me a question
14about people that were still there, and you've got to
15realize that I was out for almost a three-month period.
16So I -- I don't know for a hundred percent sure, but I
17believe he's still there.  I don't know for sure
18though.
19    Q.  And was he on your team under Mr. Voigt?
20    A.  No.  I think he actually -- So they had
21different kinds of teams.  They had -- My team was the
22kind of team that goes out and generates new business.
23I think Tom -- the team that Tom was put on was the
24kind of job where you go to existing customers and
25you're just like an account manager, you -- you know,

96

1you try and sell them additional products.
2    Q.  Did Mr. Ancira ever issue you any type of
3discipline?
4    A.  He gave me a -- not -- When you say
5discipline, I don't know exactly what you mean by that.
6    Q.  Well, did you get corrective action from
7Mr. Ancira?
8    A.  I got a review that I was underperforming
9based on what their guidelines and quotas and stuff
10like that was.  So yes, I did get a review from him
11that -- that I was under performance.
12    Q.  When you say a review, was this just for --
13was this an annual performance evaluation or was it
14some other type of document?
15    A.  That's a good question.  I don't -- I don't
16recall if it was -- It -- It might have been -- I think
17it was just based on a three-month rolling average
18where on a quar -- I think it was a quarterly basis.
19So on a quarterly basis if you're below a certain
20threshold, then they would give you a -- what they
21called a performance review and they would say you're
22underperforming, you know, by these statistics.
23    Q.  Did you receive actually a written warning
24from Mr. Ancira?
25    A.  I received a performance review.  Whether or

97

1 not I got a written warning, I don't know.
2          (Deposition Exhibit No. 6 marked.)
3    Q.   (BY MS. REINHARD) I'm going to show you
4 what's marked as Exhibit 6.
5    A.   Okay.
6    Q.   Let me know if you have seen Exhibit 6 prior
7 to today.
8    A.   Performance Improvement/Corrective Action,
9 Tom Ancira.  Yes.
10   Q.   And, in fact, Exhibit 6 is a document that
11 you signed on March 6, 2015.  Is that correct?
12   A.   Right.
13   Q.   And this is -- When we look on the first page
14 of Exhibit 6, under Level of Action, it indicates that
15 you were receiving a written warning.  Is that correct?
16   A.   Where does it say that?
17   Q.   If you look to the left-hand side, there's
18 different titles.  One of them says Level of Action.
19 Next to it, the box checked out of the options is
20 Written Warning/PIP, correct?
21   A.   Talking about down at the -- all the way down
22 at the bottom?
23   Q.   I'm talking about the top part.
24   A.   Show me where you mean.
25   Q.   If you look in the top section, you see where

98

1 it says Level of Action?
2    A.   Okay.
3    Q.   And which box is checked?
4    A.   Level of Action.  And it says Verbal Coaching
5 and Documented Counseling.
6    Q.   But you see Level of Action.  Which box is
7 checked next to it?  Written Warning, correct?
8    A.   Okay.  Written Warning/PIP.
9    Q.   And, in fact, under Additional Notes what
10 does it say?
11   A.   Says: "Putting Jeffrey on Written Warning
12 3/6/15."
13   Q.   Okay.  So this reminds you that you did
14 receive some sort of discipline or corrective action
15 from Mr. Ancira based on your performance, correct?
16   A.   Yeah.  These were pretty common things that
17 most people got from time to time.
18   Q.   Well, this indicated at least in the
19 description area that in January you were at zero
20 percent of sales of your quota?
21   A.   Uh-huh.
22   Q.   Do you remember what your quota was at the
23 time?
24   A.   You mean the dollar amount?
25   Q.   The dollar amount.

99

1    A.   I think the dollar amount was $3,750.
2    Q.   Do you know if anytime after this written
3 warning that you ever achieved a hundred percent of
4 sales in terms of your quota?
5    A.   I don't recall offhand whether I did or not.
6    Q.   You can't recall at all?
7    A.   I don't specifically recall after that.
8 Probably, but I don't recall.
9    Q.   That's just a guess on your part?
10   A.   That's a guess on my part.
11   Q.   Okay.  Did you complain to anyone about the
12 corrective action that was given to you by Mr. Ancira?
13   A.   I don't think I complained, but I certainly
14 had a conversation with him and with Tom, with Carol
15 Westmoreland and with Carol's boss, which was Lee
16 Linton, and there was kind of an extensive conversation
17 about, you know, what went on and why January was a
18 zero.
19          I was working on a project that
20 probably would have been the largest account that Time
21 Warner Cable -- one of the largest accounts that they
22 ever would have achieved.  And there were many, many,
23 many issues related to the problems that they were
24 having trying to assist me in -- The company was Regus.
25 And I don't know if you know who Regus is.  That's --

100

1 That's a provider of temporary office space.  So you
2 could go to a downtown office and get a fully-equipped
3 place that already has a desk and phones and internet
4 connection.  And I was working on a deal with Regus
5 that would have been worth millions of dollars.  So I
6 would have been Charter's No. 1 salesperson in the
7 country if we had landed that deal.
8          And it took a lot of time and Lee
9 Linton was deeply involved in this, the vice president.
10 Carol was involved in it.  Tom was involved in it.  So
11 it's not like they didn't know what was going on.
12          But ultimately because -- and Lee was
13 embarrassed because of how poorly the company performed
14 and they weren't able to support what I was trying to
15 do.  They weren't able to give the customer pricing
16 because, you know, they were looking to put fiber optic
17 connections in 900 different offices across the
18 country.  Anyway, that's what was going on.
19   Q.   Okay.  So my question to you was whether you
20 complained to anybody about the corrective action that
21 you received?
22   A.   And so did I complain?  I don't know that I
23 complained.  I had a conversation with them to remind
24 them what we were doing over December, January,
25 February time period and why I had little time to

101

1 pursue other business because I was working on a
2 monstrous transaction.
3    Q.   And that -- A transaction that never came to
4 fruition, correct?
5    A.   That is correct.
6    Q.   And when did you learn that the -- this
7 transaction with Regus was not coming to fruition?
8    A.   When their vice president of procurement --
9    Q.   I'm talking about when calendar-wise,
10 timing-wise.
11    A.   Probably March.
12    Q.   Of 2015?
13    A.   Yeah.  Yes.
14    Q.   Did you work on any massive project of the
15 scale of Regus at any time after March of 2015?
16    A.   Well, yes, I certainly worked on other large
17 scale transactions, but nothing on the scale of Regus.
18 Regus probably would have been one of the largest
19 accounts that Charter had ever landed.
20    Q.   Well, at the time this was still Time Warner
21 Cable, correct?
22    A.   Yes.  Sorry.  That's correct.
23    Q.   Okay.  Did you complain to anybody at HR
24 about the corrective action that you received?
25    A.   This corrective action, no.

102

1    Q.   Did you complain to -- Did you receive any
2 other corrective action?
3    A.   No.  Well, I don't know.  I don't recall
4 whether I received any other performance evaluations
5 like this.
6    Q.   You refer to Exhibit 6 as a performance
7 evaluation?
8    A.   That's what it is.
9    Q.   Well, the title is actually Performance
10 Improvement/Corrective Action Form, correct?
11    A.   Uh-huh.  Correct.
12    Q.   Did you complain to HR about any issues you
13 had in your Time Warner Cable employment in 2014 or
14 2015?
15    A.   No, I don't believe so.
16    Q.   Did you complain to HR about the moving
17 from -- when you were told that you potentially could
18 be moving from an AE-II to an AE-I?
19    A.   Yes, I did.
20    Q.   Who did you complain to?
21    A.   Well, first to Bruce Boggs, then to Carol
22 Westmoreland and then to -- They referred me -- Because
23 I wanted to contact HR.  And they didn't know exactly
24 who to contact.  So they referred me to somebody
25 locally who then referred me to somebody in Vienna,

103

1 Virginia, I think.
2    Q.   Was that the first time you had actually
3 expressed some type of concern to HR?
4    A.   Yes.
5    Q.   Okay.  Who was the person in Virginia that
6 you worked with or you contacted?
7    A.   I have no idea.
8    Q.   Who's the person locally that you were put in
9 touch with?
10    A.   I don't recall.
11    Q.   Did you have any conversations with these HR
12 individuals to who Bruce and Carol referred you?
13    A.   I did.  Yeah, I -- So I sent an e-mail, I
14 think, to the gal that was local.  And she referred
15 it -- I don't think I talked to her.  She referred it
16 to somebody in Vienna, Virginia.  And I believe I did
17 have one or two conversations with -- There was a guy
18 and -- and a girl, man and woman or whatever.  And so
19 it might have been her and her boss or something -- I
20 don't recall -- in Vienna, Virginia.
21    Q.   You don't recall the names of those
22 individuals?
23    A.   I don't.
24    Q.   How did your concern get resolved?
25    A.   They ultimately -- So I -- what I was

104

1 concerned about was being moved -- I -- I -- Well, I
2 was told that I was being moved from an AE-II to -- to
3 an AE-I, and I wanted to know if that was going to
4 affect my pay.  And they said:  "We have no idea."
5        And I said:  "Do you know why I'm
6 being moved from an AE-II to an AE-I?"
7        And they said:  "We have no idea."
8 So I said okay.
9        And that's when I asked them who else
10 I can talk to because they couldn't answer my
11 questions.  And they referred me to that HR person who
12 referred me to some other HR people in Vienna,
13 Virginia.  And they ultimately came back and said:  "We
14 take it back.  You're not going to go from an AE-I to
15 an AE-II.  You're going to stay an AE-II and your
16 income is not going to change at least through the end
17 of the year."  So that's how it was resolved.  And I
18 was like okay, fine.
19    Q.   Okay.  And you don't recall who it was who
20 told you about that there wasn't going to be a change
21 and your income would remain the same through 2016?
22    A.   I know that it was a woman in Vienna,
23 Virginia.
24    Q.   Other than that you don't know her name,
25 title or anything?

105

1    A.   No, but I'm sure they have copies of that
2documentation.
3    Q.   Was she with Time Warner Cable?  Do you know?
4    A.   She might have been with Charter.  And maybe
5that's why it got referred to Vienna, Virginia.
6    Q.   You don't know, in other words, was she a
7Time Warner Cable Legacy employee or Charter Legacy
8employee?
9    A.   I don't know.
10   Q.   And so you would have made that complaint
11around May, June 2016, correct?
12   A.   I believe it was May.
13   Q.   Okay.  Let's go back to Exhibit 5.
14   A.   Okay.
15   Q.   And Exhibit 5, the first e-mail is a e-mail
16from Ryan that references -- it says: "Team, as
17discussed on the call, please use the below format to
18provide your daily activity by 4:30 every day."  Did I
19read that correctly?
20   A.   Yes.
21   Q.   And then he has different bullet points
22underneath, the first one being "calls made today" and
23parenthesis "target 30."  And then under that "number
24of appointments -- appointments attended" and then
25"target 2."  And then it goes on from there.  Correct?

106

1    A.   Correct.
2    Q.   And so is this the document that you're
3referring to when you say that -- that there was 30
4calls you had to make in a day, or was there some other
5document?
6    A.   No.  There were other documents that
7described essentially what a call was.  So there was a
8document that -- that made clear that what a call was
9was a door knock.
10   Q.   Was this a Word document, or was it in some
11other format?
12   A.   I don't recall.
13   Q.   You don't recall what kind of format it was
14in?  Was it like a form that you would fill out?
15   A.   I don't know if it was a PDF or if it was a
16Word document or if it was -- I don't know.  I don't
17recall what kind of document it was.
18   Q.   Now, here it doesn't say that you've got --
19that this is door knocking.  It just refers to calls
20made today, correct?
21   A.   Right.
22   Q.   Is that correct?
23   A.   That's correct.
24   Q.   Okay.  And then it says "number of
25appointments attended," "number of proposals presented"

107

1and things of that nature, correct?
2    A.   Correct.
3    Q.   And that the goal of this is to get a better
4understanding of what it takes to hit 30 PSUs per
5month.  That's what Ryan writes in this e-mail,
6correct?
7    A.   Right.
8    Q.   PSUs are what?
9    A.   Product service units.
10   Q.   And that's where you were talking about
11earlier that things were changing from the dollar
12amount of a sale to specifically what product was being
13sold?
14   A.   Well, not product but how many.  So --
15   Q.   How many sales you had?
16   A.   Essentially.  I mean -- I mean, I'd have to
17define that a little bit better for you, but yes.
18   Q.   Okay.  And you write a response to Ryan to
19that e-mail, correct?
20   A.   Right.
21   Q.   And you indicated in your response to
22Mr. Voigt that you were not present during the 8:30
23call, correct?
24   A.   Right.
25   Q.   And this is a response you're sending at 4

108

1o'clock p.m. that day on July 8th, correct?
2    A.   Correct.
3    Q.   And then you go on to talk about -- you say:
4"It appears the central prospecting strategy that we're
5being advised to adopt going forward focusing --
6focuses on making door-to-door cold call
7solicitations."  Where did you get that conclusion that
8that was the appearance of what the central prospecting
9strategy was going to be?
10   A.   The document that was attached that described
11what making 30 phone calls was and was not.  So it
12wasn't making telephone calls.  It wasn't -- It was
13going door to door.
14   Q.   And so you're claiming that this was a
15document attached to the meeting request you reference
16in this e-mail?
17   A.   That's correct.
18   Q.   Okay.  But you don't say that, "according to
19the document attached to the meeting request," do you?
20   A.   No, I didn't say that.
21   Q.   Okay.  And you talk about in here that your
22territory is spread across 18 different zip codes?
23   A.   Uh-huh.  Correct.
24   Q.   Was that your territory as it existed in July
25of 2016?

109

1    A.  Yes.
2    Q.  Had your territory changed at any time in --
3in -- prior to July of 2016?
4    A.  The territory changed in, I believe, December
5of 2015 or January of 2016.  So right in that time
6frame.
7    Q.  Okay.  So your territory changed December
82015, 2016.  How did it change from what it was
9before?
10    A.  Well, the way it changed is prior to that I
11could sell anywhere in the State of Texas or anywhere
12where Time Warner Cable provided service.  So I could
13sell anything anywhere.  So, for instance, while I was
14working with Regus, Regus was based out of Pennsylvania
15is where their headquarters were.  And they have
16operations globally, but they have 900 offices in the
17United States.  So I was able to pursue that
18transaction.
19    Q.  So prior to December 2015, January 2016 I
20take it you had no geographical limitation on your
21territory?
22    A.  That's correct.
23    Q.  Okay.  And then it came about that you did
24and you were assigned particular zip codes?
25    A.  That's correct.

