# EXHIBIT 10

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3   JEFFREY FADNESS,              )
                  Plaintiff,       )
 4                                 )
                                   )
 5                                 )
                                   ) CIVIL ACTION NO.
 6   VS.                           ) 1:17-cv-00206-LY
                                   )
 7                                 )
                                   )
 8   CHARTER COMMUNICATIONS,       )
     INC.,                         )
 9                  Defendant      )

10   *********************************************************

11                    ORAL DEPOSITION OF

12                       RYAN VOIGT

13                    AUGUST 3, 2017

14   *********************************************************
```

15          ORAL DEPOSITION OF RYAN VOIGT, produced as a

16   witness at the instance of the Plaintiff, and duly

17   sworn, was taken in the above-styled and numbered cause

18   on August 3, 2017, from 9:57 a.m. to 1:19 p.m., before

19   Christi Sanford, CSR in and for the State of Texas,

20   Registered Professional Reporter and Certified Realtime

21   Reporter, reported by machine shorthand, at the offices

22   of Kim Tindall & Associates, 2550 South IH-35,

23   Suite 110, Austin, Texas, pursuant to the Federal Rules

24   of Civil Procedure and the provisions stated on the

25   record.

Page 2

```
 1              APPEARANCES
 2  For the Plaintiff:
 3      Jeffrey A. Goldberg
        The Law Office of Jeffrey A. Goldberg
 4      15303 Huebner Road, Building 13
        San Antonio, Texas 78248
 5      (210) 690-2200
        jeff@jeffreygoldberglaw.com
 6
    For the Defendant:
 7
        Brooke S. Waldrep
 8      Schmoyer Reinhard, LLP
        17806 IH-10 West, Suite 400
 9      San Antonio, Texas 78257
        (210) 447-8033
10      bwaldrep@sr-llp.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                INDEX
                                  PAGE
 2
    Appearances                    2
 3
    WITNESS: RYAN VOIGT
 4
        Examination by Mr. Goldberg.............  4
 5
    Signature and Changes.....................  126
 6  Reporter's Certificate....................  128
 7
                EXHIBITS
 8
    NUMBER    DESCRIPTION            PAGE
 9
    Exhibit 1   Ryan Voigt E-mails.............  50
10
    Exhibit 2   E-mail string, top one from
11              Ryan Voigt to Jeffrey Fadness,
                1/3/17.......................  102
12
    Exhibit 3   Performance Improvement/
13              Corrective Action Form........  103
14  Exhibit 4   Zip Codes (AE Sales Territories) 103
15  Exhibit 5   Additional Documents Maintained
                by Ryan Voigt.................  104
16
17
18
19
20
21
22
23
24
25
```

Page 4

1           RYAN VOIGT,
2    having been first duly sworn, testified as follows:
3               EXAMINATION
4 BY MR. GOLDBERG:
5    Q.   Would you state your name for the record and
6 spell your last name.
7    A.   Ryan Voigt, spelled V, as in Victor, -o-i-g-t.
8    Q.   Mr. Voigt, my name is Jeff Goldberg.  I
9 represent Mr. Jeff Fadness in a lawsuit against Charter
10 Communications, Inc.  We have never nor spoken before
11 today, have we?
12    A.   No.
13    Q.   Have you ever had your deposition taken before?
14    A.   No.
15    Q.   I'll be asking the questions.  You'll be
16 providing the answers.  And the court reporter takes
17 down all of the information that we talk about.  If you
18 do not hear my question or don't understand my question,
19 please ask me to rephrase it so that you hear it and
20 that you understand it.  Okay?
21    A.   Okay.
22    Q.   If you answer my question, I'll assume that you
23 heard it and understood it; is that fair?
24    A.   That's fair.
25    Q.   Please wait for me to finish my question before

Page 5

1 you give your answer because the court reporter is
2 taking down the information.  All right?
3    A.   Uh-huh.
4    Q.   Finally, please give me verbal responses to my
5 questions and not a nod of the head or any other gesture
6 because that is difficult to translate.  Okay?
7    A.   Understood.
8    Q.   All right.  Did you review any documents to
9 prepare for your deposition today?
10    A.   Yes, yesterday briefly.
11    Q.   Identify what documents you reviewed to prepare
12 for your deposition today.
13    A.   Just some e-mails that Jeff and I had gone back
14 and forth with.
