# EXHIBIT 13

```
          IN THE UNITED STATE DISTRICT COURT

        FOR THE WESTERN DISTRICT OF TEXAS

                  AUSTIN DIVISION



JEFFREY FADNESS,                )
                                )
          Plaintiff,            )
                                )
VS.                             ) No. 1:17-CV-00206-LY
                                )
CHARTER COMMUNICATIONS INC.,    )
                                )
          Defendant.            )
_____)




                 DEPOSITION OF GAIL KODAMA

                  LOS ANGELES, CALIFORNIA

                WEDNESDAY, AUGUST 2, 2017
```

REPORTED BY:
LINDA D. WHITE

CSR NUMBER 12009

Page 2

```
 1       DEPOSITION OF GAIL KODAMA, taken on
         behalf of Plaintiff, at 550 North
 2       Continental Boulevard, Suite 250,
         El Segundo, California, on
 3       Wednesday, August 2, 2017, at
         8:58 a.m., before Linda D. White,
 4       CSR Number 12009 pursuant to
         Notice.
 5
 6
 7
 8   APPEARANCE:
 9       FOR THE PLAINTIFF (Teleconference):
10       LAW OFFICES OF JEFFREY A. GOLDBERG
         BY:  JEFFREY A. GOLDBERG, ESQUIRE
11       15303 Huebner Road
         Building 13
12       San Antonio, Texas  78248
         210.690.2200
13       jeff@jeffreygoldberglaw.com
14
         FOR THE DEFENDANT:
15
         SCHMOYER REINHARD LLP
16       BY:  CHRISTINE E. REINHARD, ESQUIRE
         17806 IH 10 West
17       Suite 400
         San Antonio, Texas  78257
18       210.447.8033
         creinhard@sr-llp.com
19
20   ALSO PRESENT:
21       Jeffrey Fadness
22
23
24
25
```

Page 3

```
 1                I N D E X
 2   WITNESS            EXAMINATION         PAGE
 3   GAIL KODAMA        BY MR. GOLDBERG        4
 4
 5
 6            E X H I B I T S
 7
     PLAINTIFF EXHIBITS                      PAGE
 8
     Exhibit 1     Emails                      37
 9
     Exhibit 2     Email from Ryan Voigt Friday, 74
10                 July 6, 2016
11   Exhibit 3     Sales Rules of Engagement   75
```

Page 4

 1   EL SEGUNDO, CALIFORNIA WEDNESDAY, AUGUST 2, 2017
 2              8:58 A.M.
 3
 4              GAIL KODAMA,
 5       having been first duly sworn, was
 6       examined and testified as follows:
 7
 8              **EXAMINATION**
 9   BY MR. GOLDBERG:
10       Q.  Would you state your name for the record,
11   please.
12       **A.  Gail Kodama.**
13       Q.  Ms. Kodama, my name is Jeff Goldberg.  I
14   represent Mr. Fadness in a lawsuit against Charter
15   Communications.  Have you ever had your deposition taken
16   before?
17       **A.  Yes.**
18       Q.  Okay.  To refresh your recollection, I'll be
19   asking the questions and you'll be providing the answers
20   and the court reporter will be taking down all of the
21   information that we talk about.  And we are doing this
22   deposition over the telephone.  So it's very important
23   if you don't hear my question or don't understand it,
24   that you ask me to rephrase and repeat it so that you
25   hear it and understand it.  Okay?