110

1         (Deposition Exhibit No. 7 marked.)
2    Q.  (BY MS. REINHARD) I'm going to show you what
3I've marked as Exhibit 7, which is a listing of zip
4codes by account executive.  Do you see your name
5listed on Exhibit 7?
6    A.  I do.
7    Q.  And Exhibit 7 is -- are those the 18 zip
8codes that were assigned to you?
9    A.  I believe so, yes.
10    Q.  Now, did you make any complaints about your
11geographical territory being limited to 18 zip codes?
12    A.  No.
13    Q.  And then you write in this e-mail that you
14would like to see in writing the company's position on
15hail -- how sales personnel should proceed in the event
16of a business -- or in the event a business is
17appropriately displaying a "no soliciting" or
18equivalent signage.  Had you been advised what the
19company's position was verbally prior to sending this
20e-mail on July 8, 2016?
21    A.  No.
22    Q.  Okay.  So I take it prior to July 8th of 2016
23you weren't asked to do anything that in your mind you
24thought was somehow illegal?
25    A.  Correct.  So prior to that July 8th it was

111

1not a requirement to go door-to-door soliciting at 30
2locations a day.
3    Q.  And there's nothing in Mr. Voigt's response
4back to you that says that that's a requirement, does
5it?
6    A.  Specifically the door to door?
7    Q.  Correct.
8    A.  There was in the attached documents, which is
9how I got the information that we were supposed to go
10door to door.
11    Q.  But there's nothing in Mr. Voigt's response
12back to you --
13    A.  It is --
14    Q.  -- saying that that's a requirement?
15    A.  Correct.
16    Q.  Okay.  And in fact --
17    A.  Although he acknowledges it.
18    Q.  Well, where does he acknowledge it?
19    A.  In his response.
20    Q.  Where?
21    A.  Let me read it to you.  So he says:  "No
22worries on the call this morning.  I thought I sent a
23calendar invite to everyone, but we have been mixed up
24with TW" --
25    Q.  I'm going to stop you right there.

112

1    A.  Okay.
2    Q.  Identify where in the response versus reading
3the entire response -- I want to save our court
4reporter here -- where in the prior response you claim
5that he acknowledges.
6    A.  He has -- says "I understand your concern
7and -- your concerns and they are valid."
8    Q.  Now, this attachment, did it say anything
9about "no soliciting" signs at all?
10    A.  What attachment?
11    Q.  You said that there was an attachment to the
12calendar appointment about the problem --
13    A.  Oh, did it say anything about "no soliciting"
14signs?  No.
15    Q.  And we just need to make sure you and I don't
16talk over one another.  So if you'll wait till I get my
17entire question out.  That way we can make her job a
18little bit easier.
19    A.  Okay.
20    Q.  You then say in your e-mail to Mr. Voigt that
21in your experience during past suggestions to go door
22knocking most businesses do have these signs referring
23to "no soliciting" signs.  Were you ever suggested to
24go door knocking during the time that you were working
25under Time Warner Cable?

117

1 into buildings that had "no soliciting" signs?
2   A. No, because I don't think that we were doing
3 any of that stuff at that point.
4   Q. Okay.
5   A. So there was no more of the building blitz
6 stuff until maybe, I'm going to say, September or
7 October of 2015.
8   Q. So are you saying that in September, October
9 2015 you started doing building blitzes again or --
10   A. That's when Carol Westmoreland -- and I think
11 it was once a month that she wanted to try the building
12 blitz thing.
13   Q. So that would have coincided when you started
14 reporting to Bruce Boggs, correct?
15   A. Yeah. Probably.
16   Q. And you said you didn't do any building
17 blitzes when you reported to Bruce Boggs, right?
18   A. I -- Bruce never required it. He never
19 suggested to us that we should do that. But I do
20 believe Carol Westmoreland like on once a month wanted
21 everybody -- everybody to go out and do a building
22 blitz.
23   Q. But even though she suggested it, you didn't
24 actually do it. Is that correct?
25   A. Well, I didn't solicit business door to door,

118

1 but they didn't really require that. So what I did was
2 go to a building and essentially take pictures of the
3 marquee that showed who all the clients were so I could
4 contact them.
5       MS. REINHARD: Why don't we take a
6 break here. Seems we've been going for about an hour
7 and a half. So if we can go off the record.
8       (Break taken at 2:01 to 2:22 p.m.)
9   Q. (BY MS. REINHARD) Mr. Fadness, we've come
10 back from a break. Are you ready to proceed with your
11 deposition?
12   A. Yes.
13   Q. Did you have an opportunity to speak with
14 your attorney over the break?
15   A. Not about the case.
16   Q. Did you have a chance to speak to him
17 though --
18   A. Yes.
19   Q. -- had you wished to do so?
20   A. Uh-huh.
21   Q. Is that a "yes"?
22   A. Yes.
23   Q. And is there anything about your testimony
24 thus far that you need to change at this time?
25   A. No.

119

1   Q. Okay. Before the break we were talking about
2 these building blitzes that Carol Westmoreland had
3 suggested that you do. And did you actually do any
4 door-to-door visits with potential new customers after
5 your territory changed in December of 2015?
6   A. Sure. Yeah. I mean, if I called on a
7 company -- Well, after December 2015 when we went to
8 territories --
9   Q. Correct.
10   A. -- I don't think so.
11   Q. So from December 2015 through at least June
12 2016 how did you go about finding new customers to sell
13 services to?
14   A. Well, when they changed to territories, then
15 there were only specific customers that we could call
16 on. So you were given a territory and each person was
17 given a list of accounts within that territory
18 according to their CRM system. And you were supposed
19 to have, you know, I think between three and 400
20 accounts. And then you would contact those accounts.
21       In my case after an evaluation of my
22 territory I had 39 accounts that qualified and they
23 were spread out over many, many, many square miles.
24   Q. And so who did this evaluation that lowered
25 the accounts in your geographic territory assigned from

120

1 1300 to 400 down to 39?
2   A. I did.
3   Q. And so what sort of analysis did you do?
4   A. I contacted every company that was listed as
5 a business in my territory that was supposed to be,
6 according to them, somebody that fit my rules of
7 engagement profile.
8   Q. And how did you contact them?
9   A. Typically by phone.
10   Q. Did you visit any of those in person?
11   A. Yes.
12   Q. And when you visited those in person, would
13 you set up an appointment beforehand?
14   A. Yes.
15   Q. And so you would contact them first initially
16 by phone?
17   A. Yes.
18   Q. And what about your rules of engagement led
19 it to go from three to 400 to 39?
20   A. Well, somewhere in the documents that we've
21 provided are included the rules of engagement and they
22 show the profile of the business that I was allowed to
23 call on. So just as an example, it could not be an
24 existing customer. It had to be a commercial business.
25 It could not be a medical, you know. So they would

121

1have all of these different kinds of SIC codes, for
2instance, in the medical industry. So if they were
3associated with any of those SIC codes, you couldn't
4call on them. If it were anything related to
5government or municipality or education, you couldn't
6call on them. And they had to have a very specific
7employee count. So there were all of these different
8engagement rules that you had to check first before you
9could contact a company, which is stated very clearly
10in the rules of engagement.
11    Q.  And so by when did you make this
12determination that you only had 39 accounts in your
13geographic territory that would qualify?
14    A.  I'm going to guess -- I'm going to guess in
15April.
16    Q.  Of 2016?
17    A.  Yes, ma'am. March or April because there was
18a specific meeting in March or April.
19    Q.  What do you mean specific meeting?
20    A.  Carol Westmoreland determined -- She went to
21Bruce Boggs, who was my boss, and Jim Parker and -- I
22don't know if there were other people -- and said that
23we want you to create a PowerPoint presentation and in
24that PowerPoint presentation we want you to explain how
25it is you intend to meet the metrics that the company

122

1wants you to meet, which in theory should lead to, you
2know, sales figures. So, of course, they -- you know,
3they had a quota, which very few people in the company
4hit on a consistent basis, you know. Maybe two or
5three percent if they're lucky. Most people did not.
6        But at any rate, there were metrics
7that you supposed to meet, and we were supposed to
8create a PowerPoint presentation and explain in this
9PowerPoint presentation how we were to achieve each one
10of these metrics.
11    Q.  Was that something you were directed to
12prepare or Bruce and Jim Parker?
13    A.  It was something the individual salespeople
14were supposed to pre -- prepare.
15    Q.  And did you prepare one?
16    A.  I did.
17    Q.  And so how did you indicate you were going to
18meet your metrics?
19    A.  I advised them that it would be impossible
20based on the number of accounts in my territory that
21fell within my description.
22    Q.  And who did you present this PowerPoint to?
23    A.  We all put the PowerPoint presentation on in
24front of the -- I think it was in front of the team ·
25members of Jim's team, my team -- Jim Parker, Bruce

123

1Boggs and Carol Westmoreland.
2    Q.  And what feedback did you get from your
3PowerPoint presentation, if any?
4    A.  Carol Westmoreland told me that I was
5focusing on the wrong set of issues, that I was
6supposed to tell her how I was going to achieve the
7metrics. And I explained to her that I did tell her
8how I was going to achieve -- or how I could achieve
9the metrics. And she said that she was going to
10research my territory and get back to me.
11    Q.  How did you tell her you could achieve the
12metrics?
13    A.  That I would actually have to have the number
14of accounts that they prescribed, which would be three
15to 400 accounts, because if there's only a small
16percentage of businesses that at any given time are in
17a position to even think about changing service
18providers, because they are typically under an existing
19contract -- almost all of the contracts for service
20that I sold people were for between three and five
21years, sometimes seven years. So once you're under
22contract, you're -- you can't make a change for seven
23years. So out of 300 accounts at any given time you
24might have 2 or 3 or 4 percent in any given month, if
25you can find them, that are in a position to be able to

124

1change.
2    Q.  So how you would meet the metric was you
3wanted the number of accounts that they indicated which
4would be three to 400 accounts, correct?
5    A.  Right. So I said for me to meet these kind
6of metrics I would actually have to have, you know, the
7350 or 400 accounts that you think that we should have.
8    Q.  Did Carol ever get back to you on her
9research?
10    A.  No.
11    Q.  Did anyone ever get back to you with regard
12to the nature of your territory?
13    A.  No.
14    Q.  But this territory change came about before
15there was anything that in your mind indicated you
16needed to do door knocking, correct?
17    A.  Right.
18    Q.  And door knocking is what you're referring to
19as -- as doing cold call going door to door, correct?
20    A.  Door knocking is door-to-door solicitation,
21yes.
22    Q.  Well, you say door-to-door solicitation.
23When you were advised to do these building blitzes,
24what did they tell you you were supposed to do? What
25did Carol say you were supposed to do in a building

125

1 blitz?
2    A.   They suggested going door to door, but they
3 did not say that it was a requirement.
4    Q.   But what were you told to do in terms of
5 going door to door?  What were you supposed to do?
6 Just walk in the door and do what?
7    A.   Ascertain who the occupants of the building
8 were so you could contact them.
9    Q.   Was there any further instruction given as to
10 what you would do during this building blitz besides
11 determine who the occupants of a particular office
12 building were?
13    A.   No.
14    Q.   Now, you said earlier that you did do a
15 little bit of door-to-door solicitation in terms of you
16 would go to a strip mall and if a business didn't have
17 a "no solicitation" -- "no soliciting" sign you would
18 stop in.  Right?
19    A.   Yes.
20    Q.   On those occasions what would you say to the
21 business that you're stopping into?
22    A.   I would stop in, introduce myself, tell them
23 who I was, who I worked for and ask them if they were
24 in a position to -- you know, if they were happy with
25 their current service provider, talk to them about the

126

1 service that we offered, if they were interested in
2 having a discussion.  So it wasn't -- You know, if
3 there was a -- a store next to the one that I was in --
4 And this is before we had territories.  So --
5    Q.   Because once you had territories, you didn't
6 even stop in on any businesses that weren't assigned to
7 you, right?
8    A.   You weren't allowed to or you weren't
9 supposed to according to the rules of engagement.
10    Q.   Now, you said that you would introduce
11 yourself and then ask if you're happy with the service
12 and talk about what services you could provide.  Are
13 you just saying this to the first person you come
14 across?
15    A.   Well, yeah, I mean, you can start the
16 conversation that way with -- Say, for instance, in
17 there Sylvia would be the girl at the desk.  So I would
18 explain --
19    Q.   You wouldn't --
20    A.   -- who I was --
21    Q.   You wouldn't try to find out --
22         MR. GOLDBERG:  Wait.  Object -- Let
23 him --
24         MS. REINHARD:  -- who's the decision
25 maker?