15    Q.   Was anyone present when you reviewed those
16 e-mails?
17    A.   Yes, Brooke was.
18    Q.   Okay.  Ms. Waldrep, the attorney for the
19 company?
20    A.   Correct.
21    Q.   She's not your personal attorney, is she?
22    A.   No.
23    Q.   Was anyone else present when you reviewed these
24 e-mails --
25    A.   No.

Page 14

1    A.   Yes.  October 20th, 2001.
2    Q.   Very good.  And is that the only marriage
3 you've had?
4    A.   Yes.
5    Q.   Have you had any relatives that work for
6 Charter Communications or its predecessor, Time Warner?
7    A.   No.
8    Q.   What is your current position at Charter
9 Communications?
10   A.   Sales manager for cable operations.
11   Q.   How long have you had that position?
12   A.   For one year and eight months.
13   Q.   That would take us back to what month and year?
14   A.   December of -- it was either December or
15 January of 2015.  It was one of those.  I don't recall
16 the exact start date.  Is that right?
17   Q.   Well, I'm not real good at math, but I think
18 that takes us back to January of 2016, perhaps.
19   A.   Yes, 2016.  I apologize.
20   Q.   That's no problem.
21   A.   Yeah.
22   Q.   So in January of 2016, it was still Time Warner
23 Cable, right?
24   A.   Yes.
25   Q.   And around May or June of 2016 is when Charter

Page 15

1 acquired Time Warner?
2    A.   That's correct.
3    Q.   Okay.
4    A.   Yes.
5    Q.   So prior to January 2016, what was your title?
6    A.   Account executive.
7    Q.   How long were you an account executive with
8 Time Warner?
9    A.   From June -- from my initial start date up
10 until the point I became a manager.
11   Q.   So that would be from June -- excuse me,
12 July 30th, 2010?
13   A.   Uh-huh.
14   Q.   Is that correct?
15   A.   Correct.
16   Q.   Up until January 2016?
17   A.   Correct.
18   Q.   And as the sales manager of cable operations,
19 your current position and title, do you have a sales
20 staff that reports to you?
21   A.   Yes.
22   Q.   Can you identify for me who your sales staff
23 that currently reports to you?
24   A.   Do you want their names?
25   Q.   That would be very good, yes, sir.

Page 16

1    A.   Okay.  Caroline Guzman, Ron Doyle, Michael
2 Gates.
3    Q.   Gates or Yates?
4    A.   Gates with a G.  John Sigg.
5    Q.   How do you spell his last name?
6    A.   S-i-g-g.  Kathy Guerrero, Jose Rodriguez,
7 Steven Moore, Moore with an E.
8    Q.   So I count seven sales representatives that
9 currently report to you.
10   A.   That's correct.
11   Q.   And has Mr. Fadness been replaced?
12   A.   No, because I still have one opening on my
13 team.
14   Q.   Just for clarity, Mr. Fadness reported to you,
15 correct?
16   A.   Correct.
17   Q.   All right.  Since July of 2016, have there been
18 any changes in the salesforce that has reported to you?
19   A.   Yes.
20   Q.   Can you explain those for me?
21   A.   Yes.  Kathy Guerrero replaced a young lady by
22 the name of Meghan Franco.  Jose Rodriguez replaced
23 Frank Krafka.
24   Q.   How do you spell his last name?
25   A.   K-r-a-f-k-a.  And Ron Doyle replaced Miklynn

Page 17

1 Spencer.
2    Q.   How do you spell Miklynn?
3    A.   It's M-i-k-l-y-n-n.  And Spencer is her last
4 name.  And that's it.
5    Q.   Are you sure?
6    A.   Pretty sure.
7    Q.   Have there been any other changes in your
8 salesforce that reported to you since July 2016 where
9 the employee has not been replaced?
10   A.   Any changes?  What do you mean by that?
11   Q.   Let me be more specific.  Who's Summer Sturm?
12   A.   Yes, that's right.  Summer resigned.  She
13 resigned, I guess, in May.
14   Q.   May of what year?
15   A.   May of this year, 2017.
16   Q.   Did you just forget about her?
17   A.   I just forgot about her.  I did.
18   Q.   What was the nature of your relationship with
19 Ms. Sturm?
20   A.   I was her manager.
21   Q.   It was strictly professional?
22   A.   Strictly professional.
23   Q.   Why did she resign?
24   A.   She just wasn't performing and she was -- she
25 wasn't meeting the standard of performance.  And she

Ryan Voigt

August 03, 2017
Pages 26 to 29

Page 26

1    Q.   What were the expectations for AE1 and AE2
2  sales representatives on a daily and weekly basis?