Page 5

 1       **A.  Yes.  Thank you.**
 2       Q.  Also please wait for me to finish my question
 3   before you begin answering.  All right?
 4       **A.  Very good.**
 5       Q.  All right.  Did you review any documents to
 6   prepare for your deposition today?
 7       **A.  Yes.**
 8       Q.  Go ahead and identify those.  What did you
 9   review?
10       **A.  I reviewed emails, correspondence between**
11   **myself and the team that reports to me and human**
12   **resources.**
13       Q.  So emails, correspondence between you and your
14   team?
15       **A.  Correct, and the interrogatories.**
16       Q.  All right.  And before we get into the details
17   of what you reviewed, can you identify for me when you
18   last gave your deposition?
19       **A.  It's probably been about five years, six**
20   **years.**
21       Q.  And what was the nature of that case, if you
22   recall?
23       **A.  It was a municipal dispute.**
24       Q.  Between who?
25       **A.  Between Charter and one of the cities that are**

Page 6

1  in our footprint. I mean, it's public, so it's the City
2  of Glendale.
3     Q. All right. And were you a party to that or
4  just a witness in that case?
5     A. I would assume it would just be a witness.
6     Q. Okay. You were not named as one of the
7  parties in the lawsuit, were you?
8     A. No.
9     Q. And what was the general nature of what you
10 were called to testify for in your deposition, if you
11 recall?
12    A. It was in regards to ownership of our dark
13 fiber network and the meetings that I attended with the
14 City in representing Charter.
15    Q. Were you a corporate representative for the
16 company or merely a witness, if you know?
17    A. I don't know.
18    Q. Was that the one and only deposition that you
19 were involved in?
20    A. Based on my recollection, yes.
21    Q. Were you ever a party to a lawsuit where you
22 actually sued an individual or a company?
23    A. No.
24    Q. And where are you physically located today
25 while we're taking your deposition?

Page 7

1     A. El Segundo, California.
2     Q. What's the physical address that you're
3  located?
4     A. 550 Continental Boulevard in El Segundo. I
5  don't know the ZIP code.
6     Q. Pardon me?
7     A. I don't know the ZIP code.
8     Q. Oh. Is that office related to Charter
9  communications?
10    A. Yes.
11    Q. What's the relationship?
12    A. It's a region office.
13    Q. Okay. And what is your position with the
14 company?
15    A. Vice president of direct sales for the west
16 division.
17    Q. And what company do you work for?
18    A. Charter Communications.
19    Q. And how long have you been the vice president
20 of direct sales? Did you hear my question?
21    A. Yes, I'm counting. Sorry.
22    Q. Okay. I'm sorry. I thought you may have
23 answered and I didn't hear you. I beg your pardon.
24    A. No. I've been vice president since May of
25 2016.

Page 8

1     Q. When did you start working for Charter?
2     A. Approximately 12 and a half years ago.
3     Q. What's your date of birth?
4     A. October 15th, 1962.
5     Q. And prior to becoming the vice president of
6  direct sales, what was your position with Charter?
7     A. I was the senior director of sales.
8     Q. How long were you in that position?
9     A. Approximately five and a half years.
10    Q. What was your position prior to that?
11    A. Director of sales.
12    Q. How long were you in that position?
13    A. Approximately three.
14    Q. What was your position prior to that?
15    A. A regional sales manager.
16    Q. And what period of time were you a regional
17 sales manager?
18    A. Approximately two years.
19    Q. So I guess that takes us to the beginning of
20 your employment at Charter?
21    A. That is correct.
22    Q. And have you worked continuously with Charter
23 for the last 12 years?
24    A. Yes.
25    Q. Have you worked anywhere else in the last

Page 9

1  12 years?
2     A. No.
3     Q. And can you tell me, back to the documents
4  that you reviewed to prepare for your deposition, when
5  did you review those documents?
6     A. Yesterday.
7     Q. For how long?
8     A. Two and a half hours.
9     Q. Was anyone present when you reviewed those
10 documents?
11    A. Yes.
12    Q. Who?
13    A. Christine.
14    Q. Is that Ms. Reinhard you're referring to?
15    A. Correct.
16    Q. And she's the attorney for Charter, right?
17    A. Yes.
18    Q. She's not your personal attorney, is she?
19    A. No.
20    Q. All right. Was anyone else present when you
21 reviewed these documents for about two hours yesterday?
22    A. No.
23    Q. Did you review any of those documents today?
24    A. No, with the exception of the interrogatories.
25    Q. And other than the document that you reviewed