127

1         MR. GOLDBERG:  Let him finish his
2 answer.  You didn't let him finish.
3         MS. REINHARD:  That's fine.
4    Q.   (BY MS. REINHARD) I'm sorry.  Please go
5 ahead.
6    A.   So I would talk to Sylvia and explain who I
7 was and what we do and probably ask her about the
8 current services and see if they were happy, would they
9 consider -- you know, were they in a position to want
10 to consider anybody else's services.  And she might
11 say:  "Well, I don't handle that but Rose does."
12         And then I would say:  "Okay.  Could
13 I speak to Rose."
14         And she might say:  "I'll check with
15 her."  Or she might say:  "No.  If you want to talk to
16 Rose, you know, you'll have to see if she wants to make
17 an appointment" or whatever.
18    Q.   And if she just wanted to make a future
19 appointment, you would leave behind your business card,
20 correct?
21    A.   Sure.
22    Q.   And then you would follow up by phone
23 thereafter, right?
24    A.   Yes.
25    Q.   Did you insist on meeting with the person who

128

1 could make the decision immediately?
2    A.   No.
3    Q.   Were you ever instructed by anybody at Time
4 Warner Cable or Charter that you had to insist on
5 meeting with the decision maker immediately?
6    A.   Well, that was never an issue with Time
7 Warner Cable.  So if we're talking about Charter, I
8 don't know that they -- I wouldn't -- I wouldn't
9 describe it as insisting.  You know, that was the
10 objective, but it's not like they said you go in there
11 and demand to meet the decision maker, insist on it.
12 So no, I wouldn't say that they put it that way.
13    Q.   And in terms of any information you received
14 with regard to door knocking, as we've been referring
15 to it, the attachment that you claim was to a July 2016
16 meeting calendar invite -- did it talk about what to
17 do, how you were supposed to go about approaching
18 businesses when you were going door to door?  Did it
19 tell you the mechanics of it?
20    A.   It talked about what a call was.  So a call
21 specifically was not a telephone call, not an e-mail
22 but a door knock.  So a cold call, door knock, you
23 know, going door to door and doing this at businesses
24 that were not existing customers.
25    Q.   Did it say anything further in terms of what

**129**

1 you were supposed to do when you went to those
2 businesses?
3    A.   Other than by reference that you were
4 supposed to achieve two or three proposals a day and as
5 a result of those two or three proposals they theorized
6 that you should get at least one sale.  So you go and
7 make these contacts.  And if you do, I think, a minimum
8 of 30 cold call solicitations a day, you should be able
9 to make three proposals and out of those three
10 proposals you should be able to make one sale.
11    Q.   And that's the extent of the instruction that
12 was given?
13    A.   Right.
14    Q.   Do you know what cities fall within your
15 territory, your geographic territory of 18 zip codes?
16    A.   I've produced documents that provided that
17 information.  For instance, Manor, Elgin, Hutto,
18 Bastrop, Columbus, Smithville, Cedar Creek.  I had a
19 couple of zip codes on the outskirts -- on the -- on
20 the eastern outskirts of Austin.  So my territory
21 essentially started at the eastern border of Austin and
22 went three-quarters of the way to Houston.
23    Q.   And do you specifically know, for instance,
24 of any city in Elgin -- within the City of Elgin if any
25 business -- a specific business had a "no soliciting"

**130**

1 sign on it?
2    A.   I believe that the business that I sold had a
3 "no soliciting" sign.
4    Q.   And what was that business?
5    A.   I think it was H&H Utilities.
6    Q.   Any others in Elgin?
7    A.   Not that I specifically recall, no.  I only
8 had a few customers in Elgin.  Like in the City of
9 Elgin I might have had three -- two or three businesses
10 that fell within my ability to call on.
11    Q.   The most populace city probably in your group
12 was -- would be Bastrop; is that correct?
13    A.   Well, Bastrop is pretty populace.  Columbus
14 was pretty populace.  Certainly the -- you know, the
15 eastern edge of Austin was filled with office
16 buildings.
17    Q.   Well, any businesses in Columbus that you
18 know specifically had "no soliciting" signs?
19    A.   Well, again, in Columbus I think there were
20 maybe three businesses that I was able to call on.  And
21 I do believe that the one business that I came closest
22 to making a sale with had "no soliciting" signs on
23 their building.
24    Q.   What about the other two?  Do you know one
25 way or --

**131**

1    A.   I don't know because the other two were not
2 interested in discussing services at all.  The one
3 company that I met with was a glass company.
4    Q.   What was the name of the glass company?
5    A.   I don't recall offhand.
6    Q.   Do you know where it was located in Columbus?
7    A.   It was kind of on the outskirts.  They had
8 a -- a plant on the outskirts of Columbus, and then
9 they had like a showroom downtown.  And the showroom
10 downtown had the "no soliciting" sign.  Then I think
11 the plant on the outskirts of town had a "no
12 soliciting" sign.  Like E -- Started with an "E."
13    Q.   And Bastrop, do you know of any businesses
14 there that had "no soliciting" signs specifically?
15    A.   Specifically almost every business that I
16 called on in Bastrop had a "no soliciting" sign.  And I
17 don't recall the names of the businesses because most
18 of them were in an industrial park.
19    Q.   What was the -- Where was the industrial
20 park?
21    A.   Well, it was your -- Is it 71 that runs
22 through Bastrop?
23    Q.   Correct.
24    A.   So it's probably on the east side of town on
25 the right.  And it was a fairly big industrial park

**132**

1 that was very new.
2    Q.   Any other businesses outside of this
3 industrial park that you can identify their location,
4 if not recall their name?
5    A.   No, I don't recall any specific names.
6    Q.   What about any specific businesses in
7 Smithville?
8    A.   I sold -- I think I only had one account in
9 Smithville.
10    Q.   Did you ever visit it in person?
11    A.   Yes.  I sold them service.
12    Q.   Did they have a "no soliciting" sign?
13    A.   I don't recall specifically.  I think so, but
14 I don't -- I wouldn't say that I'm sure.
15    Q.   What was the account that you had in
16 Smithville?
17    A.   I don't recall.  I could find it, but -- You
18 know, if I looked on Google Maps, I'm sure I could find
19 it that way.  About the only big company in Smithville
20 and it was right on the right side of the highway.
21    Q.   And did you have any accounts in Hutto?
22    A.   Yes.
23    Q.   How many?
24    A.   Probably, again, on the order of three or
25 four.  And they were mostly in one industrial park,

133

1again.
2  Q.  And did they have any "no soliciting" signs?
3  A.  I believe so.
4  Q.  Did you visit the locations personally?
5  A.  Yes.  At least two of them.
6  Q.  Did you make any sales to any of these Hutto
7businesses in the industrial park?
8  A.  No.
9  Q.  On H&H Utilities you said that you made a
10sale to them, correct?
11  A.  Yes.
12  Q.  When did you make that sale?
13  A.  I'm going to guess in May of 2016.
14  Q.  And the one account you sold in Smithville,
15when did you make that sale?
16  A.  Maybe July 2016.
17  Q.  And how did you first approach this company
18in Smithville?
19  A.  I believe I called them.
20  Q.  So you -- By phone?
21  A.  Yes.
22  Q.  And H&H Utilities?  How did you first
23approach H&H?
24  A.  By telephone.
25  Q.  Now, once you were told or you saw this

134

1attachment about door knocking, did you start to keep
2records and produce a daily activity as was indicated
3in July 8th of 2016?
4  A.  Yes.
5  Q.  And how would you -- how did you maintain
6that daily activity report?
7  A.  You would fill out a sheet.  We would each
8fill out a sheet and send it to Ryan.
9  Q.  When you said you filled out a sheet, was
10this a Word document, an Excel document or was this
11actually a paper form that you would hand write?
12  A.  I believe it was a Word document.
13  Q.  And so you would fill it out electronically?
14  A.  Yes, I think so.
15  Q.  And whenever you would fill out this report,
16would you save it?
17  A.  No, I don't think I saved it.  I would send
18it to Ryan.
19  Q.  And how would you send it to Ryan?
20  A.  E-mail.  And I -- I don't know if it was
21weekly or daily.  I think we had a daily discussion,
22but I think it might have been -- the form might have
23been weekly.
24  Q.  Well, if you look at Exhibit 5, an e-mail
25that Ryan sends to the group, he indicates that there

135

1is a daily activity report.
2  A.  Okay.  Then it was daily.
3  Q.  And so for calls made today, would you put
4zero each time thereafter July 8th?
5  A.  No.  I would put the number of calls that I
6made.
7  Q.  And in that number would you include phone
8calls or e-mail contacts you made, or would you just
9include when you would cold call in person?
10  A.  No.  I would include phone calls, e-mails,
11all kinds of contacts.  But I had had a number of
12conversations with Ryan that, you know, A, I only -- He
13knew how many accounts that I had.  So I'd had that
14conversation with him on a number of different
15occasions.  And I also told him that under no
16circumstances was I going to violate "no soliciting"
17signs.  "So if, you know, the requirement was to
18violate 'no soliciting' signs, I can't do that.  But if
19you need me to put a number down in here, you tell me
20what number you want me to put and I'll do whatever you
21want me to do so you can cover your butt."
22  Q.  And so you're saying that this is a
23conversation that you had with Ryan about how you were
24going to figure out what the call -- what you
25considered to be calls and what you were going to put

136

1on your daily activity report?
2  A.  That I -- That I -- Ryan knew that I would
3not violate a "no soliciting" sign because I believed
4it was illegal.  So --
5  Q.  And when did you first tell Ryan that you
6thought it was illegal?
7  A.  Probably July 8th.
8  Q.  Did you have -- Okay.  So July 8th it's clear
9that you guys don't -- at least it appears that you
10guys did not have any phone conversation or in-person
11conversation?
12  A.  No.  We did have phone conversation that day.
13I don't recall whether it was before or after this.  It
14might have been in the morning before this letter.  No.
15It was probably after that.
16  Q.  So you send him an e-mail at 4:07 p.m.
17explaining why you weren't on the call?
18  A.  Uh-huh.
19  Q.  And then you added some additional
20information or your position with regard to
21door-to-door cold calling and with regard to the "no
22soliciting" sign.  And then he responds back and, you
23know, says no worries about the call.  And he talks
24about touching base on Monday.  So you're now saying
25you had a verbal conversation with Mr. Voigt on July

137

18th?

2    A.   I thought that we did.  Maybe we didn't.

3    Q.   You had mentioned in your --

4    A.   I think we did though.  I think we had a
5 conversation after this e-mail.

6    Q.   So after 6:09 p.m.?

7    A.   Yeah.

8    Q.   And what do you recall from that conversation
9 after 6:09 p.m. on July 8th?

10    A.   Just clarifying that -- you know, what was in
11 the meeting, what they were requesting and requiring.
12 This has been months ago.  So --

13    Q.   Well, what did Ryan tell you during this --

14         MR. GOLDBERG:  Wait, wait.  Were you
15 finished with your answer?

16         THE WITNESS:  Well, I was just going
17 to say that I wanted to make sure that they really --
18 you know, that -- that the only thing we were allowed
19 to do was make door-to-door cold call solicitations.

20    Q.   (BY MS. REINHARD) Okay.  I want to focus on
21 what you and Ryan spoke about after the 6:09 p.m.
22 e-mail and what you say you recall a verbal
23 conversation you had with him.

24    A.   And that's what I think we talked about.

25    Q.   What specifically did Ryan tell you was

138

1 required?

2    A.   That that's what they wanted.

3    Q.   What is "that"?

4    A.   Just exactly what I said, that they wanted
5 these -- what they considered to be a sales call was a
6 cold call solicitation or a door knocking, you know,
7 the way they describe it.

8    Q.   So he used the word "sales call"?

9    A.   Yeah.

10    Q.   Ryan did specifically?

11    A.   Yeah.  In terms of the door-to-door sales
12 call, yeah.

13    Q.   Okay.  And what else did he say?

14    A.   We didn't talk a whole lot about it.  I just
15 wanted to confirm that that was really the company
16 position because I couldn't -- to me that was just
17 outrageous.  So I was trying to figure out if that's
18 for real.  And I don't think we talked a whole lot.

19    Q.   How long did this phone call last?

20    A.   Maybe a few minutes.

21    Q.   Did you -- Was this using your cellphone?

22    A.   Yeah, I would assume.  It would have been the
23 company's cellphone.

24    Q.   You had a company-provided cellphone?

25    A.   Yes.

139

1    Q.   And is that the only cellphone you would use
2 to communicate with Ryan Voigt?

3    A.   Pretty much, I think so.

4    Q.   So Ryan tells you, yes, you're going to have
5 to do door-to-door calls.  What do you say in response?

6    A.   Well, I said I want to see -- I want to see
7 the company's position on this in writing because what
8 I'm thinking is if I go into -- if I violate somebody's
9 "no soliciting" sign and they want to prosecute me for
10 trespassing or -- or whatever the penalty might be,
11 that I want something that I can give the owner of that
12 building saying I'm doing this because I was threatened
13 that I'll lose my job if I don't --

14    Q.   Well --

15    A.   -- and this -- and the company requires this,
16 it's not my idea, I wouldn't do it.

17    Q.   Now --

18    A.   But I wanted something in writing from the
19 company to show this is why I'm violating your "no
20 soliciting" sign because I'm being told I have to do it
21 or I'm going to lose my job.

22    Q.   Did you explain all that to Ryan in this
23 phone conversation, or did you just tell him you wanted
24 to see it in writing?

25    A.   I may have described to him why I wanted it

140

1 in writing.  I don't recall.

2    Q.   Do you know for sure whether you did?

3    A.   No, I don't.

4    Q.   So it's possible you did not?

5    A.   Correct.

6    Q.   Now, did you -- Now, at this point in time
7 Ryan didn't tell you that if you don't do this you're
8 going to be fired?  He didn't tell you that on July
9 8th, did he?

10    A.   No, I would say he didn't tell me that on
11 July 8th.

12    Q.   So going into the next week in July you start
13 sending in your daily activity report that's being
14 requested, right?

15    A.   Uh-huh.

16    Q.   Is that a "yes"?

17    A.   Correct.

18    Q.   And you start putting down calls you've made
19 which included in -- for your numbers, phone calls,
20 e-mails and any other contacts?

21    A.   That's right.

22    Q.   Now, did Ryan ever come back and challenge
23 you in terms of why your numbers were the way they were
24 in your daily activity report?