3    A.   Sure.  We have many different avenues to obtain
4  revenue.  You have referral partners that you network
5  with.  You have field time that you go out.  You have
6  time on the phone that you call folks.  You have
7  follow-up time for customers that you ran appointments
8  with that you may follow up with.  And then you have
9  your daily appointments that you run face-to-face that
10  you've set.  Either the week before or sometimes that
11  week you'll set an appointment and run it that week.
12    Q.   Okay.  Were there expectations on going door to
13  door, cold calling, knocking on --
14    A.   Yeah.  That was a -- that's a component of what
15  we did on a daily basis.  You know, when you -- when you
16  first start at the company and you don't have any
17  business referred to you, how are you going to obtain
18  new business?  You're either going to cold call on the
19  phone or you're going to go out in the field and knock
20  on doors.  But that was -- it's always been a
21  recommended component of how to -- how to get new
22  business when you're training and trying to coach folks
23  on hitting their target.
24    Q.   And was that a criteria which you passed on to
25  your sales representatives?

Page 27

1    A.   Criteria being like --
2    Q.   Or your expectation.
3    A.   Yes, I'd say so.
4    Q.   And as regards to cold calls in the field,
5  knocking on doors, going door to door, did you have any
6  goals or expectations in that regard?
7    A.   Well, it was simply a numbers game, you know,
8  and it was really up to the rep to determine how many
9  doors they needed to knock on to obtain a new contract
10  or a new deal.  Of course, we set some standards for
11  them that they could either abide by or not abide by.
12  But, you know, it's my job to help coach, so I'm always
13  going to recommend, you know, that you get out in the
14  field and hit as many doors as you can if you don't have
15  appointments set or you don't have referral partners or
16  any sales in your pipeline whatsoever.  You know, you've
17  got to start somewhere.
18    Q.   So was the goal or expectation to obtain a new
19  contract or a new deal when they would knock door to
20  door?
21    A.   It happens all the time.  But, no, it wasn't
22  really a -- you know, we didn't expect everybody on a
23  daily basis to go out and get a contract.  Of course,
24  they take them with them, but it's not -- I guess it's
25  not -- you're not going to get in trouble if you don't,

Page 28

1  I guess, is what I'm trying to say or you're not going
2  to get put on plan for -- for not getting a sale out in
3  the field.  It's strictly a numbers-based standard of
4  performance.
5    Q.   Would that be the hope or expectation, though,
6  to get a sale by knocking on the door?
7    A.   Sure.  Yes.
8    Q.   Because the sales representatives would
9  actually take, you said, the contracts with them?
10    A.   Well, they -- we don't have contracts.  They
11  would take what they call a one call close sheet.  And
12  if the customer is interested, they would present a
13  service agreement at the time if the customer wanted to
14  purchase.
15    Q.   So the one call close sheet was in the AE1 or
16  AE2 sales representative's possession when they would go
17  knocking door to door?
18    A.   Some of them take them.  Some of them don't.
19  So I don't -- I don't know.  I'll leave it up to them.
20  Some of them are there strictly just to get a
21  decision-maker's name or set an appointment.  So I leave
22  it up to them whether or not they want to take a one
23  call close form with them or not.
24    Q.   Okay.  And so do you put on trainings for the
25  sales representatives as to how to do door knocking and

Page 29

1  prospecting?
2    A.   You mean do I go out in the field with them?
3  That's the training.  Yes.
4    Q.   Okay.
5    A.   Yes.
6    Q.   And so would you go around with the sales
7  representatives door to door, cold call knocking?
8    A.   Uh-huh.
9    Q.   Is that a yes?
10    A.   Yes.  Yes.
11    Q.   And what would you -- how would you train that
12  representative when you're going up to a building cold
13  calling to solicit business?
14    A.   We usually would go to a building that we have
15  current customers in.  We'd visit them, you know, let
16  them know who the new rep was because we were assigned
17  territory zip codes.  So they would introduce
18  themselves.  And then we would, you know, go to the next
19  door, introduce ourselves, drop off a business card, let
20  them know what services we had and if they were
21  interested to contact us.  Or if we're running an
22  appointment in a certain area, we would -- for that day,
23  we would go introduce ourselves to the surrounding
24  businesses after that appointment is complete.