Page 22

1  I did have an impromptu meeting that
2  Ryan Voigt asked me if I could attend and I said yes.
3  So I did attend his sales meeting.
4      Q.  Okay.  And do you recall who may have been
5  present at Mr. Voigt's meeting that you attended?
6      A.  I believe it was the majority of his sales
7  team.  I don't -- I didn't take roll and I don't recall
8  everyone's name.
9      Q.  Do you recall Mr. Fadness being present?
10     A.  I recall the sales team.  I don't remember
11 people's faces, per se, but I do recall his team being
12 there.  So my assumption is that Mr. Fadness was there.
13     Q.  Okay.  Well, tell me everything you recall
14 being discussed at that meeting with Mr. Voigt's sales
15 staff in August of 2016.
16     A.  It was a reiteration of the welcome and also
17 the territory alignment regarding the B to B space.  And
18 then a Q and A.
19     Q.  Okay.  Now, the sales representatives that
20 were there, was it their job to go door-to-door to make
21 cold calls for new business?
22     A.  Correct.
23     Q.  And is it fair to say, was there any
24 expectation that a certain number of cold calls be made?
25     A.  I don't recall stating exactly 30 to 40, but

Page 23

1  that is our Charter standard, is that 30 to 40 door
2  knocks or cold calls to ask for the decision maker and
3  ask for an appointment.  That is our standard and that's
4  our mantra across the country.
5      Q.  Okay.  And do you recall there being an issue
6  brought up about making cold calls on businesses that
7  had no solicit signs or words to that effect?
8      A.  Not in that meeting.
9      Q.  At what point do you recall that issue being
10 brought up about making cold calls to businesses with no
11 solicit signs or words to that effect?
12     A.  Ryan's team meeting ended and Mr. Fadness
13 asked -- caught me in the hallway and asked me if I
14 could talk to him for 15 minutes.  And a few minutes --
15 it wasn't 15, a few minutes.  I said, "Sure."  I didn't
16 know in what regards he was going to have a conversation
17 so we went into the same room that we had the impromptu
18 meeting.
19     Q.  Tell me everything you recall discussing with
20 Mr. Fadness in that impromptu meeting in August 2016.
21     A.  He asked if cold calling was a requirement and
22 I said that -- I said, "Yes."  He also asked if he had
23 to walk through doors that stated no soliciting.  And I
24 stated "Yes, that would be an expectation.  And that
25 I've been doing this for over 20 years and we walk

Page 24

1  through.  And if they ask us to leave, we professionally
2  leave and thank them for their time."
3      Q.  Is that everything you recall telling
4  Mr. Fadness at that impromptu meeting in August 2016?
5      A.  No.  He also stated that his comfort level
6  with cold calling was not high.  I told him that we
7  would send Ryan Voigt out with him and a few of our top
8  sales reps and I would talk to Ryan about making sure
9  that occurred.
10     Q.  Do you recall anything else being said during
11 that impromptu meeting with Mr. Fadness in August of
12 2016?
13     A.  No.
14     Q.  Did Mr. Fadness tell you during that impromptu
15 meeting that he did not have a comfort level calling --
16 cold calling business that had no solicit signs in them?
17     A.  Yes.
18     Q.  And did you tell Mr. Fadness that it was
19 Charter's policy to ignore no solicit signs or words to
20 that effect?
21     A.  No.  It was my original statement that I
22 stated that, "We do walk through doors that say no
23 soliciting and we leave if they ask us to leave."  But
24 the consideration is not selling them on the spot, it is
25 asking for the decision maker and asking for an