25    A.   Yes.

145

1   A.  No, Ryan Voigt did not.  That was Gail
2 Kodama.
3   Q.  And that wasn't, according to you, until
4 about August 23rd or 24th, right?
5   A.  Whatever that e-mail is dated that I sent to
6 Ryan.
7   Q.  Okay.  But Ryan Voigt never said you need to
8 ignore a "no soliciting" sign?
9   A.  No, he didn't.  I told Ryan that -- several
10 times that I wanted a response in writing.  I said that
11 I asked him for that in writing.  I asked him that face
12 to face on several different occasions.  Typically when
13 it would come up about these numbers, I'd say, you
14 know, I asked for this in writing, still haven't gotten
15 anything.  And he'd say I sent your request on, blah,
16 blah, blah, but I haven't heard anything back yet.  So
17 Ryan just essentially didn't seem to have any opinion
18 on what the company's physical position was on
19 soliciting at buildings that had "no soliciting" signs
20 other than he said he was working on getting those
21 answers for me.
22   Q.  And Ryan never issued you any corrective
23 action, did he?
24   A.  No.
25   Q.  And, in fact, at no time during the time that

146

1 you worked for -- whether it was Time Warner or Charter
2 Communications you were never demoted actually,
3 correct?
4   A.  Correct.
5   Q.  And you never had your like base salary cut
6 or the percentage of commission you were going to
7 receive cut?
8   A.  No.  Well, the commission structure was
9 changing.  What they -- When they moved me to Ryan's
10 team, you know, the deal was this was something --
11 they -- they now call two different divisions,
12 enterprise and cable operations.  So Ryan's team was
13 supposed to be only focusing on cable operations, which
14 meant that you could not -- no longer sell fiber optic
15 products.  But I was -- they didn't stop me from
16 selling fiber optic products.  And I think the deal was
17 is that that wasn't going to change, too, maybe until
18 the end of the year.
19   Q.  That would be a change also that was going to
20 affect more than just you, correct?
21   A.  Yeah.  I think there were five of us.
22   Q.  So other account executives, too?
23   A.  Right.  I think there were a total of five
24 account executives.
25   Q.  And that was a change that came before

147

1 you had any discussions with Ryan Voigt about being
2 required to do door-to-door calls or your objections to
3 doing so when there's "no soliciting" sign?
4   A.  Right.  This was immediately after Charter
5 completed the merger of Time Warner Cable, but it was
6 actually a few weeks before they came out, you know,
7 with the first inkling that this is how they wanted us
8 to conduct business going forward.
9   Q.  So in other words, those changes had nothing
10 to do with your objections you had to calling on
11 businesses with "no soliciting" signs?
12   A.  No.
13   Q.  Now, you said that you spoke to Gail Kodama.
14 Before I go into the details of those, did you speak
15 with anybody else in person about your objections to
16 calling on businesses with "no soliciting" sign before
17 you go on leave in September besides Ryan Voigt and
18 Ms. Kodama?
19   A.  No.  She was vice president -- senior vice
20 president of the company.  So I assumed that was about
21 as high as I could go.
22   Q.  Now, how many other account executives were
23 on Ryan's team besides yourself?
24   A.  Eight or nine.
25   Q.  Do you know if any of the other account

148

1 executives ever raised objections to calling on
2 businesses with "no soliciting" signs?
3   A.  Personally with Ryan, no, I don't know.  I
4 do -- It seems like I recall Michael Gates, you know,
5 saying something like, wow, I can't believe this.  But
6 no, I mean, I don't know what any of these other people
7 might have said privately with Ryan.
8   Q.  Do you know whether -- what -- You said
9 Michael Gates said what?  "I can't believe this"?
10   A.  Yeah.  He seemed to be, you know, kind of
11 surprised at -- at the changes that they were making,
12 you know, that this is how we're supposed to be
13 conducting business going door to door.
14   Q.  Is this just a comment he made to you, or is
15 this amongst a group?
16   A.  Comment he made to me.
17   Q.  No one else is around?
18   A.  There may have been other people around, but
19 it was not actually during the meeting.
20   Q.  Did he say specifically what the "this" was,
21 or was it just the changes in general?
22   A.  I think just the changes in general.
23   Q.  And did you ever ask him about his position
24 with regard to handling businesses with "no soliciting"
25 signs?

149

1   A.   No.
2   Q.   Do you know whether or not Mr. Gates has
3called on any businesses that have "no soliciting"
4signs?
5   A.   No, I would have no way of knowing that.
6   Q.   Do you know if any of the other account
7executives did?
8   A.   I would have no way of knowing that.
9   Q.   Now, when you say that this was something
10that was to be expected and it came about, did it start
11immediately on July 8th that you had to turn in these
12daily -- these new daily reports specifying the number
13of cold calls you were making?
14   A.   Based on that meeting, yes, I think that was
15the introduction of this is the new way we are going to
16be doing business.
17   Q.   So to your knowledge was any account
18executive prosecuted or had any complaint made against
19them for ignoring a "no soliciting" sign?
20   A.   I don't know.
21   Q.   Well, did you ever have that happen to you?
22   A.   I never violated a "no soliciting" sign.
23   Q.   Have you ever in your sales career been
24prosecuted for violating a "no soliciting" sign?
25   A.   I have never in my sales career violated a

150

1"no soliciting" sign, but I do believe people in a
2former building that I was in had been prosecuted for
3violating "no soliciting" signs.
4   Q.   And who was this that you're aware of?
5   A.   I couldn't tell you specifically the
6individual, but the building that I was in had "no
7soliciting" signs.  And I'd have to get you the name of
8the management company, but it was a secure building
9and sometimes companies would get through the security
10to go inside the building because they had a meeting
11with, you know, a company on the second floor and then
12they would start going down the hall and knocking on
13doors, which happened a few times to my office on more
14than one occasion.  Those people were promptly
15escorted out of the building by security.  And I do
16believe that there was one or two cases where they were
17prosecuted.
18   Q.   Was this in Virginia?
19   A.   Yes.
20   Q.   Not anywhere here in Texas?
21   A.   No.
22   Q.   I'm going to show you what's marked as
23Exhibit 8 and ask you if you recognize Exhibit 8.
24        (Deposition Exhibit No. 8 marked.)
25        THE WITNESS:  Yeah.

151

1   Q.   (BY MS. REINHARD)  By the way, on Exhibit 8 as
2well as Exhibit 5 there's some yellow highlighting.
3And I'll represent to you that those were on the
4versions that we received from your attorney.  Do you
5know if those are your highlights?
6   A.   I don't believe so.  I don't know.
7   Q.   Do you know whose they are?
8   A.   No.
9   Q.   Okay.  Exhibit 8 is an e-mail exchange
10between you and Mr. Voigt, correct?
11   A.   Right.  Correct.
12   Q.   And this looks to be -- Ryan starts out --
13And it's dated August 24th, 2016.  And he says:  "Jeff,
14I need you to send me the letter you sent to HR
15regarding no solicitation or secure buildings."  Did
16you ever send a letter to HR that he's referencing?
17   A.   No.
18   Q.   And he says:  "I believe you were on Bruce's
19team when you sent that."
20   A.   Right.
21   Q.   Did you ever send any note to HR about not
22soliciting on secure buildings even when you were on
23Bruce's team?
24   A.   No.  He was mistaken.  I sent -- While I was
25on Bruce's team it was the other -- I did send a letter

152

1to HR that -- and that's the one that we extent -- that
2we discussed pretty extensively about, you know, was my
3salary going to change, why am I going from an AE-I
4to -- or an AE-II to an AE-I.  So he somehow thought
5that I had sent a message to HR regarding no
6solicitation.
7        And I explained to him no, that I
8didn't, you know, and I think you're confusing that
9with this issue.
10   Q.   Okay.  And then in your response you also
11mention a discussion you had with Gail Kodama, correct?
12   A.   Correct.
13   Q.   And as you have in your e-mail to yourself,
14you indicate that Gail Kodama at the time is vice
15president of SMB direct sales, correct?
16   A.   Right.
17   Q.   SMB, do you know what that stands for?
18   A.   Small to medium size business.
19   Q.   Okay.  And you indicate that "Gail stated in
20our team meeting yesterday morning that the official
21policy is for us to ignore such signs."  And so I take
22it this meeting would have occurred on August 23rd,
232016?
24   A.   Yes.
25   Q.   Did you -- Have you had any conversations

153

1 with Ms. Kodama besides on August 23rd, 2016?
2    A.  Other than sitting through team meetings that
3 were prior to that.  There were team meetings that she
4 and Richard Stevens held, you know, as kind of like a
5 meet-and-greet and this is the new policy.
6    Q.  So you attended some team meetings where Gail
7 Kodama participated prior to August 23rd, 2016?
8    A.  Right.
9    Q.  Did you have any communications with
10 Ms. Kodama after August 23rd, 2016?
11    A.  No.
12    Q.  The prior team meetings that were held was
13 there any discussion of door-to-door cold calling or
14 what to do if a business displayed a "no solicitation"
15 sign?
16    A.  There was discussion of door-to-door sales,
17 if that's what they wanted us to do, but -- and that
18 was not just my team.  That was several teams.  So
19 there were probably, you know, 40 or 50 people in the
20 meeting.  And no, I didn't raise the issue with "no
21 soliciting" signs in that.
22    Q.  Was there even any discussion of what to do
23 if there was a "no soliciting" sign?
24    A.  No.
25    Q.  Okay.  So August 23rd, 2016 do you know why

154

1 Ms. Kodama was -- Well, let me back up.  She was there
2 in person in Austin, correct?
3    A.  Yes.  Correct.
4    Q.  And do you know why she was in Austin on that
5 particular occasion?
6    A.  Not really, no.
7    Q.  When you say a team meeting, what team
8 meeting were you referring to?
9    A.  Ryan's team.  The team that I was on.  The
10 eight or nine of us that were on Ryan's team.
11    Q.  So this was a typical weekly sales meeting?
12    A.  Except for Gail was the one that was holding
13 the meeting instead of Ryan.
14    Q.  And what all did Gail discuss during this
15 meeting when the whole team is together?
16    A.  What the objectives were, that we were
17 supposed to do a minimum of like 30 or 40 door knocks a
18 day and that should lead to, you know, a certain amount
19 of proposals which should result in a certain amount.
20 So just kind of reiterating the metrics that they
21 wanted us to achieve and how they wanted us to achieve
22 those metrics.
23    Q.  Did she comment without anybody prompting
24 her -- did she comment at all about what to do with
25 regard to "no solicitation" signs?

155

1    A.  No.
2    Q.  Let me ask you this.  In any of your
3 discussions with Ryan Voigt did he ever tell you not to
4 include within the numbers that you were reporting for
5 daily activity -- to exclude from those your phone
6 calls or e-mail contacts?
7    A.  No.
8    Q.  So when he was talking about your numbers, he
9 was just talking about hitting 30 in total, correct?
10    A.  Well, when he was telling me -- So he -- No,
11 he didn't say don't include the phone calls.  What he
12 said was if you don't start doing what they want you to
13 do, if you don't start hitting 30 businesses a day,
14 which is -- those are the numbers that essentially he
15 was talking about -- if you don't start hitting 30
16 businesses a day, they're not screwing around, they're
17 going to fire you.  So it kind of led up to that over a
18 period of weeks of saying, you know, hey, you need to
19 start going out there and calling on these people face
20 to face, hey, you know, you're not -- you know, you've
21 got to go out there and start doing this to -- to, hey,
22 they're not F-ing around, if you don't start doing
23 this, they're going to fire you.
24        So he was getting heat and --
25    Q.  Did you ever speak directly to Richard

156

1 Stevens?
2    A.  Not specifically about door knocking, no.
3    Q.  Did you ever speak to Mr. Stevens about
4 door-to-door solicitation of any sort?
5    A.  No.  I sat through meetings where he
6 discussed that that's what they wanted us to do, but I
7 never had an individual discussion with him like I did
8 with Gail.  Kind of like he reported to Gail.
9    Q.  And did you raise to Gail during the team
10 meeting a question about "no solicitation" signs, or
11 was this in your conversation afterwards?
12    A.  It was during the team meeting.
13    Q.  So you're saying you -- you raised this in
14 front of everybody else?
15    A.  Yep.
16    Q.  What specifically did you raise?
17    A.  Very specifically I said that you're telling
18 us you want us to go uninvited door to door to 30 or 40
19 businesses a day and you understand that probably 90
20 percent of all businesses out there have "no
21 soliciting" signs.  So I said:  "What are we supposed
22 to do when there's a 'no soliciting' sign because I've
23 been asking Ryan for weeks to give me something in
24 writing and I haven't gotten a response to it yet?  So
25 what is it that you expect us to do when a customer

157

1 had -- has a 'no soliciting' sign."
2   Q.   So at this point in time you're asking the
3 question and what you're representing to Ms. Kodama is
4 that Ryan has not advised you what you're supposed to
5 do if there's a "no soliciting" sign?
6   A.   Right.
7   Q.   Okay.  He hasn't told you --
8   A.   That I have asked Ryan for guidance and I
9 have not gotten guidance.
10   Q.   Okay.  And so what does Ms. Kodama say in
11 response?
12   A.   Ignore the signs and proceed into the
13 building and solicit the business.
14   Q.   She say anything else, or -- or are those the
15 words she used?
16   A.   Those are the words she used.  And I said:
17 "You really want us to ignore a 'no soliciting' sign?"
18   Q.   And what did she say?
19   A.   She said yes.
20   Q.   Was there any further discussion?
21   A.   I believe that I said that that's the -- the
22 equivalent of trespassing or isn't that trespassing or
23 whatever.  And she was like just don't worry about it,
24 go in there and solicit the business.
25   Q.   Did she say anything else?

158

1   A.   Not at that point.
2   Q.   Was there any further discussion about what
3 to do if a business has a "no soliciting" sign?
4   A.   I believe that we did have additional
5 discussion because I think she concluded the team
6 meeting shortly thereafter because I think it irritated
7 her that I raised that issue in front of the other team
8 members.  So she dismissed the meeting, and I asked her
9 if I could speak to her privately, and she said yes.
10   Q.   So besides what you've told me during the
11 team meeting -- Or let me ask you this.  You've told me
12 everything you recall Ms. Kodama saying during the team
13 meeting about "no soliciting" signs?
14   A.   I don't -- That's all I recall at the moment.
15   Q.   And you're doing your best to recall?
16   A.   To the best of my recollection, yes, she was
17 talking about how they wanted us to make 30 or 40 sales
18 contacts a day -- There was more.  I asked her:  "So
19 you're telling -- you want us to go door to door
20 without the opportunity to contact these people and try
21 and make an appointment?"
22         And she said yes.
23         And I said:  "So I can't call
24 somebody, I can't e-mail somebody and first try and
25 make an appointment?"

159

1         And she said no.
2         And I said:  "Why not?"
3         And she said:  "We have an outbound
4 telemarketing group that that's all they do.  They make
5 outbound telemarketing calls.  We have an outbound
6 e-mail marketing group that that is all that they do.
7 They do the e-mail marketing.  Your job is not to try
8 and contact people by phone or by e-mail.  Your job is
9 to go call on them door to door unannounced and try and
10 get ahold of a decision maker."
11   Q.   Did she say anything else?
12   A.   I think that was it.
13   Q.   And this is all during the team meeting?
14   A.   I believe so.
15   Q.   And did you --
16   A.   And asking about the "no soliciting" signs
17 and her saying ignore the signs was definitely during
18 the team meeting.  And I think when I asked about phone
19 calls and e-mails that was during the team meeting as
20 well, but it might have been after the team meeting
21 when we had a private discussion.  But I don't recall
22 that for sure.
23   Q.   Did you make any notes of your conversation
24 with Ms. Kodama or what she was telling you during this
25 team meeting?