25    Q.   Okay.  So the cold call door-to-door

Page 34

1  for you, including Mr. Fadness, would walk into a
2  building, their job was not to walk into an existing
3  customer, it was to call on new potential customers?
4      A.  Yes.  Uh-huh.
5      Q.  And is there anything else about the meeting
6  that you would have with the prospective new customer
7  that you would discuss or share that you haven't told me
8  about?
9      A.  No.
10     Q.  The one call close sheet that you reference, is
11 that something that you suggest or recommend that the
12 sales reps have on them in case there is a potential
13 close of a business transaction on a cold call?
14     A.  Yes.
15     Q.  So, I guess, do you tell them, Make sure you
16 have your one call close sheet before you go in here,
17 because you never know, this person may want to close
18 the deal?
19     A.  Actually, I don't.  I leave it up to them.
20 I --
21     Q.  So do you just tell the sales rep, By the way,
22 this one call close sheet is available if you want to
23 take it with you?
24     A.  Correct.
25     Q.  And do you explain to the sales reps in advance

Page 35

1  in your training of what the purpose of the one call
2  close sheet is and how to fill it out and what to do?
3      A.  Well, the process has changed several times.
4  So, no, I don't.
5      Q.  So the one call close sheet process has
6  changed?
7      A.  Yes.
8      Q.  Okay.  When did it change?
9      A.  About a month ago, approximately.
10     Q.  What happened?
11     A.  We were given tablets.  The sales reps were
12 given tablets, so they no longer need the forms.
13     Q.  Oh, I see.  It's electronic.
14     A.  Yeah.  They can sign the tablet right there.
15     Q.  I mean, we're here in Austin.  You'd think
16 they'd be electronic anyway, right?
17         So other than the change from the hard
18 copy one call close sheet to the now tablet, one call
19 close tablet, have there been any other changes in the
20 way that sales reps are to approach cold call new
21 business clients?
22     A.  No.
23     Q.  And that one call close tablet that they now --
24 do they actually carry around like a -- what do you call
25 it?  My wife has one.  The portable tablet, is that what

Page 36

1  they carry around with them?
2      A.  Yes.
3      Q.  In each appointment?
4      A.  Uh-huh.
5      Q.  Is that a yes?
6      A.  That's correct.
7      Q.  Okay.  And on that tablet, is there any other
8  client -- or, excuse me, product information or any
9  additional information that can be shared or disclosed
10 or discussed with the prospective new business?
11     A.  Not to my knowledge.  I don't have the tablet;
12 only the sales reps do.  But if a customer wants to sign
13 up, whether you're on an appointment or you're out in
14 the field, you can draw up an agreement right there and
15 they can sign it.
16     Q.  It makes it easier, I guess, for new cold call
17 business that's being solicited to sign up, right?
18         MS. WALDREP:  Objection, misstates the
19 testimony.
20     Q.  (BY MR. GOLDBERG)  Is that accurate?
21     A.  I mean, they can sign up right there, if they
22 want, that's correct.
23     Q.  And does the sales rep tell them that?
24     A.  Yes.
25     Q.  Is that part of the recommended approach?

Page 37

1      A.  No, because most of our business is obtained on
2  appointments that have been previously set.
3      Q.  Okay.  But appointments that have not been
4  previously set, that would not be the same as a cold
5  call, would it?
6      A.  Well, you may have set the appointment cold
7  calling, so there's --
8      Q.  Oh, okay.  But if you don't have a preset
9  appointment, then, otherwise, it's cold calling?
10     A.  It's -- yes.
11     Q.  Okay.
12     A.  That's correct.
13     Q.  Anything else about what is said or done during
14 that initial discussion with a prospective new
15 customer --
16     A.  No.
17     Q.  -- on a cold call?
18     A.  No.
19     Q.  And other than taking this tablet that the
20 sales reps have, do the sales reps take anything else
21 with them, other than maybe a business card?
22     A.  No.
23     Q.  Okay.  And when you go on these -- do you still
24 go on these training sessions with sales reps to
25 introduce them on how to do cold calling?

Ryan Voigt

Page 38

1    A.  Yes.
2    Q.  And do you critique them?
3    A.  Yes.
4    Q.  And as part of your critique, do you ever
5  suggest to them in this particular case you should have
6  asked for the close because the client or potential
7  client wanted more information and they wanted to sign
8  up or --
9    A.  No.  It's more of an information-gathering
10  process and ultimately trying to set an appointment.