Page 25

1  appointment.
2      Q.  And is that still Charter's policy today?
3      A.  I would not say that it's a policy.  It's a
4  recommendation and also standard protocol, but it
5  is not -- I would not necessarily call it policy.
6      Q.  Is that the expectation that you have for all
7  sales reps who work under your supervision that those
8  account executives are to walk through doors cold
9  calling even if they have a no solicit sign in the --
10 visible?
11     A.  I would -- yes, I would ask them.  The
12 expectation would be to walk through the door, ask for
13 an appointment, correct.
14     Q.  And did you tell Mr. Fadness anything else
15 about your expectations or Charter's expectation as it
16 related to cold calling or going through doors that had
17 no solicit signs in that impromptu meeting in
18 August 2016?
19     A.  No.
20     Q.  And how is it that you convey that expectation
21 to sales representatives to walk through doors of
22 businesses even if they have no solicit signs in them?
23     A.  ==That question has never been asked of me prior
24 to Mr. Fadness.==
25     Q.  Okay.  So after Mr. Fadness asked you that

Page 26

1    question and you expressed to Mr. Fadness Charter's
2    expectation -- your expectation that he walk through the
3    door regardless of whether there was a no solicit sign,
4    who, if anyone, did you follow up to confirm that was,
5    in effect, legal?
6       A.  Well, as far as -- I don't know the legal
7    ramifications, but I did go to human resources and that
8    is Ryan Hennings.
9       Q.  And is Ryan Hennings -- where is he located?
10      A.  In our San Diego office.
11      Q.  And where is Charter's home office?
12      A.  Stanford, Connecticut.
13      Q.  Okay.  So when you say you went to
14   Mr. Hennings, did you contact him by phone or see -- see
15   him in person?
16      A.  I believe it was by phone.
17      Q.  And was he the first person that you reached
18   out and spoke to either by email or by phone regarding
19   the issue of cold calling businesses with no solicit
20   signs?
21      A.  After receiving notice, correct, he was the
22   first person.
23      Q.  What do you mean "after receiving notice"?
24      A.  Well, after the conversation and the email
25   strings, I -- that's when it was confirmed by Ryan.

Page 27

1       Q.  Okay.  So I'm trying to go chronologically.
2    After you met with Mr. Fadness, did you get a follow-up
3    email from Mr. Fadness or Mr. Voigt or Mr. Stevens about
4    the issue of contacting or cold calling businesses with
5    no solicit signs?
6       A.  No, not immediately.  I believe I did call
7    Ryan shortly thereafter.  I don't believe it was the
8    same day.  I believe it was a few days later.
9       Q.  Okay.  So when the progression of things --
10   after you met with Mr. Fadness in August of 2016 in
11   Austin, you then subsequently reached out to
12   Mr. Ryan Hennings about the issue of cold calling
13   businesses with no solicit signs, right?
14      A.  Correct.
15      Q.  And that was before you received any emails
16   about the issue, right?
17      A.  I believe so.
18      Q.  All right.  Was your contact with Mr. Hennings
19   within several days of your meeting with Mr. Fadness?
20      A.  I believe so.
21      Q.  And tell me everything you recall discussing
22   with Mr. Hennings.
23      A.  I discussed everything that -- that was
24   related to the sidebar with Mr. Fadness as far as the
25   cold calling, as far as the coaching that could occur

Page 28

1    from the sales manager and top sales reps on how to walk
2    through the door and ask for the decision maker and ask
3    for the appointment.
4            And then I asked him to check with legal
5    regarding the no soliciting signs and if it was
6    acceptable to make that a request, to walk through doors
7    that say no soliciting.
8       Q.  Okay.  Have you now told me everything you
9    recall talking to Mr. Hennings about in that
10   conversation?
11      A.  I believe so, yes.
12      Q.  What did Mr. Hennings say, if anything?
13      A.  He was going to check with legal.
14      Q.  And had you spoken to anyone else about the
15   issue of cold calling businesses with no solicit signs
16   posted in them prior to speaking with Ryan and after
17   speaking to Mr. Fadness?
18      A.  I would have likely talked to Kristen Shumway
19   and potentially Richard Stevens.
20      Q.  Okay.  And did you have any email
21   correspondence with either Ms. Shumway or Mr. Stevens
22   prior to speaking to Mr. Hennings about the issue of
23   cold calling businesses with no solicit signs?
24      A.  I don't believe so.  I think I recapped the
25   conversation at some point and sent that to Ryan.