160

1   A.   Nothing other than like the e-mail that I
2 sent to Ryan.
3   Q.   You didn't make any handwritten notes or type
4 any notes while the meeting's going on or immediately
5 thereafter?
6   A.   No.
7   Q.   And I take it you didn't record the meeting
8 either --
9   A.   Wish I had.
10   Q.   -- using some sort of recording device?
11   A.   But no, I didn't.
12   Q.   So the answer is no?
13   A.   Correct.
14   Q.   And so what else -- You said that you had a
15 private one-on-one discussion with Ms. Kodama after the
16 team meeting, correct?
17   A.   Right.
18   Q.   And you're not sure about this discussion
19 about whether you can call or e-mail in advance
20 happened in a team meeting or this one-on-one meeting.
21 What else though did you discuss during the one-on-one
22 meeting?
23   A.   Several issues, one of which was the fact
24 that in my territory I only had 39 accounts.  And I
25 said that I had raised this issue on multiple occasions

161

1 with Carol Westmoreland, Bruce Boggs, Ryan Voigt, that
2 I wasn't getting any reply or response from anybody.
3 So I said, A, that makes it awfully difficult to try
4 and achieve any kind of metrics because I only have 39
5 accounts.  And she said she was going to look into it,
6 too, and I never got a response from her either.  And I
7 think that's mostly what I talked to her about
8 privately was --
9             Oh, and then I also talked to her
10 about how are we supposed to go doing this door-to-door
11 soliciting when rules of engagement say you're not
12 allowed to contact a company unless they're your
13 account and you've researched the account, you know
14 the -- that nobody else is talking to this account, you
15 know that they're not an existing customer, you know
16 that they're not government, you know that they're not
17 healthcare, you know that they're not educational, so
18 they can't be all these different things?  So I said
19 that's a conflict of -- of what you're telling us to
20 do.
21             And her -- her response to that was
22 something like, well, you know, there'll be -- you
23 know, those things will be changing, those rules of
24 engagement in time.  And so she had no specific
25 response as to how I should -- she had no answer for

162

1 the question that I was posing.  She listened, but that
2 was kind of it.
3    Q.  Did you raise any other issues besides that
4 you only had 39 accounts and then how you were going to
5 do door to door with being limited in terms of the
6 accounts you could call on?
7    A.  And the fact that I believe violating a "no
8 soliciting" sign was illegal.  No, I don't think
9 that -- that we discussed anything else.
10    Q.  So it's in the -- Was it in the one-on-one
11 meeting or the team meeting that you said you thought
12 violating a "no soliciting" sign was illegal?
13    A.  I believe that was in our one-on-one.
14    Q.  And what --
15    A.  When I posed the question what are we
16 supposed to do with a "no soliciting" sign, that was in
17 the team meeting.  But I didn't want to -- you know, I
18 didn't want to accuse her of doing something illegal in
19 front of the rest of the team.
20    Q.  But you did tell her that it was illegal in
21 your one-on-one conversation, if I'm understanding you
22 correctly?
23    A.  That I believed it was, yes.
24    Q.  And what did she say in response?
25    A.  She really didn't have a response to that.

163

1    Q.  She tell you she was going to do anything
2 with regard to all the different concerns you brought
3 to her attention?
4    A.  No.  She seemed kind of irritated.
5    Q.  How would you -- Why do you say she seemed
6 irritated?
7    A.  She listened to what I had to say and then
8 she was kind of like all right, good enough, I've got
9 stuff to do.
10             Like okay.
11    Q.  Did she tell you that if you didn't ignore
12 "no soliciting" signs you would be fired?
13    A.  She did not tell me at that point that if I
14 violated "no soliciting" signs I would be fired.  She
15 just said that whether or not they have "no soliciting"
16 signs we expect you to enter that building and call on
17 those people anyway.
18    Q.  So she said it was an expectation?
19    A.  She said that's what we expect you to do.
20    Q.  Okay.  But she didn't say anything about what
21 would happen if you didn't do it?
22    A.  Not at that point, no.
23    Q.  And you didn't have any other direct
24 conversation with Ms. Kodama afterwards?
25    A.  No, I don't think so.

164

1    Q.  And you didn't have any direct even e-mail
2 correspondence with Ms. Kodama afterwards?
3    A.  I don't believe so, no.
4    Q.  Okay.  Now, you ended up going on FMLA leave
5 in mid September 2016, correct?
6    A.  Correct.
7    Q.  So between August 24th and you going on FMLA
8 leave what businesses did you visit?
9    A.  I don't know.  You could probably go back and
10 check the company records.
11    Q.  But you can't recall which businesses you
12 visited during that time frame?
13    A.  No.
14    Q.  Do you know if you visited any businesses in
15 person during that time frame?
16    A.  Of course I did.  Yes.
17    Q.  So there -- I take it since you never
18 violated a solicitation -- a "no soliciting" sign there
19 were still businesses that you could visit?
20    A.  There were still businesses that I visited,
21 and I was continuing to make sales.  So yes.
22    Q.  And did you have -- After you spoke to Gail
23 Kodama did you have any conversation with Ryan Voigt
24 with regard to what you do with "no soliciting" signs?
25    A.  Well, other than the fact that I explained to

165

1him that Gail says it's fine to ignore no-solicit signs
2and that's what we're supposed to do and that I told
3Ryan I couldn't do that.
4   Q.   So I take it after you spoke to Gail you had
5a separate conversation with Ryan Voigt?
6   A.   Sure.  I -- I had lots of conversations with
7Ryan.  He was my manager.
8   Q.   But I'm talking about specifically after Gail
9spoke at the team meeting and you had a one-on-one
10conversation with her, did you have a conversation with
11Ryan Voigt that talked about what to do with "no
12soliciting" signs?
13   A.   Yeah, I believe we did.  And it was after
14that meeting with Gail that I believe Ryan said they
15want the 30 calls a day, the 30 door knocks a day and
16they're not F-ing around and they're going to fire you
17if you don't do it.
18   Q.   Is that something he said before Gail?
19   A.   No.  I believe that was after that situation.
20And I believe I continued to ask Ryan for something in
21writing from the company.  And, of course, I believe
22that the company knows full well that what they were
23doing was illegal and that's why they wouldn't put it
24in writing.
25   Q.   That's just your speculation though, right?

166

1   A.   That's correct.
2   Q.   Do you -- Do you even know what Ryan Voigt
3did to follow up on any of your conversations with him?
4   A.   Aside from seeing e-mails where I think he
5and Gail Kodama or maybe he raised the issue with
6Richard Stevens, Richard Stevens raised the issue with
7Gail Kodama, Gail Kodama raised the issue with other
8people, they raised the issue with the corporate
9attorney or whatever.  So just those e-mails that I've
10seen between those people.
11   Q.   So these are all e-mails you've seen as part
12of this litigation?
13   A.   That's correct.
14   Q.   You weren't privy to those e-mails prior to
15you resigning from Charter Communications?
16   A.   No, I was not.
17   Q.   You did send an e-mail to Mr. Voigt before
18you began your leave of absence, correct, that pertain
19to your objections to changes that were occurring
20because of the Charter merger?
21   A.   I believe so, yes.
22   Q.   I'm going to show you what I'm marking as
23Exhibit 9 and ask you if you recognize Exhibit 9.
24         (Deposition Exhibit No. 9 marked.)
25         THE WITNESS:  Yes.

167

1   Q.   (BY MS. REINHARD) Exhibit 9 is an e-mail that
2you -- or actually two e-mails that you sent to Ryan
3Voigt on September 19, 2016, correct?
4   A.   Correct.
5   Q.   And these are e-mails that you drafted
6yourself?
7   A.   Yes.
8   Q.   Okay.  And attach -- you attached to the
9e-mail your resume?
10   A.   Okay.
11   Q.   Is that correct?
12   A.   Yes.
13   Q.   And in your first e-mail to Ryan you indicate
14that there are issues that you want to bring to his
15attention, correct?
16   A.   Correct.
17   Q.   And in here, the first paragraph, you say
18that you're limited and constrained by various changes
19over the last several months, correct?
20   A.   Yes.
21   Q.   And then you say the first issue that you
22encountered was a limitation of 41 accounts that fit
23your business model under the new territory management
24initiative and rules of engagement.  That's what you
25reference first; is that correct?

168

1   A.   Yes.
2   Q.   And that you felt that your quota and KPI
3objectives were unrealistic?
4   A.   That's correct.
5   Q.   Okay.  And you indicate that you brought
6these concerns to the attention of Carol Westmoreland,
7Bruce Boggs, Ryan Voigt and Gail Kodama as well?
8   A.   Correct.
9   Q.   And that you had also raised this to HR
10personnel before?
11   A.   Correct.
12   Q.   We've gone over those conversations you've
13had with those individuals on that issue, correct?
14   A.   Yes.
15   Q.   Okay.  Then -- So that's the first paragraph.
16Then in the second paragraph you indicated that you
17were informed of Charter's new prospecting directive
18and this was enumerated by Richard Stevens and Gail
19Kodama and that you're expected to solicit 30 new
20business customers each day by physically cold calling
21on a door-to-door basis.  Now, had you had 300 business
22customers in your geographic territory, none of which
23had "no soliciting" signs, you wouldn't have an issue,
24would you, with cold calling, or did you still have an
25issue with doing that to begin with?

169

1   A.   No.  I mean, I could have cold called as
2 long -- if they didn't have "no soliciting" signs.
3   Q.   Are you saying that your only objection to
4 cold calling is the existence of "no soliciting" signs?
5   A.   Well, aside from the fact that in my
6 territory I had 41 accounts.  And the reason I keep
7 referring to 39 is two of those 41 accounts were
8 existing customers.  So they really -- weren't
9 supposed to -- Well, actually they were my keep
10 accounts.  So you were allowed to have two keep
11 accounts.  And they were existing customers that I had
12 started.  So aside from the fact that -- you know,
13 going door-to-door cold calling in an area that is
14 probably hundreds of square miles on 41 accounts
15 doesn't make any logical sense.
16        But let's say that I had three or 400
17 accounts.  Then the answer is yes.  You know, if it
18 were efficient, I would have no problem if I was going
19 to some type of place where there were "no soliciting"
20 signs -- did not have "no soliciting" signs, yes, then
21 I could have -- I would have stopped in and said hello,
22 you know, assuming that it's okay to do that.
23   Q.   So you did have an issue with doing cold
24 calling even if there wasn't a "no soliciting" sign,
25 correct?

170

1   A.   No.  What I just said was as long as they
2 didn't have a "no soliciting" sign -- If they have a
3 "no soliciting" sign, there's a reason not to walk
4 through their door.  If they don't have a "no
5 soliciting" sign and it's the neighboring business in a
6 strip mall or something like that, then I wouldn't have
7 a problem walking next door and saying "hi, I'm Jeff
8 with Time Warner Cable" unless -- So I guess the point
9 that I'm -- was trying to make to you is, according to
10 my rules of engagement, my rules of engagement state
11 that I'm not allowed to do that.  That's one of the
12 things that I was talking to Gail about privately is
13 how does any of this make sense.
14        And she didn't give me an answer
15 other than saying eventually the rules will change.  So
16 she didn't say "for now ignore the rules."  If you
17 ignore the rules, you get spanked.  So it's like.I'm --
18 I don't want to ignore the rules, but I can't do what
19 you're asking me to do based on the way the rules are
20 written.  So what do you want me to do?
21   Q.   When you say "you ignore the rules, you get
22 spanked," did you ever have that happen to you because
23 you ignored some rules of engagement?
24   A.   It caused a lot of friction, yes, where --
25 When I started out with Time Warner Cable, there were

171

1 no territories.  It was just kind of a free-for-all.
2   Q.   But you -- you used the word "you get
3 spanked"?
4   A.   Right.
5   Q.   What did you mean by that?
6   A.   You get chewed out by a manager, you --
7 there's -- creates a huge conflict when everybody's
8 fighting over who's right, who's wrong.  And it
9 typically boils down to --
10   Q.   Did you ever get any discipline for ignoring
11 rules of engagement?
12   A.   No, but there were certainly plenty of times
13 where there were conflict where, say, another
14 salesperson would complain and say that I contacted a
15 customer that they were already talking to.  "Well,
16 okay, where's the evidence that you were talking to
17 him?"  I -- I don't have any evidence of that.  So how
18 am I supposed to know I'm not supposed to talk to these
19 people.  So when it was an open free-for-all without
20 territories, it was a mess.  And that's why they have a
21 multitude of bogus accounts in their CRM system and
22 they can't -- it's caused tremendous problems for them.
23        MS. REINHARD:  Objection,
24 nonresponsive after "no."
25   Q.   (BY MS. REINHARD) Turning to your Exhibit 9,

172

1 again, besides raising the issue of cold calling on a
2 door-to-door basis, you also raised that you were
3 informed that after September 18th, 2016, that you
4 would no longer have the ability to sell Fiber DIA or
5 P2P Ethernet products?
6   A.   Right.
7   Q.   And that was something else that you had an
8 issue with, correct?
9   A.   Sure.
10   Q.   And, in fact, you had said later on in your
11 e-mail that you felt that that in and of itself was
12 counter to one of the primary reasons you accepted
13 employment with Time Warner Cable?
14   A.   Right.  Time Warner Cable pursued me as an
15 employee with the objective that I could sell fiber
16 optic products.
17   Q.   And so that was a real issue that you had is
18 that you were no longer going to be allowed to sell
19 fiber optic products?
20   A.   Right.  I was disappointed that I would not
21 be able to sell fiber optic products.  And Ryan was
22 telling -- And all of the team was disappointed that --
23 that this was an issue.  And that was an issue that was
24 frequently raised in team meetings.  And Ryan's
25 position and other managers were, "You know, don't get

177

1September 19th e-mail you say "perhaps there is another
2position I could fill that is more suited to my
3expertise and experience." And then you talk about
4your 30 plus years in sales, sales management,
5territory management, marketing and business
6development and you attach your resume. By this point
7in time September 19th did you apply for any other
8positions within the company?
9    A.  No, because I was trying to explore these
10issues with Ryan. I'd been talking to Ryan for quite
11sometime. I'd had a discussion with Gail. I never
12received a response in writing that I had requested. I
13was being pressured daily, weekly about this, you know,
14cold calling on 30 businesses a day without being able
15to contact them and just having to go to 30 different
16door knocks. And I'm incredibly frustrated because, A,
17I don't have enough accounts in my territory to do
18that; B, I'm not going to violate the law regardless
19of, you know, whether they tell me to go and do
20something illegal or not. I'm just -- You know,
21that's -- they want to do that, that's their business.
22But it's different when they ask me to do it. So I was
23very frustrated and I was searching for a different
24answer.
25            MS. REINHARD: Objection,