11  You know, the odds of you obtaining the business are
12  better with a face-to-face appointment with the
13  decision-maker, because we don't -- you know, we're not
14  barging in or disrespecting anybody's time.  That's why
15  we ask for the appointment.  You know, you don't want to
16  put pressure on anybody.  It's a pretty casual process,
17  but I do critique them in asking the right questions.
18    Q.  Okay.  And was this -- the same process that
19  you've just described in terms of cold calling and what
20  the sales reps should do, is that what was expected
21  during 2016?
22    A.  Yes.
23    Q.  Did you notice any change in the goals or
24  expectations in terms of cold calling on customers after
25  Charter Communications merged with Time Warner?

Page 39

1    A.  No, I wouldn't say so.
2    Q.  What is a PSU?
3    A.  A PSU is one line of business, whether it be
4  internet, cable TV or telephone.
5    Q.  Do those initials stand for something?
6    A.  Yeah.  We're asked that all the time.  And all
7  I can think of is that the U stands for unit.  I don't
8  know what the PS stands for.
9    Q.  And can you tell me what the goals or
10  expectations are for AE1 and AE2 sales representatives
11  under your supervision, the expectations on how many
12  cold calls they should make in a day?
13    A.  Well, we recommend, you know, anywhere from 20
14  to 30.  And cold calls can be, you know, a door knock or
15  a phone call.  It's really up to the rep what they're
16  comfortable with, you know, on a daily basis, however
17  they feel they can obtain new business and hit their
18  number.
19    Q.  Okay.  And are there any other stated goals to
20  the sales representatives of the 30 cold calls, either
21  door knocking or telephone cold calling?
22    A.  It's just activity.  You know, we want to see
23  activity so that they succeed, whether that activity be
24  cold calling or attending networking events or going to
25  an install to potentially meet a third-party vendor that

Page 40

1  you can partner with and obtain new business.
2    Q.  Well, let me be more specific.  Are there any
3  PSU expectations on a daily basis?
4    A.  Well, if you -- if you do the math, you know,
5  you want to get two per day to hit your number in a
6  20-day selling month to get to 30 PSUs.
7    Q.  All right.  And in order to get a PSU, to get
8  two PSUs in a day if you're cold calling 30 or 40 new
9  businesses, to get two PSUs, is that per day, the
10  expectation?
11    A.  Well, if you -- if you want to get a deal every
12  day.  You know, you don't get one every day, but
13  sometimes you'll get six in one day and then you'll go
14  two days.  So the general rule of thumb, you know, you
15  would want to do two per day.  That's what we coach on.
16  And it's not a requirement, but that's what we would
17  coach on.
18    Q.  And when you say two PSUs, that's getting a
19  deal, right?
20    A.  Correct.
21    Q.  And when we say getting two deals a day, does
22  that mean cold calling and you get the deal that day?
23    A.  No.  You would get that deal, more than likely,
24  in your funnel, in your funnel tracker.
25    Q.  Okay.  And is it possible to get a PSU the same

Page 41

1  day that you make the cold call?
2    A.  It is, yes.
3    Q.  And are there any goals or expectations in that
4  regard?
5    A.  No.
6    Q.  Okay.  So as I understand it, are there
7  expectations or goals of two PSUs per day?
8    A.  There's not an expectation of it.  You don't
9  want to go two consecutive days without at least two
10  PSUs.  And, again, this is all to hit your number to get
11  you to 100 percent.  But there is no expectations due to
12  the standard of performance that we have.
13    Q.  And of the sales representatives that have been
14  replaced, were any of those terminated?
15    A.  No.
16    Q.  Did they all resign?
17    A.  Yes.
18    Q.  Meghan Franco, do you know where she is today?
19    A.  I don't.
20    Q.  And it's your testimony she resigned?
21    A.  Yes.
22    Q.  And when did she resign?
23    A.  Maybe February or March of this year.  I don't
24  remember the exact month.
25    Q.  Did she tell you she was resigning?

Page 66

1 that -- that it was a valid concern and that I would
2 look into it.
3    Q.   Okay.  If we then turn to Bates stamp 236 of
4 Exhibit 1.
5    A.   Okay.
6    Q.   This is an e-mail from you dated July 8th,
7 2016, the same day, at it looks like 6:08 p.m.