Page 29

1       Q.  All right.  After your phone call with
2    Mr. Hennings -- was it a phone call?
3       A.  I believe so.
4       Q.  And did you follow up the phone call with any
5    email immediately after, or soon thereafter, with an
6    email to Mr. Hennings about what you had spoken about?
7       A.  I do recall sending an email.  I don't know if
8    it was before or after.
9       Q.  Okay.  Who was the next person you recall
10   speaking to or getting email correspondence from
11   regarding the issue of cold calling businesses with no
12   solicit signs?
13      A.  Ryan Hennings.
14      Q.  Okay.  And what was the nature of that
15   communication and what was discussed?
16      A.  That legal had no issue.
17      Q.  Okay.  That's all he told you?
18      A.  Correct.
19      Q.  Then that's all you recall?
20      A.  Correct.
21      Q.  And that was in the form of an email or a
22   conversation?
23      A.  It could have been a conversation and an email
24   response.
25      Q.  In terms of emails, what did you do to gather

Page 42

1  recollection of this statement being said in the team
2  meeting.
3      Q.  All right.  Not necessarily in the team
4  meeting, but did you -- do you recall saying something
5  similar to Mr. Fadness in your impromptu meeting?
6      A.  As stated in my prior statement, that I would
7  expect that we would walk through the door, ask for the
8  decision maker and try to set an appointment.  And if
9  they ask us to leave, we would leave politely.
10     Q.  Okay.
11     A.  And professionally.
12     Q.  So -- and I apologize.  This may have been the
13 way I worded the question.  It may have been worded
14 poorly.
15         But did you tell Mr. Fadness or any team
16 member in your meetings in August of 2016 in Austin that
17 "We should simply ignore such signs and continue in our
18 prospecting activities"?  Did you make any statements
19 similar to that?
20     A.  No.
21     Q.  Okay.  And the last paragraph on email Bates
22 stamp 255, Mr. Fadness states in the middle of that
23 paragraph, "Perhaps there's another position I could
24 fill that's more suited to my expertise and experience."
25         Do you know if there was any effort to find

Page 43

1  Mr. Fadness another position within the company?
2      A.  No, I do not.
3      Q.  You did not make any efforts to look for
4  another position for him, did you?
5      A.  That is correct.
6      Q.  All right.  And so turning back to Page Bates
7  stamp 254, you received this email string on or about
8  September 19th, 2016; would that be fair?
9      A.  That would be fair.
10     Q.  And do you recall having any meetings with any
11 of the recipients of this email after you received it on
12 or about September 19th, 2016?
13     A.  I'd have to have a refreshment of the meeting
14 time frames, but I'm sure we had a discussion.
15     Q.  Okay.  What discussion do you recall having
16 and with whom and when?
17     A.  It may have been in regard via email and/or
18 with Richard and Kristen because they were really front
19 line to it.  I was not.
20     Q.  And when you say "frontline with it," what are
21 you talking about?
22     A.  Meaning they were in the market.  My visits
23 are periodic and they -- they're direct reports.  Most
24 of the dialogue happens with Richard and Kristen.
25     Q.  Okay.  So back to my question.  Do you recall