178

1nonresponsive after "no."
2    Q.  (BY MS. REINHARD) Did you even look into
3applying for any other position within the company
4at -- any time prior to September 19th, 2016?
5    A.  That's what I was doing with this e-mail.
6    Q.  Just saying perhaps there's another position
7I could fill?
8    A.  Right.
9    Q.  But you didn't actually go and look to see
10what positions were open and available, did you?
11    A.  No, I didn't.
12    Q.  And that was information that was available
13to you through Time Warner Cable's Channel You,
14correct?
15    A.  Maybe. I didn't go to Channel You.
16    Q.  You know what Channel You was, don't you?
17    A.  Kind of like Charter's internet site.
18    Q.  Kind of their intranet, internal company
19website?
20    A.  Intranet. Okay.
21    Q.  It's where they post policies, job positions,
22things of that nature?
23    A.  I guess. I never went on Channel You to see
24if they posted jobs there. I don't know. I don't know
25if they do that internally or if that's on their

179

1external site. I know that they advertised jobs
2externally on their internet site, but I don't know if
3they do it on their intranet site. Maybe they do.
4    Q.  Did you ever look -- Prior to September 19th,
52016 did you ever look to see if there were other
6positions for which you may be qualified that were
7posted externally with Time Warner Cable/Charter?
8    A.  No.
9    Q.  Now, had you yourself -- By September 19th,
102016, had you yourself looked into whether or not there
11was any legal violation if you ignored a "no
12soliciting" sign?
13    A.  State that again.
14    Q.  By September 19th, when you send this e-mail
15to Ryan, had you looked into whether or not if you
16ignored a "no soliciting" sign that would be a legal
17violation?
18    A.  If that was illegal. I assumed that it was
19illegal from my experience in the past, but I had asked
20Ryan and Charter Communications to provide me with that
21information. So I -- the extent of my research was by
22asking the company to tell me what was legal or not.
23    Q.  Understand that. But did you yourself do any
24research at least at this point in time?
25            MR. GOLDBERG: Object to the form of

180

1the question.
2            You may answer.
3            THE WITNESS: No. I just assumed
4that it was illegal.
5    Q.  (BY MS. REINHARD) And you didn't do anything
6to check into whether or not your assumption was
7correct or not?
8    A.  No. Like I said, I just assumed it was
9illegal.
10    Q.  Okay. If we go back to the front page of
11Exhibit 9, you indicate to Mr. Voigt that you were now
12taking an additional leave of absence. And you refer
13to some issues regarding with your mother, correct?
14    A.  Okay. Correct.
15    Q.  And so you were beginning, I take it, a leave
16of absence effective the next day?
17    A.  Correct.
18    Q.  And you were taking a leave of absence
19specifically in order to care for your mother, correct?
20    A.  My mother and my father, yes.
21    Q.  Are they still living?
22    A.  Yes.
23    Q.  And what specifically did you have to do in
24order to care for your mother and father?
25    A.  Well, the first few weeks there wasn't a lot

181

1 that I could do.  My mother was in the hospital, and
2 they didn't expect her to live.  And they performed
3 several procedures or surgeries or whatever they were
4 to try and stop internal bleeding, and they ultimately
5 were successful in doing that.  And then she was
6 transferred to a 24-hour care facility for three or
7 four weeks.  And my father is not in a condition where
8 he could drive.  So I would help him back and forth on
9 a daily basis to visit my mother.
10        And they were aging in place in a
11 home that -- that they had been in since 1972.  And
12 it's a four level, split home.  So my dad said we can't
13 continue to live here because it was not functional
14 anymore for my mother.  She was put on hospice care.
15 She was immobile.  She needed 24-hour assistance.  And
16 they needed money for that and they needed to get out
17 of that house and into an assisted living facility --
18        Is this still answering your question
19 or am I --
20    Q.  Do you remember what my question was?
21    A.  No.  What was it?
22        MR. GOLDBERG:  She asked about why
23 you were taking FMLA.
24        MS. REINHARD:  That's not --
25        THE WITNESS:  Oh.

182

1        MS. REINHARD:  -- what I asked, but
2 that's okay.
3        MR. GOLDBERG:  Well, if you want to
4 repeat the question, go ahead.
5    Q.  (BY MS. REINHARD) Let me ask you this.  You
6 stopped working with -- with Charter Communications
7 when you began your leave of absence; is that correct?
8    A.  I was told I had to, yes.
9    Q.  Okay.  So was there any reason for you to log
10 into Sales Force at any time during your leave of
11 absence?
12    A.  I logged into Sales Force several times to
13 check on transactions, check on accounts that I had
14 been working with.
15    Q.  And were you told that you should not be
16 doing that?
17    A.  I was never told specifically I should not
18 log into Sales Force.  I was told that I should not
19 be -- because I was continuing to work with customers
20 and that at some point I was advised that while I was
21 on FMLA leave I was not supposed to be pursuing sales.
22 And I don't remember how long after I went on FMLA
23 leave that Ryan informed me of that.
24    Q.  Did you have any -- any other contact with
25 Ryan after you started your FMLA leave during the month

183

1 of September of 2016?
2    A.  I know at some point Ryan -- I think I was
3 asking Ryan or talking to Ryan about -- about accounts.
4 I was still trying to make sales.  At some point Ryan
5 said stop doing that, you're not supposed to be, you
6 know, trying to make sales and -- and -- you know, when
7 you're on FMLA leave you're not supposed to be doing
8 your normal job functions.
9    Q.  And did you follow his direction?
10    A.  Yes.
11    Q.  Now, were you in Virginia the entire time
12 starting September 20th, 2016 until you indicated you
13 could return to work on December 12th, 2016?
14    A.  No.
15    Q.  When did you return or -- Yeah.  When did you
16 return to Texas during that time period between
17 September 19th and December 12th?
18    A.  Probably sometime in October.
19    Q.  Did you just return for a few days, or did
20 you return from Virginia permanently in October?
21    A.  No.  I returned permanently when I came back.
22    Q.  Do you remember when it was in October?
23    A.  Not specifically, no.
24    Q.  So you weren't back in Virginia doing
25 anything to care for your parents after you came back

184

1 to Texas in October of 2016?
2    A.  Well, I was -- No.  At that point I was
3 working with contractors, movers, estate salespeople,
4 real estate people.
5    Q.  That was in order to sell your parents' home
6 that you were talking about earlier?
7    A.  Correct.
8        MR. GOLDBERG:  When you get to a
9 stopping point, let me know.  I need to go to the
10 bathroom.
11    Q.  (BY MS. REINHARD) Did you have any contact
12 with anybody else with Time Warner Cable or Charter
13 between September 19, 2016 and December 12th, 2016?
14    A.  Several contacts with Jametra Shanks.
15    Q.  Anyone else besides Ms. Shanks?
16    A.  Whoever their FMLA -- Well, their FMLA
17 administrator I don't think is with Time Warner Cable.
18 I don't recall the name of that business.
19    Q.  Anyone else that you can recall?
20    A.  With Time Warner -- or with --
21    Q.  Or Charter.
22    A.  -- Charter?
23    Q.  Yes.
24    A.  I don't think so.
25    Q.  All right.  Then we'll go into the details of

185

1 that after we take a break.
2           (Break taken at 4:07 to 4:20 p.m.)
3           (Exhibit Nos. 10 and 11 marked.)
4      Q.  (BY MS. REINHARD) Mr. Fadness, we've come
5 back from a break.  Are you ready to proceed with your
6 deposition?
7      A.  Yes.
8      Q.  And did you have an opportunity to speak with
9 your attorney over the break should you have chosen to
10 do so?
11     A.  Yes.
12     Q.  And is there anything about your testimony
13 thus far that you need to change at this time?
14     A.  No.
15     Q.  Earlier when you were referencing that you
16 assumed it was illegal to ignore a "no soliciting"
17 sign -- when you say the word "illegal," do you mean
18 that just violates the law or that it also carries with
19 it criminal penalties?
20     A.  Well, I assuming -- I guess I assume when you
21 violate the law that means criminal violation.  What
22 other kind of violation is there?
23     Q.  So that's at least -- When you use the term
24 "illegal," that's what you mean?
25     A.  Right.

186

1      Q.  Okay.  Now, you also said before the break --
2 You talked about that you were being pressured daily
3 and weekly to make your numbers.  Did Ryan Voigt ever
4 tell you that if you didn't ignore "no soliciting"
5 signs you would be fired?
6      A.  What Ryan Voigt told me is that if I didn't
7 do what they were asking me to do, which was make 30 to
8 40 door-to-door sales calls a day, whether they had
9 soliciting signs or not -- that if I didn't do that I
10 would be fired.
11     Q.  Did he tell you though specifically that if
12 you didn't ignore "no soliciting" signs you would be
13 fired?
14           MR. GOLDBERG:  Object to the form of
15 the question.
16           You can answer.
17           THE WITNESS:  It was the context of
18 doing what they were telling me to do, which was go
19 door to door and it didn't make any difference if there
20 were "no soliciting" signs.  So I guess the answer
21 would be yes, if you consider it in that context.
22     Q.  (BY MS. REINHARD) Well, did Ryan Voigt ever
23 specifically talk to you about "no soliciting" signs
24 after Gail Kodama's visit?
25     A.  Ryan and I had a number of conversations

187

1 about "no soliciting" signs because I still wanted
2 something in writing from the company.
3      Q.  But did he ever say specifically if you don't
4 start going to businesses with "no soliciting" signs
5 you're going to be fired?
6      A.  He never said to me specifically that my only
7 job in life was to violate "no soliciting" signs.  What
8 he said was the company wants you to go door to door to
9 30 or 4 -- 40 locations.
10          And I would say:  "Well, I don't have
11 any places like that that I can go to.  The only places
12 like that that I do would be on the eastern part of
13 Austin where there are office buildings and they have
14 'no soliciting' signs."
15          And he said doesn't make any
16 difference, this is what they want you to do.  So if
17 that means -- No, Ryan never told me that your only job
18 is to violate "no soliciting" signs.
19     Q.  Did Ryan pressure you in any other way
20 besides meeting your numbers?
21     A.  You mean aside from saying that they were
22 going to fire me?
23     Q.  So you're saying he told you they were going
24 to fire you if you didn't meet your numbers, right?
25     A.  That if I did not do what they wanted us to

188

1 do.
2      Q.  But did he pressure you in any other way?
3      A.  Aside from saying that they would fire me,
4 no.
5      Q.  Aside from that?
6      A.  No.
7      Q.  Did --
8      A.  Aside from saying that they would get rid of
9 me or fire me or whatever.
10     Q.  Did he change your job responsibilities in
11 any other way?
12     A.  I don't know what you mean.
13     Q.  Well, were your job responsibilities as an
14 AE-II under Ryan Voigt the same as they were for other
15 account executives under Ryan Voigt?
16     A.  Yes.
17     Q.  And you don't think the fact that your
18 territory was changed -- that had nothing to do with
19 you raising any objections over "no soliciting" signs,
20 did it?
21     A.  Not sure I understand your question.
22     Q.  When you said that your territory changed and
23 you got 18 specific zip codes and you were given a
24 specific list of customers that you had to call upon,
25 that had nothing to do with you raising objections to

**189**

1 "no soliciting" signs, did it?
2   A.   I objected to calling on businesses with "no
3 soliciting" signs before that and after that.  So my
4 position on that never changed.  I don't understand
5 your question, but --
6   Q.   Do you think your --
7   A.   -- my position never changed.
8   Q.   Do you think your territory was changed
9 because you raised objections with regard to "no
10 soliciting" signs?
11   A.   No.  No, that had nothing to do with it.  Two
12 completely separate issues.
13   Q.   Now, in Exhibit 9 -- Do you have Exhibit 9
14 still in front of you?
15   A.   Yes, ma'am.
16   Q.   You didn't say anything in your e-mail to
17 Ryan that he told you you were going to be fired, did
18 you?
19   A.   Let me read it.  I'm sure I implied that
20 because that was the discussions we've been having.
21   Q.   Well, point me to where you indicated to Ryan
22 or reiterated to Ryan that he told you you were going
23 to be fired if you didn't start ignoring "no
24 soliciting" signs.
25   A.   "With all due respect, I cannot in good

**190**

1 conscious engage in prospecting tas -- tactics that
2 disregard the publicly posted policy and preference of
3 any business.  This is to me the equivalent of
4 continuing to e-mail a recipient that has selected the
5 opt-out or unsubscribe option or continuing to call on
6 a business that has registered the caller into the
7 do-not-call registry.  Furthermore, with respect to the
8 new structure that precludes sales personnel on the
9 cable operation side from selling fiber products,
10 that's counter to the primary reason that I" --
11         THE COURT REPORTER:  It's counter to
12 the primary reason?
13         THE WITNESS:  -- "primary reason I
14 accepted employment with TWC nearly three years ago" --
15   Q.   (BY MS. REINHARD) If you're going to read it,
16 you're going to need to slow down for the court
17 reporter.
18   A.   Oh, sorry.  So that was the discussion that
19 we were having.  So I don't -- it doesn't look in here
20 like I specifically say, you know, since you told me
21 here that I'm going to be fired if I don't do this.
22 But what I'm stating is that this is what I'm being
23 told that I have to do.  And Ryan did tell me that they
24 were going to fire you if you don't do it.
25   Q.   But you don't mention anything about Ryan

**191**

1 telling you that you're going to be fired in your
2 e-mail to him dated September 19th, correct?
3   A.   What I talk about is the requirement that he
4 has been stating that I have to perform and if I don't
5 that they'll fire me.  But it's not stated that way
6 specifically, correct.
7   Q.   During the time that you were on leave -- I
8 know earlier we talked about that you had applied for
9 employment with Niagara Bottling while you were out on
10 leave.  Did you apply for employment anywhere else
11 while you were on leave with Charter?
12   A.   Yes.  I sent my resume to a number of
13 different companies.
14   Q.   And do you remember specifically applying
15 with Sears in October of 2016?
16   A.   Yes.
17   Q.   Did you apply with anybody else in October of
18 2016 that you can recall specifically?
19   A.   No.
20         MR. GOLDBERG:  Here, I'll throw that
21 away for you.
22         MS. REINHARD:  Thank you.
23   Q.   (BY MS. REINHARD) And you said during your
24 leave of absence you had contacts with Jametra Shanks.
25 Who was Ms. Shanks?