8    A.   6:08 p.m., yes.
9    Q.   And you responded to Mr. Fadness.  In the
10 second paragraph that you state, I understand your
11 concerns and they are valid, right?
12    A.   Yes.  I was referencing his concern.  That's
13 correct.
14    Q.   His concerns as discussed in his July 8th,
15 2016, e-mail to you, right?
16    A.   That's correct.
17    Q.   Okay.  So after you sent Mr. Fadness this
18 e-mail acknowledging his concerns and validating his
19 concerns and you, as a supervisor, wanted to act on
20 those concerns, tell me specifically what you did.
21    A.   Well, I did a number of things.  I don't recall
22 the order in which they were done.  But I reached out to
23 Richard to express Jeff's concern, and at that point
24 we -- I believe we got -- you know, eventually got human
25 resources involved.  I don't remember the time frame

Page 67

1 that that happened, but HR was definitely involved.
2    Q.   Okay.  And did you ever tell Mr. Fadness that
3 if the door knocking, cold calling was a concern, that
4 he could just make phone calls instead?
5    A.   I believe, yes, I did.  I believe at some point
6 I did say that.
7    Q.   At what point did you say that?
8    A.   I don't remember when that was.  I don't know
9 if it was, you know, before or after this.  I can't
10 recall.  But I -- but I did tell him due to the fact
11 that his territory was so vast and went all the way to
12 I-10, you know, it gave him the ability to still do his
13 job and made the decision, you know, to allow him to do
14 that while -- while we investigated his concern.
15    Q.   So let me make sure I understand what you've
16 just testified to.  You're saying that you advised
17 Mr. Fadness that he did not have to make door-to-door
18 cold calls?
19    A.   Well, he had -- he had asked -- from what I
20 recall, he had asked if he could make cold calls via the
21 phone.  And, of course, I'm going to say yes to that.
22    Q.   And did you tell him that he could do that
23 until these issues were investigated?
24    A.   I believe I would have said that.  I don't
25 recall exactly, but --

Page 68

1    Q.   All right.  And the issue to be investigated
2 was the ability of the sales representatives to make
3 cold calls on businesses that had no solicit signs?
4         MS. WALDREP:  Objection; misstates the
5 testimony.
6    Q.   (BY MR. GOLDBERG) Well, you tell me.  What was
7 the nature of the investigation?
8    A.   I think the -- the -- the issue, as a whole,
9 was rather not -- cold calling, door knocking, in
10 general, was not abiding by the law.  I didn't see it as
11 anything that had to do with a no solicitation sign
12 whatsoever.
13    Q.   So you didn't understand that Mr. Fadness was
14 concerned about cold calling businesses with no solicit
15 signs?
16    A.   That was one of two concerns.  The first
17 concern would be cold calling in general.
18    Q.   Okay.  So you understood Mr. Fadness' concerns
19 to be, number one, cold calling in general?
20    A.   Uh-huh.
21    Q.   Cold calling door-to-door?
22    A.   Correct.
23    Q.   And the second concern that you understood
24 Mr. Fadness to have was cold calling door-to-door
25 unsolicited, where there's a no solicit sign?

Page 69

1    A.   That is correct.
2    Q.   Okay.  So those were the two issues and
3 concerns that you felt Mr. Fadness had?
4    A.   That is correct.
5    Q.   And so to alleviate those concerns, it's your
6 testimony that you responded to Mr. Fadness' request to
7 make cold calls over the phone?
8    A.   That's correct.
9    Q.   And did you convey that in an e-mail to
10 Mr. Fadness?
11    A.   I don't recall.
12    Q.   Okay.  So that dealt with the cold call
13 door-to-door issue.  He could then call over the phone
14 as opposed to in person.  But then there was the
15 outstanding issue of cold calling door-to-door when
16 there's a no solicit sign, right?
17    A.   Correct.
18    Q.   So what was the resolution of -- or let me back
19 up.  Was there an investigation into that issue, as far
20 as you know?