Page 44

1  having further conversations with either Richard or
2  Kristen regarding the contents of the September 19th,
3  2016 email?
4      A.  Conversation, no.
5      Q.  Email?
6      A.  I may have had email correspondence.  I'm not
7  sure.  I may have actually called Kristen to follow up
8  with human resources.  I'm not -- if anything, I called
9  Kristen for -- to have her follow up with Ryan.
10     Q.  Okay.  So after September 13th, you got -- you
11 sent an email to Mr. Stevens.  If you would turn now to
12 Bates stamp 277.
13     A.  (Witness complies.)  Yes, I'm on 277.
14     Q.  277, -78 and -79, do you have those pages?
15     A.  Yes, I do.
16     Q.  Okay.  Are these pages you reviewed to prepare
17 for your deposition today?
18     A.  I did review them.
19     Q.  Okay.  So just so I understand, if you go back
20 to 278 and 279, it looks like Mr. Ryan Voigt sent an
21 email to Mr. Stevens on September 16th.  That's Bates
22 stamp 278, right?
23     A.  Correct.
24     Q.  And it looks like Mr. Stevens then forwarded
25 that email string to you on September 16th, 2016,

Page 45

1  looking at the bottom of Bates stamp 277, right?
2      A.  That is correct.
3      Q.  Okay.  So you then sent an email that same
4  day, September 16th, 2016, to Mr. Hennings, right?
5      A.  That is correct.
6      Q.  Now, is this the first time that you had
7  raised the issue of no soliciting with Mr. Hennings?
8      A.  You know, I'm relatively sure, going back to
9  my original statement, that I had a verbal conversation.
10 As far as this email, I believe this is probably my
11 first -- anything in email, based on what we're
12 reflecting here on email.
13     Q.  I thought you had told me earlier in your
14 testimony that you had a verbal conversation with
15 Mr. Hennings and he followed up and told you what the
16 company was expecting in terms of calling on businesses
17 with no solicit signs was okay.
18     A.  He did.  And I don't know what the date was on
19 that unless you have a document here that gives us that
20 date.
21     Q.  Okay.  Was that before September 16th or
22 after?
23     A.  I don't recall unless it's in the body of the
24 string.
25     Q.  Let's look at Bates stamp 277, your email to

Page 58

1  tenured employee so he would have gone through
2  Time Warner's training. And in the tenure that he had,
3  I would not know that -- what.
4      Q.  You're familiar --
5          (Reporter requests clarification)
6      MR. GOLDBERG: I said, "You're familiar with
7  Charter's training, are you not?"
8      THE WITNESS: Yes.
9  BY MR. GOLDBERG:
10     Q.  And are there training classes for sales reps
11 on what to say and what to do when they walk through a
12 business's door?
13     A.  I believe that they have role play that's
14 associated with it that gives guidelines that are spoken
15 to in training and we'd have to check with training on
16 exactly what transpires there.
17     Q.  And what are those guidelines called?
18     A.  I would say that the guidelines are based on
19 the coaching that we give from a sales perspective. But
20 again, you have to check with training.
21     Q.  Okay. Well, let's -- if I'm going to ask
22 Charter or training for that material, what is it? How
23 do you instruct -- what do you instruct your sales
24 representatives to do when they walk through the
25 business's door? How would you phrase it? How would

Page 59

1  you ask for that information?
2      A.  I would ask the -- for the decision maker or
3  the owner or the manager and ask for the appointment.
4      Q.  No, no, no. I'm asking -- I'm trying to find
5  the training materials that provide the guidelines for
6  sales representatives in terms of what they're supposed
7  to say when they walk through the door. How would you
8  describe that information to request it?
9      A.  I would describe it as sales manager coaching.
10     Q.  And sales manager coaching, is that a
11 guideline or a form or a book or what is that?
12     MS. REINHARD: Are you asking if that's a document?
13     MR. GOLDBERG: Yes. Is that a document?
14     THE WITNESS: It is not a document.
15 BY MR. GOLDBERG:
16     Q.  Okay. Are there documents that exist that
17 you're aware of that provide guidelines or examples as
18 to what a sales representative should say and do when
19 they walk through the door of a business?
20     A.  No.
21     Q.  Okay. Well, what is an example of what a
22 salesperson should say when they walk through the
23 business's door?
24     A.  The typical account executive will walk
25 through the door. And typically, there's a receptionist