**192**

1   A.   I think she was an HR person.
2   Q.   Had you met or spoken with her at any time
3 before you went on leave?
4   A.   No.
5   Q.   And did you actually have any phone
6 conversations with Ms. Shanks?
7   A.   Before I went on leave.
8   Q.   While you were on leave.
9   A.   I don't recall.  I know we had e-mail
10 exchanges, but I don't recall if we had phone
11 conversations.
12   Q.   Were your e-mail exchanges in reference to
13 your FMLA leave?
14   A.   Yes.
15   Q.   And Ms. Shanks was trying to assist you in
16 getting the FMLA administrator the information they
17 needed in order to review your request?
18   A.   I -- I don't -- I think the first time that I
19 heard from Jametra was a letter that was over-nighted
20 to my house and it was just kind of a blanket statement
21 that since my FMLA was not approved, they made the
22 determination that that was the same thing as job
23 abandonment -- Or she said that I didn't -- didn't
24 provide the required documents or something like that.
25         And so I responded with a letter

201

1 request?
2     A.  I hoped they would, yeah.
3     Q.  Do you know if Time Warner Cable or Charter
4 had a policy against moving people simply at their
5 request?
6     A.  No, I had no idea if they had a policy about
7 that.
8     Q.  I'm going to show you what's marked as
9 Exhibit 11.  And is Exhibit 11 the e-mail that you sent
10 to Ryan Voigt copying Jametra Shanks on November 27,
11 2016?
12     A.  Yes.
13     Q:  And in this e-mail you're writing -- This is,
14 in fact, the Sunday after the Thanksgiving holiday,
15 correct?
16     A.  Oh, November 27th, whenever Thanksgiving is I
17 guess.  Yeah.
18     Q.  And this is an e-mail you drafted on your
19 own, correct?
20     A.  Uh-huh.  Correct.
21     Q.  Nobody told you what to write, did they?
22     A.  No.
23     Q.  And in this e-mail -- And, in fact, you sent
24 it at 10:53 p.m., pretty late in the evening, correct?
25     A.  Yes.

202

1     Q.  And you indicate in here that you have an
2 antic -- you anticipate a potential return to work date
3 December 12th, 2016?
4     A.  Okay.
5     Q.  And how did you come up with that particular
6 date if you were no longer in Virginia assisting your
7 parents?
8         MR. GOLDBERG:  Object to the form of
9 the question.
10        You can answer the question.
11        THE WITNESS:  Well, whatever we were
12 in I had finally gotten my parent -- my parents -- They
13 were moved.  They were in a new location.  I had all of
14 the work contracted.  We had disposed of whatever
15 assets that we could get rid of, taken the rest to
16 Goodwill or the dump.  The work on the house that
17 realtors were saying had to be done was completed.  So
18 pretty much everything I could do at that point was
19 done.
20     Q.  (BY MS. REINHARD) Okay.  And then your next
21 line that you indicate -- you say "there are issues
22 remaining that need to be addressed regarding my
23 specific role and duties," correct?
24     A.  Right.
25     Q.  And you open up the next paragraph with the

203

1 sentence "if there is a requirement that my sales
2 prospecting activity is to be conducted primarily on a
3 door-to-door cold call, door knocking basis, I would
4 respectfully decline." Did I read that correctly?
5     A.  Yep.
6     Q.  You didn't mention anything in that sentence
7 about "no solicitation" signs, did you?
8     A.  Well, that's not a complete issue, but yes,
9 that's part of the message.
10     Q.  But you didn't say anything in that line
11 about no solicitation?
12     A.  No, no solicitation I think is in the
13 following sentence.
14     Q.  But in this sentence you just talk about that
15 you don't want to go door-to-door cold call door
16 knocking, period?
17     A.  Well, if you read the following sentence, it
18 specifically has to do with doing that at locations
19 that have "no soliciting" signage which in my view is
20 about 90 percent of the commercial locations in and
21 around Austin.
22     Q.  And how did you come up with that 90 percent?
23     A.  Because I haven't been to a single building,
24 a single office building in or around the City of
25 Austin that doesn't have "no soliciting" signs.  I

204

1 believe even Time Warner Cable's offices have a "no
2 soliciting" sign.  So the only place that you can find
3 no soliciting -- were -- where there isn't a "no
4 soliciting" sign is at some of the stores perhaps in a
5 strip mall, perhaps a standalone building somewhere
6 although even most of those individual standalone
7 buildings they have "no soliciting" signs as well.  So
8 that's how I assume that number.
9     Q.  Now, -- And you're basing that on your time
10 when?  Just during your time with Time Warner Cable or
11 your experience before then?
12     A.  No.  In my four years here in Austin.
13     Q.  Okay.  And then you also mentioned though
14 that you had an issue with the fact that you weren't
15 going to be selling fiber products anymore, correct?
16     A.  That was one of the issues that I also felt
17 was disappointing, but it wasn't a deal breaker.  But
18 sure.
19     Q.  You don't say that that's not a deal breaker
20 in this e-mail, do you?
21     A.  No.  The only thing that I said is a deal
22 breaker is "no soliciting" signs, soliciting at places
23 where there are "no soliciting" signs.
24     Q.  But you specifically mention in here also
25 that you don't want to do door-to-door cold call door

209

1   A.   That's a "yes."
2   Q.   Now, according to Exhibit 11, Ryan indicates
3 that he contacted you on the prior Friday proceeding
4 December 5th and that he wanted you to call him back.
5 Did you, in fact, call Mr. Voigt back?
6   A.   Yes.
7   Q.   And did you have a phone conversation with
8 Mr. Voigt as well as Ms. Shanks?
9   A.   I did.
10   Q.   And how long did this conversation last?
11   A.   I didn't time it.  But if I -- Half an hour,
12 45 minutes, an hour.  I'm not sure.
13   Q.   Now, did you ever record any of your
14 conversations with Mr. Voigt?
15   A.   No.
16   Q.   Did you ever record any conversations you had
17 with any Time Warner Cable or Charter Communications
18 management personnel?
19   A.   No.
20   Q.   Or HR personnel?
21   A.   No.
22   Q.   Did you take any notes during your phone call
23 with Mr. Voigt and Ms. Shanks?
24   A.   Aside from the letter that I wrote subsequent
25 to that call, that -- I didn't take notes while we were

210

1 talking.  But I do believe that they said the call was
2 being recorded.
3   Q.   They said the call was being recorded?
4   A.   I believe so.
5   Q.   Who said that?
6   A.   I believe Ryan Voigt said that the call was
7 being recorded, but it might have been Jametra.
8   Q.   Did he tell you why it was being recorded?
9   A.   No.
10   Q.   Did you tell him you had any objection to it
11 being recorded?
12   A.   No.
13   Q.   Did you ever try to verify whether or not
14 Mr. Voigt had -- or Ms. Shanks had recorded the phone
15 call?
16   A.   Not until, you know, months later during this
17 lawsuit.  I wanted to know.
18   Q.   Did he tell you -- Did he mention that or did
19 this mentioning of the phone call being recorded -- was
20 that at the outset of the phone call?
21   A.   Yes.  In the very beginning.
22   Q.   And describe for me this phone call as best
23 as you can recall.  Who speaks first or who's calling
24 who?  Let's start there.
25   A.   I think I called Ryan and then -- Well, I

211

1 don't recall whether I called Ryan or Ryan called me,
2 but then Ryan said:  "Okay.  I want to" -- he said:
3 "I'm going to hang up with you and I'm going to call
4 Jametra Shanks and get her on the phone and then we'll
5 call you back."
6        And I said okay.
7   Q.   And do you know if you were on your personal
8 cellphone or your work cellphone at this point in time?
9   A.   I don't recall.
10   Q.   And then -- So Ryan calls you back with
11 Jametra Shanks on the phone?
12   A.   Correct.
13   Q.   And describe for me what happens next in this
14 phone call.
15   A.   I believe that he said that the phone call
16 was being recorded.  And he said -- And actually before
17 that call was initiated with Jametra Shanks on the
18 line, when I called him to begin with and he said that
19 he would have to call me back, he said, "I'm going to
20 call you back with Jametra because Jametra had
21 researched the issue of calling on businesses with 'no
22 soliciting' signs and she has checked it out and
23 it's -- there's no problem doing that.  So I'm going to
24 get her on the line and we're going to call you back."
25 And I said okay.

212

1   Q.   Did Mr. Voigt say anything else that you can
2 recall in this first initial phone call before
3 Ms. Shanks is brought into the discussion?
4   A.   No.  His point was just to tell me that he
5 wanted to get Jametra Shanks on the line and why he
6 wanted her on the call, too, because she apparently had
7 information about no soliciting.
8   Q.   So he calls you back with Ms. Shanks.  And
9 what happens?  What is said?
10   A.   Right.  And then they said:  "We're just
11 calling you back to clarify the issues that you wanted
12 to clarify."
13        So I guess it was regarding my letter
14 of November 27th about the issue of "no soliciting."
15 And he said -- or Jametra said that it is their
16 position that there is no legal liability in calling on
17 businesses and buildings posting "no soliciting" signs.
18        And I said okay.  And so -- so I
19 said:  "That's your position?"
20        And they said:  "Yes, that is
21 Charter's position" -- Or I said that's Charter's
22 position, and they said yes, that is Charter's
23 position.
24        And I said:  "Okay.  So how does that
25 affect me?  Are you telling me that it is a requirement

213

1 for me on my return to work that I have to call door to
2 door uninvited on 30 to 40 businesses a day whether or
3 not they have no soliciting signs?"
4         And their answer to that was:  "Yes,
5 that is a new requirement.  Yes, it's a change."
6         So I -- I wanted to know, you know, I
7 had never had this requirement in the past and you're
8 telling me that this is a new requirement and that it
9 is a requirement of my employment.
10        And they said:  "Yes.  If you wish to
11 return to work, this is what you will be doing."
12        And I said:  "I disagree with your
13 position.  I don't believe that it's okay to list -- to
14 solicit door to door when there are 'no soliciting'
15 signs.  I believe that that's the equivalent of
16 trespassing."
17        So I wanted to confirm that that was
18 a requirement now, that it would be an ongoing
19 requirement.  The answer was yes.  I said:  "Okay.  I
20 can't do that.  Can you" --
21        Ryan had told me months earlier that
22 if I didn't want to do that -- This is going back quite
23 a bit earlier.
24   Q.  Is this something that you're saying on the
25 phone call or that you're now recollecting --

214

1   A.  Well, it relates to what we're talking to on
2 the phone call because sometime back Ryan had said if
3 you don't want to do this, we can find you a different
4 position because he told me -- For instance, he
5 referenced Tom Ancira.  He said just like Tom, you
6 know, they told him that they were, you know, demoting
7 him from -- or removing him from his position as sales
8 manager but they gave him an option to do something
9 else.  So he said:  "You know, I think you can probably
10 do that, too."
11        So I -- I was asking Ryan what about
12 the option that we talked about of me doing something
13 different because I can't -- I don't believe this about
14 the "no soliciting" stuff, I'm not going to do that and
15 what about moving me to a different position like we
16 had talked about months earlier.
17        And he said:  "No, that's not an
18 option at this point."  He said:  "The only option that
19 you have regarding a different position is if you leave
20 Time Warner Cable, then you can come back and reapply
21 for a job in a different position, but you can't
22 transfer to a different position.  You have to leave
23 the company and then you can come back and apply."
24        And so I said:  "Well, what are you
25 telling me?  Are you telling me -- what if I don't

215

1 agree to solicit door to door where there are "no
2 soliciting" signs?
3         And he said:  "Then you will be
4 terminated for" -- I'm trying to remember how he put
5 it.  Like essentially refusing to do the job because
6 that is the job.  So he said:  "If you refuse to do it,
7 we take that as your resignation or we will -- we will
8 take that as your resignation because you're refusing
9 to do the job."
10        So I said:  "If I don't do the job,
11 you're telling me you're going to fire me?"
12        And he said:  "Well, you can be
13 terminated for refusing to do the job or you can
14 resign.  But either way, if you refuse to do the job,
15 we're going to take that as your resignation."
16        And I also confirmed that, you know,
17 is there any chance that I can move into enterprise
18 sales where I can sell the fiber products.
19        And his answer was:  "No, there are
20 no -- you cannot sell fiber products, you cannot move
21 to enterprise sales, you cannot move to any other" -- I
22 would have considered any other position basically at
23 that point, but their position was you either agree to
24 do what we're telling you to do or you're terminated
25 and that can be either by refusing to do the job and we

216

1 terminate you or you can resign in lieu of being
2 terminated, but it doesn't make any difference.  If you
3 refuse to do the job, we will accept that as your
4 termination -- as your resignation.
5         And I said:  "Well, I won't agree to
6 solicit door to door."
7         And he said:  "Well, then you're
8 resigning."
9         And Jametra said:  "When do you want
10 your last effective day to be?  Do you want it to be
11 today or a week from now or whatever?"
12         And I think she suggested December
13 the 22nd, and I said okay.  And that was the end of the
14 conversation -- Well, that wasn't the end of the
15 conversation.  They said:  "We want you to send us a
16 letter stating that you're resigning."
17         And I said:  "I'll send you a letter
18 outlining our discussion."
19   Q.  Anything else you can recall from that
20 conversation other than what you've just described?
21   A.  Not specifically right now.
22   Q.  Did Ms. Shanks tell you during that
23 conversation that you could return from leave and apply
24 for other positions?
25   A.  No.  She specifically told me I was not able

221

1discussion that you had with Ms. Voigt -- or Mr. Voigt
2and Ms. Shanks, correct?
3    A.  Did I do what now?
4    Q.  You sent a follow-up e-mail to Ms. Voigt --
5or Mr. Voigt and Ms. Shanks about the phone call that
6you had with them on December 6th, 2016?
7    A.  Right.
8    Q.  And in it you were explaining the reasons why
9you were resigning your employment, correct?
10    A.  Correct.
11    Q.  Okay.  I'm going to show you what's marked as
12Exhibit 12.
13            (Deposition Exhibit No. 12 marked.)
14    Q.  (BY MS. REINHARD)  And tell me if you
15recognize Exhibit 12 as being a couple of different
16e-mails sent from you to Mr. Voigt.
17    A.  This is an e-mail on December 29th and
18December 7th.  So is the question do I recognize these?
19If that is, the answer is yes.
20    Q.  Okay.  The first page of Exhibit 12 is an
21e-mail that you sent to Ryan Voigt on December 29th,
22correct?
23    A.  Correct.
24    Q.  And it says on the subject line "forward" and
25then it says "Jeffrey Fadness, employment status" on