21    A.   Yes.
22    Q.   What was the nature of the investigation?
23    A.   The nature of the investigation was to
24 determine if it was okay to, in fact, still go into a
25 business that had a no solicitation sign on it.  Other

Ryan Voigt

Page 94

1    Q.   And after that, if you turn over now to Bates
2  stamp 242, it appears you then respond to that e-mail
3  and you send an e-mail to Mr. Hennings and Ms. Shumway
4  saying, Thanks to all for your assistance.  I will call
5  Jametra, right?
6    A.   Uh-huh.
7    Q.   That's Bates stamp 242 at the bottom.
8    A.   That's correct.
9    Q.   All right.  So now -- did you find it?
10    A.   Uh-huh.
11    Q.   So that brings us up to December 2nd, 2016.
12  And you state that you're going to contact Jametra.
13  That's Ms. Shanks, right?
14    A.   That's correct.
15    Q.   And her position is what?
16    A.   Well, at this point if he doesn't want to be
17  here, I'm trying to figure out how to help accept his
18  resignation.  So I have turn to HR.  That is where
19  Jametra works, in HR.  And from what I can remember, her
20  position was that we need to either get a letter of
21  resignation, which I don't recall if one was ever sent
22  in an e-mail, or he has to do it over the phone.  And I
23  believe there wasn't one sent in an e-mail, which is why
24  we had to call over the phone and accept it that way.
25  That's -- that's really all I remember about that.

Page 95

1    Q.   So to set the table here, I understand a
2  conversation took place on December 6th, 2016, with you
3  on the phone?
4    A.   Uh-huh.
5    Q.   Mr. Fadness on the phone and who else?  Was it
6  Ms. Shanks on the phone or Ms. Kodama?
7    A.   I don't remember the exact day.  It was -- it
8  was probably Jametra, yes, Ms. Shanks, uh-huh.
9    Q.   All right.  So you're on the phone, Ms. Shanks
10  is on the phone and Mr. Fadness is on the phone?
11    A.   That's correct.
12    Q.   Before you made the call, did you review any
13  materials?  Did you talk to anybody?  Did you discuss
14  strategy on how you would approach the call?  Any
15  preliminary work done before you made the call?
16    A.   I don't think so, because it was just a call to
17  accept his resignation.  I don't -- I don't recall.  You
18  know, in my mind, I don't think there's anything to
19  prepare for, you know.  I don't write the policies.  I
20  just follow them.  And so I wouldn't have done any
21  preparation --
22    Q.   Okay.
23    A.   -- other than setting a date and time with
24  Jametra.
25    Q.   Tell me everything you recall being said during

Page 96

1  that conversation and who said it.
2    A.   I'm assuming at this point Jeff is back from
3  FMLA.  I don't recall exactly.  But our -- the phone
4  call went as follows, the best of my knowledge, was that
5  we addressed his concern about no soliciting and I had
6  mentioned to him or Jametra or myself -- I don't
7  remember who -- that, you know, door knocking is -- is
8  part of the day-to-day activity within Charter and it's
9  one of the components to doing your job.  You know,
10  we're not going to physically force anybody to do it,
11  but it is a component of the job.  And if you're not
12  willing to do that, then, you know, you're probably not
13  going to be successful, especially if you don't have
14  referral partners.  But that was what was said, and he
15  decided to -- to leave.
16    Q.   Okay.  And how do you recall in the discussion
17  that you say you addressed his concern regarding the no
18  soliciting?
19    A.   Well, I -- I believe that was the -- since he
20  went out on FMLA, I wasn't able to have any contact with
21  him whatsoever.  So anything that transpired while he
22  was out was relayed to him on this phone call, because
23  that was the first time he was allowed to even speak to
24  anybody being that he was on FMLA.  And so that's what
25  was relayed to him and that was pretty much -- you know,

Page 97

1  pretty much it.
2    Q.   Well, my question is:  How was his concern
3  addressed during that call about the no soliciting?
4    A.   I don't recall.  I probably told him what Ryan
5  Hennings had said, that, you know, you can go in, but if
6  you're asked to leave, you've got to leave.
7    Q.   Okay.
8    A.   That's really all I remember.
9    Q.   All right.  So after December 7th -- excuse me.
10  After December 6th, 2016, you have the conversation.
11  December 7th, 2016, you sent Ms. Shumway an e-mail at
12  the top of Bates stamp 242.
13    A.   Uh-huh.
14    Q.   It says, The call took place last night at
15  8:00 p.m.  Do you see that?
16    A.   Uh-huh.
17    Q.   So if that helps you refresh your recollection
18  it did, in fact, occur on December 6th, right?
19    A.   Okay.  Correct.
20    Q.   Okay.  So you were then expecting Mr. Fadness'
21  letter of resignation based on this e-mail, right?