Page 60

1  or -- and we will ask for the owner or manager. And if
2  they're not available, we also identify ourselves. And
3  then we hand them a card and we ask them for the contact
4  information and/or an appointment.
5      Q.  Do they explain why they want the decision
6  maker?
7      A.  Yes, to discuss their voice and Internet
8  services.
9      Q.  For what purpose?
10     A.  Typically, for a consultation and quote.
11     Q.  So to discuss their voice and computer
12 service? I missed that last part.
13     A.  Data or Internet services.
14     Q.  And are any materials left at the business?
15     A.  It varies. We have promotional slicks which
16 we provide for the account executives and/or just a
17 business card.
18     Q.  So when you said "promotional flips"?
19     A.  Slicks.
20     Q.  I'm sorry. I didn't hear you.
21     A.  Slicks.
22     Q.  I didn't hear you. I'm sorry.
23     MS. REINHARD: I think it's S-L-I-C-K-S; is that
24 correct?
25     THE WITNESS: Correct.

Page 61

1      MR. GOLDBERG: Okay. Promotional flicks?
2      MS. REINHARD: Slicks, S-L.
3      MR. GOLDBERG: Right. That's what I said,
4  promotional flicks.
5      THE WITNESS: Slicks. Did you say S-L-I-C-K-S?
6      MR. GOLDBERG: I said F-L-I-K-S.
7      MS. REINHARD: Yeah, it's not an F, Jeff. It's an
8  S, as in Sam.
9  BY MR. GOLDBERG:
10     Q.  Okay. So the promotional materials that would
11 be left there, would the account executives be informed
12 to leave material?
13     A.  That's a choice of the coaching of the sales
14 manager and the account executive. There are different
15 philosophies in sales, so it's individual.
16     Q.  So have you ever -- in your role, in your
17 position at the sales meetings that you attend and in
18 charge of, would you ever role play or discuss what
19 sales reps should say when they enter into an office
20 building?
21     A.  I have sat in on role play, yes.
22     Q.  And would you offer comments or criticism to
23 what you observed?
24     A.  Yes.
25     Q.  And are there pillars? Are there certain

Page 62

1  things that should be said and done when a call is made,
2  when someone goes to the door uninvited to a business?
3     A.  I guess I'm not clear on the question because
4  there is -- most of what we do is cold calling and
5  walking through a door that is an existing public
6  business.  So we walk through that door.  Again, we ask
7  for the decision maker, the owner or general manager and
8  ask them for an appointment.
9     Q.  And you tell them the purpose for which you're
10 there, right?
11    A.  Yes, that we represent Spectrum Business and
12 that we would like to set an appointment to discuss a
13 consultation for a quote of their current services.
14    Q.  And their current -- would you explain what
15 the services were that Charter was selling?
16    A.  Phone, Internet and video services.
17    Q.  Right.  I'm asking would the sales rep make a
18 statement about what it is they were selling?
19       MS. REINHARD:  Objection.  Calls for speculation.
20 BY MR. GOLDBERG:
21    Q.  Would that be the expectation?
22    A.  The expectation to state that they are
23 representative of Spectrum Business?
24    Q.  Right.  Based on your duties and
25 responsibilities in the training and the people that you

Page 63

1  sat in and role play, is it the expectation of sales
2  reps when they walk through a business's door that they
3  explain they're there on behalf of Charter and that they
4  have services to sell?
5       MS. REINHARD:  Objection to the extent it misstates
6  the testimony.
7       THE WITNESS:  The statement is the fact that we
8  will give -- we are asking for an appointment for the
9  consultation and quote of services.
10 BY MR. GOLDBERG:
11    Q.  And what?
12    A.  And the quotation of services.
13    Q.  And the quote of services is what?
14    A.  Phone, Internet and video services.
15    Q.  Is any pricing left with the business?
16    A.  If they use a promotional slick, yes.  If
17 they -- if they decide to leave a quote, it's
18 potentially possible, yes.  And then there are others
19 that just ask for the appointment or -- and if the
20 decision maker is not there, the contact information and
21 no quote is left and no promotional slick.  And
22 sometimes, no card.
23    Q.  I'm sorry?
24    A.  And sometimes they don't even leave a business
25 card.  So it's really based upon an individual sales