222

1the subject line, correct?
2    A.  Correct.
3    Q.  And that's because you were forwarding with
4that e-mail the prior e-mail you had sent on Thursday,
5December 8th, 2016, correct?
6    A.  Right.  Correct.
7    Q.  And the e-mail that you sent on December 8th,
82016, in the body of it you dated it December 7th?
9    A.  Okay.
10    Q.  Is that correct?
11    A.  Yes.
12    Q.  But you didn't send it in until 11:59 p.m. on
13December 8th; is that right?
14    A.  That's what it says.
15    Q.  Now, did -- is this a e-mail that you drafted
16by yourself?
17    A.  Yes.
18    Q.  And you chose all the words that were
19contained therein?
20    A.  I did.
21    Q.  You didn't have any assistance in drafting
22this e-mail?
23    A.  No.
24    Q.  You indicate in the opening line of the
25e-mail that you wanted to thank both Ryan and Jametra

223

1Shanks for taking the time to speak with you Tuesday
2evening, December 6th, correct?
3    A.  Okay.  Yes.
4    Q.  And so that indicates when this phone call
5occurred with Mr. Voigt and Ms. Shanks and yourself?
6    A.  Right.
7    Q.  And then you indicate that the purpose of
8your e-mail or the letter is to memorialize the details
9of our discussion and the conclusions reached.  Is that
10correct?
11    A.  Correct.
12    Q.  And you go through and you have clarification
13of new policy and procedures, a heading along those
14lines; is that correct?
15    A.  Yes.
16    Q.  And then you talk about changes that have
17been made after the acquisition of Time Warner Cable by
18Charter Communications, correct?
19    A.  Correct.
20    Q.  And the first one you list, No. 1, you raise
21again that you're no longer able to sell dedicated
22fiber optic or related services, correct?
23    A.  Correct.
24    Q.  And then No. 2, the first line you include is
25you state personnel employed in sales as AE-I or AE-II

224

1in the cable operation side of the business are now
2required to perform their primary function of
3prospecting for new business by way of in-field
4door-to-door cold call door knocking.  Did I read that
5correctly?
6    A.  Yes.
7    Q.  And you objected to doing in-field
8door-to-door cold call door knocking, correct?
9    A.  At places with "no soliciting" signs, sure.
10    Q.  Did you say anywhere in the Subparagraphs A,
11B or C that you were okay doing cold call door knocking
12as long as there wasn't a "no soliciting" sign?  I
13don't see that in there.  If you can point me to it.
14    A.  Well, we never focused on the issue of
15anything other than cold call door knocking at places
16that had "no soliciting" signs because at the time I
17didn't realize that there would be anything wrong with
18door knocking at places that didn't have "no
19soliciting" signs.
20    Q.  Well, you'll agree with me that since you put
21No. 1 -- you put fiber -- the issue you had with fiber
22optic or related services that that then was something
23that you discussed during your phone call with Ryan
24Voigt and Jametra Shanks?
25    A.  Right.

229

1 warning, you know, about before you continue to do what
2 you're doing because what you're doing can be illegal,
3 you know, trying to force somebody else to do something
4 illegal. So I wanted him to be aware of that to -- you
5 know, so he could protect himself.
6    Q. (BY MS. REINHARD) Okay. So you obviously had
7 some sort of contact with -- with Ryan Voigt after
8 December 6th and before December 29th when you actually
9 returned the equipment as indicated in Exhibit 12. Is
10 that right?
11    A. And that was the phone call that I described.
12    Q. Was it just one phone call that you had with
13 Mr. Voigt in that time frame?
14    A. I honestly don't recall if he sent me an E --
15 I'm sure if he sent me an e-mail he would have had a
16 record of it. So I'm assuming it was a phone call.
17    Q. Well, if he had sent you an e-mail, would you
18 have kept that e-mail as well?
19    A. Probably.
20    Q. And where would he -- Did he have your
21 personal e-mail to e-mail you?
22    A. Yes.
23    Q. When you say you probably would have kept it,
24 would there have been any reason for you not to?
25    A. No.

230

1    Q. And if you kept it, you would have given it
2 over to your attorney; is that correct?
3    A. Yes.
4    Q. And so it at least had been at least sometime
5 since you -- There were at least some occasions where
6 you had communications about returning the company
7 equipment you had which was the cellphone, the laptop
8 and the mobile hotspot, correct?
9    A. Right.
10    Q. Okay. And you don't recall who it was he
11 told you, said that he had just gotten a call that said
12 they might be filing a police report if you don't
13 return it?
14    A. Yeah. I think -- I -- I think he said the IT
15 department or something like that.
16    Q. So it wasn't Ryan threatening to file the
17 police report on you?
18    A. No. He said that the IT department or
19 something like that was -- was getting ready to contact
20 the police and file a stolen equipment report or
21 something like that.
22    Q. But you don't know that they ever did
23 anything like that, do you?
24    A. I don't know, no.
25    Q. And you returned the equipment. And

231

1 according to Exhibit 12, you returned it about 2:30
2 p.m. on December 29th, correct?
3    A. Correct.
4    Q. And then you said you sent Ryan a text,
5 didn't get a response, which is why you sent the first
6 e-mail that's included within Exhibit 12 at 3:54 p.m.,
7 correct?
8    A. Right.
9    Q. And then you say in this e-mail that also, as
10 you requested, I've enclosed for your review a few
11 examples of municipal ordinance codes. When did Ryan
12 request these from you?
13    A. When he called me and asked me about the
14 equipment -- Okay. So when he called me and asked me
15 about the equipment and said that they were -- it's --
16 it would be great if you can return right now because
17 they're getting ready to file a police report for
18 stolen equipment. And I was like: Okay. Well, I can
19 bring it up right now.
20       And -- And it was in that
21 conversation that I said: By the way, you know, before
22 you tell anybody else that they have to go, you know,
23 soliciting door to door at locations that have "no
24 soliciting" signs, you should be aware that
25 individual -- you know, that these cities have laws

232

1 against that, you know, that are stated very clearly.
2       So I wanted him to know that it was
3 illegal to do that. And, therefore, if you're asking
4 someone to do something illegal, you yourself are
5 committing an illegal act. And apparently --
6    Q. So you were voluntarily providing --
7       MR. GOLDBERG: Wait a minute. Excuse
8 me. Did you finish? You said --
9       THE WITNESS: I'm done. I'm done.
10       MR. GOLDBERG: Go ahead.
11    Q. (BY MS. REINHARD) So you were voluntarily
12 providing this information to Ryan in order, in your
13 mind, to ensure that he didn't get himself into trouble
14 as you said?
15    A. Right.
16    Q. Okay. Had you provided these ordinances that
17 you cite in Exhibit 12 to Ryan at any time prior to
18 then?
19    A. No.
20    Q. Had you provided specific ordinances to
21 anybody else besides Ryan at any time prior to December
22 29th, 2016?
23    A. I think it was right about that time -- Well,
24 I don't know. I'll just answer that by saying I don't
25 know.

1    Q.   Well, did you provide any ordinances or
2 citations to ordinances or references to ordinances to
3 anyone else within Charter Communications?
4    A.   No.
5    Q.   Why not?
6    A.   Because I wasn't even aware of cities having
7 their own specific laws regarding -- You know, I
8 assumed there was state law.  I wasn't even aware that
9 individual cities had their own laws guide -- you know,
10 that dealt with these issues.  I know now, after
11 looking into it, that, you know, 97 percent of the
12 municipalities regulate uninvited people going door to
13 door because it's a huge issue.
14    Q.   You know that post as part of this
15 litigation, in other words?
16    A.   I'm sorry?
17    Q.   You know that as part of this litigation?
18    A.   About the city ordinances?  Yes.
19    Q.   Correct.  So what prompted you to look at
20 city ordinances on or about December 29th, 2016?
21    A.   Well, I had filed for unemployment
22 compensation and the woman on the phone that I was
23 talking to said, well, if a -- if you -- even if you
24 resigned involuntarily, you know, that's not
25 necessarily a reason that you can collect unemployment

1 compensation.  So, you know, just because you think
2 that it's illegal.
3         So essentially she was saying, you
4 know, do you have proof.  And that's when I started
5 looking at -- You know, I didn't know how to find
6 proof.  I'd been asking Charter for this information
7 for months.  And -- And it's my belief that Charter
8 knows full well, since they operate in tens of
9 thousands of cities and have thousands of salespeople
10 deployed both residentially and in business, that
11 they're clearly aware of this, but they wouldn't give
12 me the information.
13         So when I started digging around it
14 was readily available on the internet.  And I sent this
15 to the lady at the unemployment commission, and she
16 said:  Then you have a case because that means they
17 fired you for -- for a wrongful cause and we'll send a
18 notice to them and ask them for their response.
19         And that was the last I heard of it.
20 But about a week later she said that my uninsurance --
21 or my request for uninsurance compensation was
22 approved.
23    Q.   And you, in fact, receive unemployment
24 benefits; is that correct?
25    A.   Yes.

1    Q.   Did you ever participate in a telephonic
2 hearing where somebody from Charter was present with
3 the Texas Workforce Commission?
4    A.   No.  At least not to my knowledge.
5    Q.   And in here you cite Bastrop, Texas.  Do you
6 know whether or not there is any criminal penalties
7 associated with the ordinance you cite from Bastrop,
8 Texas?
9    A.   I believe so.
10    Q.   Where does it say that within these
11 particular provisions that you cite in Exhibit 12?
12    A.   "It shall be unlawful for a peddler,
13 solicitor or vendor to conduct or attempt to conduct
14 activities at a place where a sign clearly indicates
15 that peddlers, solicitors or vendors are unwelcome."
16 So --
17    Q.   And the rest of it says?
18    A.   Says: "Complaint of a violation of this
19 pro -- pro -- prohibition -- prohibition -- prohibition
20 is grounds for revocation of a permit."
21    Q.   It doesn't mention anything about being a
22 particular type of criminal violation, does it?
23         MR. GOLDBERG:  Object to the form of
24 the question.
25         THE WITNESS:  It states that it's

1 unlawful.  I don't know what "unlawful" to you means,
2 but to me it means that it's a criminal violation.
3    Q.   (BY MS. REINHARD) Well, it says that the only
4 complaint of a violation is grounds for revocation of a
5 permit.  Did you ever raise needing a permit to anyone
6 with Charter Communications?
7    A.   At the time that I worked for Charter, no.  I
8 wasn't even aware at that time that permits were
9 required in almost every city in which they're
10 operating.
11         MR. GOLDBERG:  Let me know when
12 you're at a breaking point.
13    Q.   (BY MS. REINHARD) So when you had your own
14 business, did you look into laws against no
15 solicitation or -- or what to do if there's a "no
16 solicitation" sign?
17    A.   No, we never attempted to do business by
18 going uninvited door to door.
19    Q.   Most of your solicitation was by phone; is
20 that correct?
21    A.   Yes.
22    Q.   And that was true with your prior sales
23 positions even before owning your own business; is that
24 correct?
25    A.   Absolutely.  That's correct.

237

1   Q.   Now, have you -- you have since contacted
2 other cities with regard to their position on
3 door-to-door sales when there's a "no soliciting" sign;
4 is that correct?
5   A.   Yes.
6   Q.   Have you contacted any others besides the
7 City of Elgin and the City of Hutto?
8   A.   Yes.  I sent out, I think, 12 or 14 e-mails.
9 And I -- I'm assuming I know which ones that you're
10 talking about.  I'd have to look at it specifically.
11 But if it's the one like Elgin and Hutto, I think I
12 sent out 12 or 14 e-mails.
13   Q.   And have you re -- received responses from
14 anyone other than Elgin and Hutto?
15   A.   I think I received two other responses that
16 essentially said "here's a link to our ordinances"
17 which essentially say the same thing of Hutto and
18 Elgin.
19   Q.   Who were these two other responses from?
20   A.   Manor.
21   Q.   And who else?
22   A.   And I don't recall the other one.  And I
23 told --
24   Q.   And you've provided those e-mails to your
25 attorney?

238

1   A.   I believe I did, yeah.
2       MS. REINHARD:  We can take a break
3 here.
4       (Break taken at 5:42 to 5:49 p.m.)
5   Q.   (BY MS. REINHARD)  Mr. Fadness, we've returned
6 from a break.  Are you ready to proceed with your
7 deposition?
8   A.   Yes, ma'am.
9   Q.   And did you have an opportunity to visit with
10 your attorney over the break should you have chosen to
11 do so?
12   A.   I did.
13   Q.   And is there anything about your testimony
14 thus far that you need to change at this time?
15   A.   No.
16   Q.   All right.  A few clarification questions.
17 You didn't -- The conversations that you had with Ryan
18 Voigt, you didn't docum -- document them in terms of in
19 any handwritten notes or typewritten notes, did you?
20   A.   Aside from just a follow-up e-mail that I
21 would have sent him, no.
22   Q.   And you're not aware of anyone associated
23 with char -- Charter spreading any type of false rumors
24 about you since you left, are you?
25   A.   No.

239

1   Q.   And part of the reason that you resigned was
2 because one of the requirements that you were going to
3 face if you returned was that you could only sell
4 cable; is that right?
5   A.   No.
6   Q.   Isn't it true that part of the reason you
7 resigned was also because you were unhappy with your
8 territory assignments?
9   A.   No.
10   Q.   All that's not true even though those are
11 listed in your December 2016 e-mail to Ms. Shanks and
12 Mr. Voigt?
13   A.   No.  Those were certainly not issues that --
14 over which I would have risked my daughter's security.
15   Q.   And your daughter, does she receive any type
16 of governmental benefits?
17   A.   Yes.
18   Q.   What type of benefits does she receive?
19   A.   Since she was 16 or 17 she gets SSI.
20   Q.   Does she receive any type of support,
21 financial or otherwise, from her mother?
22   A.   No.
23   Q.   Or from any of her other siblings?
24   A.   No.
25   Q.   Now, during the time that you worked for

240

1 Charter Communications did you ever call the ethics
2 help line?
3   A.   Didn't know there was one.
4   Q.   Did you ever send anything online to an
5 ethics -- through an ethics online system with Time
6 Warner Cable?
7   A.   No.
8   Q.   Or Charter?
9   A.   No.  And if there's like an ethics thing, I
10 didn't even know there was one.
11   Q.   Did you ever try to look to see if there was
12 one?
13   A.   No, I don't believe so.
14   Q.   And did you try to contact anyone above Ryan
15 Voigt or Jametra Shanks after you spoke to them on
16 December 6th, 2016?  Did you try to contact anybody
17 that was higher than them?
18   A.   No.  I'd spoken with Gail Kodama, and she's a
19 senior vice president.  So I assumed that was about as
20 high as I could go.
21   Q.   Well, as your e-mail showed earlier, she was
22 a vice president, correct?
23   A.   Yeah.
24   Q.   And you only spoke to her on one occasion,
25 right?