22    A.   Okay.  Uh-huh.
23    Q.   So if we turn the page to Bates stamp 241,
24  bottom of the page, it appears you then sent Ms. Shanks
25  an e-mail on December 8th, 2016, saying that Mr. Fadness

Ryan Voigt

August 03, 2017
Pages 110 to 113

Page 110

1    Q.   Okay.  If you had placed Mr. Fadness on
2  documented counseling, where would that be?
3    A.   Human resources.
4    Q.   Would you have also kept it in your folder?
5    A.   I should have, yes.  It would have been in my
6  folder.  I just don't recall if I -- he was on my team
7  for a short period, so I don't recall if -- I don't
8  recall.
9    Q.   Okay.  So if we look down at the Description of
10  the Violation/Conduct/Performance, it gives a breakdown
11  of performance.  Do you see that?
12    A.   Yes.
13    Q.   And September has zero percent.  Do you see
14  that?
15    A.   Yes.
16    Q.   So what does that zero percent mean?
17    A.   That means zero percent of attainment.
18    Q.   Of sales or --
19    A.   Of sales, uh-huh.
20    Q.   Okay.  And if Mr. Fadness had returned to work,
21  would he have had the ability to improve his performance
22  and bring the numbers up?
23    A.   That's a great question.  I don't know the
24  answer to that.
25    Q.   Why not?

Page 111

1    A.   That would have to be determined by HR.  I
2  don't know what the policy is regarding coming back from
3  FMLA when you've already been on corrective action.
4    Q.   Well, this document was never issued to him,
5  was it?
6    A.   It must not have been, because if it was
7  signed, I would have it filed away with a signature.
8  And I believe he went out on FMLA prior to ever signing
9  this.
10    Q.   Okay.  And was there any -- to your knowledge,
11  was there any research done into the possibility of
12  finding Mr. Fadness another position while he was out on
13  FMLA?
14    A.   No, not while he was out on FMLA.  No.
15    Q.   There was no discussion of that, to your
16  recollection?
17    A.   No.
18    Q.   Okay.  Was there a discussion about moving him
19  after he returned from FMLA?
20    A.   No.
21    Q.   Were there positions available for which
22  Mr. Fadness could have transferred to?
23    A.   If there were, I believe he may have had
24  the opportunity to speak to those hiring managers if
25  there was a position open, but I don't -- I don't recall

Page 112

1  if there was or not.
2    Q.   Would you turn to Bates stamp 566?  And this is
3  part of his performance improvement plan.  It says,
4  Measurable/Tangible Improvement Goals and Expectations.
5  Do you see that?
6    A.   Yes.
7    Q.   And the Performance Criteria.  Do you see that?
8    A.   Uh-huh.
9    Q.   Is that correct?
10    A.   Yes.
11    Q.   And you filled this in, right?
12    A.   I believe so, yes.
13    Q.   And it says, Field Cold Calls per day: 30.
14  What does that mean?
15    A.   That means cold calls out in the field.
16    Q.   That means door knocking --
17    A.   Correct.
18    Q.   -- cold calling businesses, whether or not they
19  have no solicit signs or not, right?
20    A.   Correct.
21    Q.   Appointments per day, what does that mean?
22    A.   Attend two appointments per day.
23    Q.   All right.  And it says, Proposals per day: 3.
24  What does that mean?
25    A.   That's -- that's sending out three proposals

Page 113

1  per day, new proposals to new customers.
2    Q.   Okay.  And Closed per day: 2 PSUs and $125,
3  what does that mean?
4    A.   That's two PSUs.  It should say and/or.  And,
5  again, this document wasn't approved by HR, so it was
6  never delivered.  But the average RPU, which is average
7  revenue per unit, is $75, roughly, or 70, you know,
8  somewhere around there.  So it's either two PSUs or 125
9  in revenue of what that would equal to.
10    Q.   All right.  Did you go out on sales calls with
11  Mr. Fadness?
12    A.   No.
13    Q.   Did you offer to?
14    A.   We ran some appointments together.  I believe I
15  did.
16    Q.   Okay.  And do you ever recall having any
17  discussions with Mr. Fadness about how many accounts he
18  had in his territory?
19    A.   I do, yes.
20    Q.   What do you recall in that regard?
21    A.   I recall him saying that there was a lot of
22  current customers in his territory.
23    Q.   Do you recall Mr. Fadness more specifically
24  saying that he had about 40 prospective accounts in his
25  territory?