Page 64

1  person.
2     Q.  So are you saying it's left up to the
3  individual sales representative's manager as to what
4  information should or should not be left at the
5  business?
6       MS. REINHARD:  Objection.  Misstates testimony.
7       THE WITNESS:  It is a conversation between the
8  manager and the account executive and recommendations
9  and coaching.  And at some point, yes, sometimes a
10 requirement.  But typically not.
11 BY MR. GOLDBERG:
12    Q.  So is the object when the sales rep goes
13 through the door to meet the decision maker to discuss
14 Charter's available services?
15    A.  The objective is to identify the decision
16 maker and ask for the appointment.  If it is that at the
17 same time, absolutely.
18    Q.  And if they can't meet at that point, then to
19 make an appointment to meet later; is that right?
20    A.  That would be correct.
21    Q.  Now as I also understand it, sales
22 representatives like Jeff Fadness, they were to do the
23 door-to-door soliciting, right?
24    A.  Yes, they were to go door-to-door to identify
25 decision makers and make appointments.

Page 65

1     Q.  And there are separate lines of business that
2  I guess that do email marketing or phone marketing,
3  right?
4     A.  Well, our account executive can send emails.
5  But if you're talk -- what are you referencing as far as
6  emails and materials?
7     Q.  What I'm referencing is that Mr. Fadness and
8  the other sales representatives like him were to go
9  door-to-door.
10       MS. REINHARD:  Objection.  Asked and answered.
11 BY MR. GOLDBERG:
12    Q.  Right?  I mean, that's what they were to do,
13 right?
14    A.  There's definitely more to it.  There is
15 correspondence via email.  There is phone follow-up.  It
16 would be impossible not to do follow-up.
17    Q.  Right.  But in order -- initiating the contact
18 as an account executive like Mr. Fadness, that
19 initiation of contact would be done door-to-door?
20    A.  There are multiple ways.  Our account
21 executives work today and worked at the time that
22 Mr. Fadness was employed.  So we have an agent referral
23 program where I can get a referral from, let's say, a
24 phone vendor.  And I may just talk to that prospect over
25 the phone and close it over the phone.  And I may have

```
 1                       ERRATA SHEET
 2
 3        IF ANY CORRECTIONS TO YOUR DEPOSITION ARE
 4   NECESSARY INDICATE THEM ON THIS SHEET, GIVING THE
 5   CHANGE, PAGE NUMBER, LINE NUMBER AND REASON FOR
 6   CHANGE.
 7                    lastnameinfo Requested.
 8   PAGE  LINE  FROM                    TO
 9    9    10   Cress  (Steve Cress)
10   REASON _____
11   ____  ____  _____
12   REASON _____
13   ____  ____  _____
14   REASON_____
15   ____  ____  _____
16   REASON_____
17   ____  ____  _____
18   REASON _____
19   ____  ____  _____
20   REASON _____
21   ____  ____  _____
22   REASON _____
23   ____  ____  _____
24   REASON _____
25   SIGNATURE OF DEPONENT             DATE
```

L. A. REPORTERS                                  (800) 675-9700

```
 1   STATE OF CALIFORNIA        )
                                ) ss
 2   COUNTY OF ORANGE           )

 3

 4           I, the witness herein, hereby certify, under
 5   penalty of perjury under the law of the State of
 6   California, that the foregoing is true and correct.

 7

 8           Executed this ___8th___ day of _September_
 9   2017, at __El Segundo__, California.

10
             _____
11   GAIL KODAMA
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```